FILED
DESOTO PARISH, LA
2020 JUN 26 PM 12: 35

| | |
|---|---|
| J & A OF LOUISIANA, LLC, LEONARD Q. "PETE" ABINGTON, AND CALVIN H. JONES | SUIT NO.: 81474 A |
| VERSUS | 42ND JUDICIAL DISTRICT COURT |
| ANDREW J. BRYANT, BRYANT ASSET ADVISORS, LLC, AND THE WELFONT GROUP, LLC | DESOTO PARISH, LOUISIANA |

## ORIGINAL PETITION

NOW INTO COURT, through undersigned counsel, come J & A of LOUISIANA, LLC, LEONARD Q. "PETE" ABINGTON, and CALVIN H. JONES, which respectfully aver as follows:

1.

Plaintiff herein is J & A of Louisiana, LLC, a Louisiana limited liability company having its principal place of business in Sabine Parish, Louisiana (hereinafter "J&A"), and having as its sole members—Leonard Q. "Pete" Abington and Calvin H. Jones—being both individuals of the full age of majority and residents of Sabine Parish.

2.

Also named Plaintiff herein is Leonard Q. ("Pete") Abington, an individual of the full age of majority, and resident of Sabine Parish, Louisiana.

3.

Also made and named Plaintiff herein is Calvin H. Jones, an individual of the full age of majority, and resident of Sabine Parish, Louisiana.

4.

Made Defendants herein are the following:

a. ANDREW J. BRYANT (hereinafter referred to as "Mr. Bryant"), an individual of the full age of majority and a domiciliary of Noblesville, Hamilton County, Indiana, who, for purposes of service of process, can be served at his place of business and employment, Bryant Asset Advisors, LLC, 11715 Fox Road, Suite 400-127, Indianapolis, Indiana 46236;

**EXHIBIT B**

b. BRYANT ASSET ADVISORS, LLC (hereinafter referred to as "Bryant Asset"), a limited liability company organized under the laws of the State of Indiana who can be served with service of process via its agent for service of process, Matthew R. Macaluso, 760 3rd Ave SW, Suite 210, Carmel, Indiana 46032; and,

c. THE WELFONT GROUP, LLC (hereinafter referred to as "Welfont"), a limited liability company organized under the laws of the State of Delaware, with such foreign LLC registered in the State of Florida, and having its principal place of business in Tampa, Hillsborough County, Florida, and which can be served with service of process through its agent for service of process both in Delaware and Florida at: (a)A Registered Agent, Inc., 8 The Green, Suite A, Dover, Delaware, 19901; and, (b) Registered Agents Inc., 3030 N. Rocky Point Drive, Suite 150A, Tampa, Florida 33607;

5.

This Court has venue over this action pursuant to Louisiana Code of Civil Procedure Article 74.

6.

Jurisdiction is proper as the sale took place in Desoto Parish, Louisiana, where the property at issue is located.

7.

J&A was the owner of the tract of real estate in DeSoto Parish, Louisiana consisting of 9.64 acres, more or less, located near Stonewall, Louisiana (the "Subject Tract").

8.

The Subject Tract was listed for sale by the prior owners for $1,059,300.00 but was subsequently re-surveyed and the listing price was reduced to $882,750.00 on February 7, 2015.

9.

On May 11, 2016, J&A purchased the Subject Tract for $337,400.00, which amount the principals of J&A believed was well below the actual value of the property.

10.

J&A purchased the property because of the price at which it was then available and because it was thought that real estate prices in North DeSoto Parish was subject to significant appreciation. Additionally, the area within which the property is located has been the source of significant natural gas production, which increased the speculative value of the Subject Property.

11.

In 2017, the Subject Tract was offered for sale and listed with Doug Abington of Sealy Real Estate of Shreveport, Louisiana. Doug Abington is the son of Leonard Q. Abington.

12.

In mid-2017, Sealy Real Estate was approached by Welfont with an expression of interest in purchasing the Subject Tract.

13.

After obtaining initial information about the Subject Tract, Welfont proposed a purchase of the Subject tract utilizing a structure that Welfont characterized as a "bargain sale" to a charitable organization—pursuant to Internal Revenue Code § 170—whereby the property can be sold for a very low purchase price and the seller can obtain a tax deduction for the amount of the difference between the appraised value of the property for purposes of the sale and the cash purchase price. This type of purchase/sale is commonly known in the industry as a "Bargain Sale" and is referred to as such herein.

14.

Welfont held itself out to have special expertise in Bargain Sales, about which J&A and their realtor, Doug Abington, were completely unfamiliar.

15.

Welfont suggested J&A confirm with its tax professionals that Bargain Sales are, in fact, permitted by the Internal Revenue Code, and that such transactions can be beneficial to sellers.

16.

Welfont further explained, and the parties understood, that the actual beneficiaries of the tax benefits resulting from such Bargain Sale would be the principals of J&A, Pete Abington and Calvin Jones.

17.

J&A, Pete Abington and Calvin Jones consulted their tax professional(s) and confirmed this information.

18.

Welfont advised Sealy Real Estate and J&A that, based on its experience, the Subject Tract would be appraised at or near the value of one million dollars ($1,000,000.00) and it compiled pro forma estimates of the net proceeds of the transaction to the Buyer and its members, after taxes.

19.

On or about August 11, 2017, a Letter of Intent was forwarded by Welfont, on behalf of its proposed purchaser, to Doug Abington at Sealy & Company, realtor for the Seller. The Letter of Intent is annexed hereto as **Exhibit "A"**.

20.

As set forth in the Exhibit "A" Letter of Intent, Welfont proposed a Bargain Sale, and contained an estimate of the tax benefits to the Seller, based upon an appraisal value of the Subject Property of just more than $1,000,000.00.

21.

The Exhibit "A" Letter of Intent provided, *inter alia*, that "Seller shall engage an appraiser to prepare an appraisal of the Property during the Inspection Period," that the appraisal would comply with Internal Revenue rules and regulations and that the appraisal would be provided to the Buyer within five days of Seller's receipt of same (Exhibit "A", at p. 2 ¶9).

22.

At or about the time the Letter of Intent was provided, Welfont also provided a one page "Offer," a one page "Comparison," a one page "Projected Cash Benefit," and a one page "Opinion of Value," all four pages of which are collectively annexed hereto as **Exhibit "B"**.

23.

As set forth more fully in the "Opinion of Value," the Welfont opinion valued the Subject Property at $1,052,000.00, using four comparable property values. (*See* Exhibit "B", at p. 4).

24.

However, the "Opinion of Value" contains a fine print, boilerplate "Disclaimer" stating that, "[t]his IRS Section 170 Bargain Sale Opinion of Value is not an actual appraisal, but simply the author's opinion of what this property may ultimately be appraised at for the purposes of valuing donated property as described in IRS Code Section 170 and IRS Publication 561. <u>The opinion is calculated in good faith based on information available on the internet and key real estate databases. The opinion author has not had the opportunity to actually inspect the property. Therefore, the opinion author has no way to verify or assure that all of the information submitted is completely accurate. If the seller is interested in the proposed transaction, the seller must obtain an actual qualified appraisal according to Section 170 of the Internal Revenue Code and IRS Publication 561.</u>" (Exhibit "B", at p. 4 (emphasis added)).

25.

The structure of the transaction as described by Welfont, and the after-tax benefits of the Bargain Sale, appeared beneficial to J&A, Pete Abington, and Calvin Jones, so J&A agreed to proceed with the appraisal and sale based on the representations made by Welfont.

26.

Welfont also advised that it represented a qualified charitable organization for purposes of the Bargain Sale and that Food Assistance, Inc. of Greensboro, North Carolina would purchase the property.

27.

On or about September 11, 2017, J&A and Food Assistance entered into a Real Estate Purchase Agreement, a copy of which is annexed hereto as **Exhibit "C"**. The form for the Real Estate Purchase Agreement was provided to Sealy Real Estate by Welfont, which drafted the form.

28.

As set forth more fully on Exhibit "C", the sale was conditioned upon the receipt of an appraisal of at least ninety percent (90%) of $1,053,000.00.

29.

Unlike the Letter of Intent, however, in the Real Estate Purchase Agreement, <u>Welfont</u> undertook to identify and engage the appraiser for the transaction. The Real Estate Purchase

Agreement provides that, "The Welfont Group, LLC shall coordinate and facilitate the Appraisal with an independent appraisal management company, or another qualified appraiser that complies with the requirements of Section 170 of the IRC, the Treasury Regulations and rulings and other pronouncements of the Internal Revenue Service (the '**IRS**')." (*See* Exhibit "C", at p. 2 ¶4(a) (emphasis in original)). Thus, Welfont undertook to provide the "actual qualified appraisal" referred to in its "Disclaimer" on its Opinion of Value (discussed in more detail *infra*).

30.

J&A now knows that on November 1, 2017, "Bryant Asset Advisors" entered into an Engagement Agreement to conduct a Bargain Sale Opinion of Value of the Subject Property, based on IRS Publication 561, all as set forth in **Exhibit "D"** annexed hereto, (*See* Exhibit "D," at pp. 60-61). For reasons that are not clear, Bryant Asset Advisors was engaged by Linda Scull on behalf of "Tax Appraisal Group" or "TAG", which shows an address of 701 Howard Avenue, Suite 106260, Tampa, Florida, which is near the offices of Welfont Group in Tampa, Florida.

31.

The Engagement Letter states, next to Linda Scull's signature "Appraisal Management Approval (per Purchase Agreement Section 4(A)" (Exhibit "D", at p. 60). J&A is informed and believes and hereby alleges that Linda Scull has or had an employment relationship with Welfont Group and was acting in concert with Welfont Group in connection with securing the Appraisal. J&A is also informed and believes and alleges that Welfont has engaged Bryant in other transactions.

32.

At no point prior to the sale did J&A nor Abington nor Jones communicate with Bryant Asset Advisors or Andrew J. Bryant. Nevertheless, at page 12 of the Appraisal, Bryant identifies J & A of Louisiana, LLC and its affiliates and assigns, as the "client" and "intended user" of the appraisal. (*See* Exhibit "D," at p. 12).

33.

At all times relevant hereto, Welfont, Bryant Asset Advisors and Andrew J. Bryant understood that the objective of J&A in entering into the subject sale was to enjoy the benefits of a bona fide Bargain Sale, compliant with all applicable Internal Revenue Service rules and

regulations pertaining to same, having been introduced to the concept and advised about its desirability and applicability by Welfont.

34.

As set forth more fully in the Exhibit "C" Agreement, all parties acknowledged that "the Seller's motivation is for charitable purposes." (Exhibit "C", at p. 2 ¶3).

35.

Food Assistance, Inc. has a website that reflects a charitable purpose, and the members of J&A believed DeSoto Parish would benefit by the presence of such an organization in that area of the State.

36.

Pursuant to the Exhibit "C" Agreement, Food Assistance was to pay $100,000.00 for the Subject Tract, an amount that was later reduced to $28,182.00. (*See* Exhibit "C", at p. 1; *and* "Addendum to Real Estate Purchase Agreement," annexed hereto as **Exhibit "E"**).

37.

During negotiations for the sale of the subject property, Food Assistance conditioned the purchase of the subject property on the inclusion of the mineral rights therein and thereunder.

38.

Defendant Andrew J. Bryant performed an appraisal of the Subject Tract dated November 20, 2017 providing an appraised value of one million one hundred fifty thousand dollars ($1,150,000.00), which was considerably higher than J&A's original asking price and an appraisal obtained a few years earlier by a local appraiser, but consistent with the value opinion submitted by Welfont. However, neither Welfont nor Bryant timely forwarded a copy of this appraisal to J&A or its principals, all as set forth below.

39.

J&A was assured that Andrew J. Bryant was well qualified in commercial appraisals throughout the country, was well familiar with Bargain Sales, and the accountants for J&A's principals assured them that charitable deductions for qualifying Bargain Sales were quite lawful and beneficial to the charitable organizations which participate therein.

40.

At some point in November 2017, Welfont indicated to Sealy Real Estate that the appraisal would, in fact, reflect an appraised value in excess of $1,000,000.00 in order to fulfill that condition of the sale, and the parties began preparing for a Closing. Doug Abington of Sealy Real Estate conveyed this information to J&A.

41.

Closing documents were drafted, with a majority of such documents drafted and exchanged between Welfont and Sealy Real Estate on or about November 30, 2017.

42.

On December 5, 2017 by 12:58 PM, the purchase price for the sale had been funded and all closing documents were signed. However, the actual appraisal from Andrew J. Bryant, dated November 20, 2017 still remained in the possession of Welfont.

43.

Finally, at 1:32 PM on December 5, 2017 Savannah Audino of Welfont Group forwarded the actual appraisal, which Welfont called (and labeled) the "Final Appraisal", to Doug Abington at Sealy Real Estate, permitting the disbursal of funds and final closing within minutes thereafter. The appraisal was placed in Sealy Real Estate's files. This "Final Appraisal" was sent by Welfont to J&A by overnight mail on December 5, 2017, with the result that neither J&A, Pete Abington nor Calvin Jones had access to the Appraisal (either final or otherwise) until after the sale closed.

44.

J&A sold the Subject Tract to Food Assistance, Inc. as reflected in the Cash Sale Deed, was executed on or about December 4, 2017 and recorded in DeSoto Parish on or about December 8, 2017. The Cash Sale Deed, as recorded, is annexed hereto as **Exhibit "F"**.

45.

Shortly after the consummation of the subject transactions set forth above, Food Assistance, Inc. sent the principals of J&A plaques, thanking them for their charitable assistance to that organization.

46.

At closing, despite never having communicated or signed a written contract with Bryant Asset Advisors, Linda Scull or TAG—or seen the actual "Final Appraisal"— the closing documents reflect that J&A paid for the appraisal and, for reasons completely unknown to J&A, also paid $1,000.00 to TAG/Linda Scull. (*See* Closing Statement, annexed hereto as **Exhibit "G"**).

47.

As another condition of sale, J&A had to pay off the remainder of the mortgage loan on the property, which at the time of closing was $139,713.30. *See* Exhibit "G".

48.

After the sale, Pete Abington and Calvin Jones took tax deductions based upon the difference between the cash purchase price of $28,182.00 and the appraised value of $1,150,000.00.

49.

Following the sale, J&A noted that no one took occupancy of the Subject Tract. Instead, and unbeknownst to J&A, six months later, Food Assistance had "flipped" the Subject Tract to Deborah Dowden Dees for the cash purchase price of $210,000.00.

50.

On or about November 5, 2019, Messrs. Abington and Jones, through their CPAs, received a communication from the IRS that pursuant to an audit, the deductions for the sale were being disallowed because the "appraised value has been unrealistically and grossly understated." As a result, the deductions of Messrs. Abington and Jones for the difference between the appraised fair market value and their basis was completely disallowed", and substantial penalties have been assessed to them. As a result, J&A has been deprived of all or virtually all of the sale price for the subject property and is left to pay penalties and interest.

51.

The IRS audit noted that the actual appraisal was facially deficient by improperly using urban property comparables in Shreveport, Louisiana and was the product of data obtained on the internet, not a physical inspection. J&A and its members were unaware of the deficiencies in the Appraisal until the IRS pointed them out in November 2019.

52.

Upon receipt of information from the Internal Revenue Service, J&A examined the subject appraisal, which had been withheld by Welfont until the final moments of the closing, and which was not actually *received* by J&A until after closing.

53.

When the IRS sought information from J&A and Bryant regarding the Appraisal, J&A, through its accountants repeatedly sought to obtain cooperation from Bryant, but despite representations that he would, in fact, cooperate, Bryant failed to provide the information requested. Finally, on the day of the final conference call with the IRS, Andrew J. Bryant responded by email, a copy of which is annexed hereto as **Exhibit "H."** As set forth in Exhibit "H," Bryant declined to assist and directed J&A to Welfont.

54.

A close examination of the Appraisal reveals that appraiser used as "comparable" tracts for land valuations, the sales of three urban tracts of land located in Shreveport (not Stonewall, Louisiana) with each such site located across the highway from some of the busiest shopping locales in Shreveport. J&A is now informed that use of these "comparable" tracts as a basis for the appraisal is unrealistic, professionally irresponsible and inappropriate, and results in a much higher appraisal value than justified.

55.

A close examination and comparison of the Appraisal and the "Opinion of Value" reflects that the appraiser utilized one or more comparables previously chosen by Welfont in its Opinion. (*Compare* Exhibit "B", at p. 4 *with* Exhibit "D", at pp. 48-50).

56.

A close examination of the appraisal also reflects that Bryant was not licensed as an appraiser with the State of Louisiana and was required to secure a temporary license in order to conduct the subject appraisal—which did not occur until three (3) days before the date of the Appraisal—, strongly suggesting that Bryant is similarly unfamiliar with real estate markets and prices in Northwest Louisiana. (*See* Exhibit "D", at p. 59).

57.

A close examination of the Appraisal reflects that the subject appraisal was conducted without the appraiser ever having set foot in the state of Louisiana let alone perform a physical inspection of the property, and that, instead, the analysis was based on Google Maps and similar information available on the internet. (*See* Exhibit "D," at p. 12).

58.

As a result of the foregoing, including the lack of personal inspection of the property and reliance on information available on the internet and key real estate databases, the subject appraisal is identical, in all material respects to Welfont's "Opinion of Value" and subject to the same disqualifying disclaimers which rendered Welfont's Opinion of Value inadequate for use in a Bargain Sale.

59.

Upon information and belief, Welfont, which holds itself out as an expert in real estate transactions generally and Bargain Sales in particular, was aware of these defects as of the date of the Appraisal on or about November 20, 2017, but chose to withhold delivery of the Appraisal until the final minutes of the actual closing on December 5, 2017 (and even then, only provided it to J&A by placing same in "overnight mail" <u>on the day of closing</u>).

60.

J&A alleges that Welfont's failure to disclose these facts enabled it to secure J&A's consent to the sale.

61.

J&A alleges that Andrew J. Bryant and Bryant Asset Advisors failed to exercise the degree of care, expertise, and diligence—and to utilize the skills and procedures—necessary to provide a competent and professional real estate appraisal for purposes of this transaction, as set forth hereinabove.

62.

J&A alleges that Welfont failed to exercise reasonable care in undertaking to retain a qualified and competent appraiser for purposes of the subject transaction.

63.

J&A alleges that Welfont also breached its agreement to retain a qualified and competent appraiser for purposes of the subject transaction.

64.

Welfont negligently and/or intentionally selected an appraiser who it knew or should have known was not likely to provide an accurate appraisal.

65.

Welfont negligently and/or intentionally selected an appraiser who was unfamiliar with the market and was unlikely to provide a qualified, appropriate appraisal.

66.

Upon receipt and review of the appraisal, Welfont knew or should have known that the appraisal provided was inadequate or otherwise inaccurate.

67.

After receipt of the appraisal, Welfont negligently and/or intentionally withheld the appraisal from J&A until after the closing of the sale of the subject property.

68.

Moreover, for the reasons detailed above, J&A allege that Andrew J. Bryant and Bryant Asset Advisors breached their respective agreement(s) to provide a competent, accurate and appropriate appraisal of the subject property.

69.

J&A, Pete Abington, and Calvin Jones have each been damaged as a result of the sale of property without adequate compensation, and seek damages and interest for the disparity in the sell price and the fair market value of the property, along with interest, as well as any fees and penalties assessed to Pete Abington and Calvin H. Jones by the IRS.

WHEREFORE, PLAINTIFFS, J & A of Louisiana, LLC, Leonard Q. "Pete" Abington, and Calvin H. Jones, pray that Defendants each be cited and served herein and that, after due proceedings are had, a judgment be rendered in favor of Plaintiffs and against each Defendant, *in solido*, for the following:

A. Damages for the disparity in J&A's sell price and the fair market value of the subject property, including but not limited to additional fees, costs and payments associated with the closing (e.g.: remainder of mortgage, appraisal, commissions, etc...);

B. Interest from December 4, 2017, to the present;

C. Judicial interest;

D. Fees and penalties assessed to Pete Abington and Calvin H. Jones by the IRS, including accounting fees associated therewith;

E. Attorneys' fees and costs incurred by Plaintiffs herein; and,

F. For such other equitable relief as the Plaintiffs shall show themselves justly entitled and/or that this Court deems proper.

Respectfully submitted,

HARPER LAW FIRM
(A Professional Law Corporation)

BY:____________________________________

**Jerald R. Harper, La. Bar No. 06585**
harper@harperfirm.com
**Anne E. Wilkes, La. Bar No. 36729**
anne@harperfirm.com
213 Texas Street
Shreveport, Louisiana 71101
(318) 213-8800 (telephone)
(318) 213-8804 (facsimile)

**ATTORNEYS FOR J & A OF LOUISIANA, LLC, LEONARD Q, "PETE" ABINGTON, and CALVIN H. JONES**

{***Service InstructionsAppear on the Following Page***}

**PLEASE MAKE SERVICE IN ACCORDANCE WITH LOUISIANA'S LONG-ARM STATUTE LSA R.S. 13:3201, ET SEQ.:**

ANDREW J. BRYANT
***Personal Service Only***
11715 Fox Road, Suite 400-127
Indianapolis, Indiana 46236

BRYANT ASSET ADVISORS, LLC
***Through its Agent for Service of Process***
Matthew R. Macaluso
760 3rd Ave. SW, Suite 210
Carmel, Indiana 46032

THE WELFONT GROUP, LLC
***Through its Agent for Service of Process***
A Registered Agent, Inc.
8 The Green, Suite A
Dover, Delaware 19901

THE WELFONT GROUP, LLC
***Through its Agent for Service of Process***
Registered Agents, Inc.
3030 N. Rocky Point Drive, Suite 150A
Tampa, Florida 33607

# LETTER OF INTENT

Date: August 11, 2017

To: Doug Abington with Sealy & Company | Shreveport, LA

This Letter of Intent (**"LOI"**) sets out the basic terms upon which we would be prepared to purchase the real property (**"Property"**) described below. Both parties hereby acknowledge and agree that the terms of this LOI are not comprehensive and the parties expect that additional terms will be incorporated into a formal and binding Real Estate Purchase Agreement (**"Contract"**). See Section 16.

1. **Buyer:** Food Assistance, a 501(c)3 organization.

2. **Buyer's Broker:** Ryan Ruhge with The Welfont Group, LLC, 100 South Ashley Drive Suite 1300, Tampa, FL 33602.

3. **Seller's Agent:** Doug Abington, Sealy & Company | Shreveport, LA
   Address: 333 Texas St, 1050, Shreveport, LA 71101
   Phone: (318) 222-8700
   Email: douga@sealynet.com

4. **Property:** 1665 Hwy. 171, Stonewall, LA 71078

   Which consists of real estate and improvements of 0 square feet MOL situated on 9.64 acres MOL (the "Property").

   **Property Type:** land only

5. **Purchase Price:** The Buyer shall purchase the property through an IRS Section 170 Bargain Sale purchase, which consists of a combination of cash and a charitable contribution (**"Bargain Sale"**). A Bargain Sale occurs when a seller sells a property to a 501(c)(3) organization and is then able to use the difference between appraised value and cash received as a tax deduction through a charitable contribution.

   a. **Cash Amount:** $46,000

   b. **Charitable Contribution Amount (Tax Deduction):** $1,007,000

   c. **Projected Tax Savings Estimate (% of Charitable Contribution):** $459,192

   d. **Total Estimated Cash Benefit (a+c):** $505,192

   e. **Cash Equivalent Value (pretax estimate of an equivalent cash offer):** $527,859

6. **Earnest Money Deposit.** Within three (3) business days of the full execution of the Contract, Buyer will deliver to a mutually acceptable escrow agent an initial sum of $5,000 (**"Initial Deposit"**) and an additional sum of $15,000 (**"Additional Deposit"**) within three (3) business days of either the waiver of due diligence, or expiration of due diligence period, whichever comes first (said sum, together with all interest earned thereon, is referred to herein as the **"Deposit"**). The Deposit will be deducted from the Cash Amount stated above and credited toward the Purchase Price upon closing.

   a. **Total Earnest Money Deposit:** $20,000





EXHIBIT "A"

7. **Proof of Funds.** Within three (3) business days of full execution of the Contract, Buyer will deliver to Seller a proof of funds letter from Buyer's lender for the total Cash Amount required to close.

8. **Broker Fee.** Seller agrees to pay the Seller's Broker any commissions or fees at their agreed upon rate based on the Total Cash Benefit (per Paragraph 5(d), Total Cash Benefit is a calculation of the Cash Amount + Projected Tax Savings) to the Seller as determined by the appraisal. Said commission or fee shall be split equally between the Seller's Broker and Buyer's Broker or an affiliate Buyer's Broker designee, who shall serve as a cooperating broker.

9. **Appraisal.** Seller shall engage an appraiser to prepare an appraisal for the Property during the Inspection Period (the "**Appraisal**"). The appraiser shall comply with the requirements of Section 170 of the Internal Revenue Code, and the regulations, rulings and other pronouncements of the Internal Revenue Service, including current IRS Publication 561. A copy of the Appraisal will be provided to Buyer within five (5) days after Seller's receipt of same and during the Inspection Period. If the appraised value of the Property disclosed by the Appraisal is less than 90% of the Opinion of Value, Seller may terminate the Contract by written notice to Buyer given within five (5) days after receipt of the Appraisal.

10. **IRS Form 8283.** At the closing, Buyer shall sign and deliver Internal Revenue Service Form 8283 to Seller setting forth the appraised value of the Property. This form will represent that Buyer is a duly established non-profit corporation and qualified as a tax exempt public charity under Internal Revenue Code Section 501(c)(3) qualified to receive federal tax deductible contributions pursuant to the Internal Revenue Code Section 170.

11. **Inspections and Due Diligence.** Buyer shall have the right, at its sole cost and expense for a period of up to forty-five (45) days after receipt of all due diligence materials ("**Inspection Period**"), to perform any studies, inspections, or other due diligence it deems necessary or desirable on the Property. If the results of its inspections are not satisfactory to Buyer, Buyer may terminate the Contract by written notice to Seller. Buyer will indemnify Seller from any claims for injury to person or property occurring during any testing or studies.

12. **Condition of Property.** Seller will provide to Buyer all current environmental reports in its possession, one year of detailed utility bills and any documents or information regarding the condition of the Property within five (5) days after the date of execution of the Contract. Buyer will acquire the Property in an "As Is" "Where-Is" condition without representation and warranties of Seller as to its physical and environmental condition.

13. **Closing.** The Seller will have performed a current title search resulting in a Commitment satisfactory to the Buyer. Seller will provide the closing documents, and shall convey the Property to Buyer by a special warranty deed or the customary local equivalent. Seller shall be responsible for all property taxes on and before the Closing Date and Buyer will be responsible for all property taxes after the Closing Date. Taxes shall be prorated through the Closing Date, with the day of closing allocated to Seller, utilizing the taxes as shown on the last available tax bill. Closing will take place as soon as practicable, but no sooner than ten (10) days after receipt of the Appraisal and not later than sixty (60) days after the date of the Appraisal.

14. **Closing costs.** Seller shall pay (i) the documentary stamp or other transfer taxes attributable to the conveyance of the Property; (ii) the cost of curing any Title Defects that Seller elects to cure; (iii) Seller's attorneys' fees; (iv) the cost of preparing the closing documents; (v) one-half of the costs of the Escrow Agent; and (vi) the premium for the owner's policy of title insurance and an ALTA Endorsement 9 (or equivalent endorsement). Buyer shall pay (i) the recording fees to record the deed conveying the Property and any other document associated with the conveyance of the Property; (ii) the cost of Survey; (iii) Buyer's attorney's fees; (iv) the cost of any mortgagee title insurance policy and endorsements; and (v) one-half of the costs of the Escrow Agent.

15. **Contract.** Within five (5) business days after the execution of this LOI, Buyer will deliver a draft of the Contract to Seller for its review. Seller shall have a period of seven (7) days after receipt to execute the Contract.

16. **Not a Binding Agreement.** Except for the Confidentiality statement, this LOI does not create a binding agreement between Seller and Buyer. Buyer and Seller, however, acknowledge that the terms of this LOI will be incorporated into the Contract, and they will rely upon the terms of this LOI.

17. **Confidentiality.** The terms of this LOI shall remain confidential. Buyer and Seller shall not disclose the existence of this LOI or any of its terms, except to their respective accountants, attorneys, and other advisors as necessary to fulfill its due diligence.

18. **Acceptance.** This offer to purchase shall be valid for sixteen (16) days from the date of delivery of this LOI. If Seller is in agreement with the foregoing terms, please sign and return a duplicate copy of this Letter of Intent by 5p.m. within sixteen (16) days from the date of delivery of this LOI.

19. **Counterparts; Electronic Versions.** This LOI may be executed by the parties in multiple counterparts, each of which shall be deemed an original, but all such counterparts taken together shall constitute one and the same LOI. A signed facsimile or electronic scanned copy of this LOI shall be deemed to be an original for all purposes.

**ACCEPTED & AGREED BY:**

| | |
|---|---|
| ______________________________ | Jane Y. Carlson |
| *Authorized Signature of Seller Above* | *Authorized Signature of Buyer Above* |
| Print Name:____________________ | Print Name: Jane Y. Carlson |
| Title:_________________________ | Title: Executive Director |
| ______________________________ | August 11, 2017 |
| Date of Signature | Date of Signature |
| Address of Seller: | Address of Buyer: |
| ______________________________ | 102 Kirk Road |
| ______________________________ | Greensboro, NC 27455 |
| Phone Number:__________________ | Phone Number: (336) 988-8899 |

**Please Fax Signed Agreement to: 877-565-9511**
**Or Email to ryan.ruhge@welfont.com**

## OFFER

WELFONT

**Presented by:**
**The Welfont Group, LLC**
Ryan Ruhge @ (813) 695-6504

**1665 Hwy. 171, Stonewall, LA 71078**

| | | |
|---|---|---|
| 1A | **Current List Price:** | **$578,400** |

## OUR CLIENT'S IRS SECTION 170 BARGAIN SALE OFFER

| | | |
|---|---|---|
| 2A | **IRS Section 170 Bargain Sale Opinion of Value** | **$1,053,000** |
| 2B | **Cash from Buyer at Closing** | **$46,000** |
| 2C | **Seller's Estimated Eligible Tax Deduction** | **$1,007,000** |
| 2D | **Federal TAX FREE Contribution: Tax Savings @ 39.6%** | **$398,772** |
| 2E | **State TAX FREE Contribution*: Tax Savings @ 6.0%** | **$60,420** |
| 2F | **Total Cash Benefit** (2B+2D+2E) | **$505,192** |
| 3A | **Equivalent Selling Price** | **$527,859** |

## HIGHLIGHTS IN SUMMARY

Seller must have, or expect to have, sufficient tax liability due to income or the sale of assets such as a business, or other real estate, (including 1031 exchanges).

C-Corps may deduct 10% of their taxable income for charity each year, while entities such as S-Corps, LLCs and Individuals may deduct 30 to 50% of their AGI depending on whether they use FMV or their basis.

| | | |
|---|---|---|
| 3A | Total tax deductible amount: Opinion of Value (line 2A) minus Cash at closing (line 2B) | **$1,007,000** |
| 3B | Annual tax deduction if spread out over 6 years | **$167,833** |
| 3C | Annual taxable income needed to realize the full deduction for S-Corps, LLCs and Individuals | **$559,444** |
| 3D | Annual taxable income needed to realize the full deduction for a C-Corp | **$1,678,333** |

**If the Seller qualifies for an IRS Section 170 Bargain Sale, these are the major advantages they can look for:**

- Similar or higher cash value than traditional sale
- Immediate and significant tax reduction
- Quick closing (30-60 days)
- Elimination of all carrying costs, management headaches and ongoing liability

*Some states restrict or deny itemized deductions for state income tax. Seek professional tax advice to determine what rules apply in this case.

EXHIBIT "B"

tabbies®

## COMPARISON

WELFONT

### 1665 Hwy. 171, Stonewall, LA 71078

### COMPARISON 1

**TRADITIONAL SALE**

| | | Amount | Cash |
|---|---|---|---|
| 1A | Current List Price | | $578,400 |
| 1B | Average Nat'l List to Sell Ratio (for type & location) | 80% | $462,720 |
| 1C | Estimated Cost Basis (80% of 1B) | $370,176 | |
| 1D | Total Gain | $92,544 | |
| 1E | Less Estimated Capital Gain Tax | 20% | $18,509 |
| 1F | Less State Tax | 6.00% | $5,553 |
| 1G | Less Net Investment Tax (Health Care Act) | 3.80% | $3,517 |
| 1H | Net Proceeds to Seller | | $435,142 |

### COMPARISON 2

**IRS SECTION 170 BARGAIN SALE**

| | | Amount | Cash |
|---|---|---|---|
| 2A | Opinion of Value (IRS Publication 561 Guidelines) | $1,053,000 | |
| 2B | Cash at Closing | | $46,272 |
| 2C | Estimated Tax Deduction | $1,006,728 | |
| 2D | Fed. Cash Contribution (Estimated Tax Savings) | 39.6% | $398,664 |
| 2E | State Cash Contribution (Estimated Tax Savings)* | 6.00% | $60,404 |
| 2F | Total Cash to Seller | | $505,340 |
| 2G | Less Cap Gains (Cash - (Basis X (cash / FMV)) IRS Pub. 544 | 20% | $6,001 |
| 2H | Less State Tax | 6.00% | $1,800 |
| 2I | Less Net Investment Tax (Health Care Act) | 3.8% | $1,140 |
| 2J | Net Proceeds to Seller | | $496,398 |

**BOTTOM LINE**

| | | | |
|---|---|---|---|
| 3A | Difference in Total Cash Benefit | 12.3% | $61,256 |
| 3B | Equivalent Selling Price | | $527,859 |

*Some states restrict or deny itemized deductions for state income tax. Seek professional tax advice to determine what rules apply in this case.

## PROJECTED CASH BENEFIT

WELFONT









## OPINION OF VALUE

WELFONT

### Purpose of Document

This report is an IRS Section 170 Bargain Sale Opinion of Value (based on IRS Publication 561 guidelines) on the subject property described below for the purposes of determining value of donated property. It is not the actual appraisal, but a good faith estimate of where the appraisal will come in. If seller is interested in the proposed transaction, the seller must obtain an actual appraisal from a qualified appraiser in accordance with IRC Section 170. Unlike a bank appraisal seeking a quick-sale value, the actual appraisal will reflect true and full, fair market value.

### IRS Publication 561 Appraisal Guidelines

**Highest and Best Use:** When determining FMV (Fair Market Value) for a 561 Appraisal, the appraiser may factor in highest and best use, which may elevate appraisal value.

**Comparable Sales Method:** The comparable sales method compares the subject property with several similar sold properties where the seller is under no compulsion to sell. (Properties excluded from comparison include bank owned, REO, liquidation sales, distressed sales, non-arms length, etc.)

**Weighted Average:** At the appraisers discretion, a weighted average (blended approach) may be taken to arrive at the most accurate FMV. This typically comes in higher than a conservative bank appraisal.

### Property Address

**1665 Hwy. 171, Stonewall, LA 71078**

| IRS Section 170 Bargain Sale Opinion of Value Based on IRS Publication 561: | $1,053,000 |
|---|---|

### Author's IRS Section 170 Bargain Sale Opinion of Value Notes

The subject sits on 9.6 acres:

- In the market approach, property comparables believed to be sold under compulsion were not used per IRS Publication 561. Due to the unique size and type of property, comps had to be pulled from a local and regional basis. Therefore, an average rate of 109219.86 per sq acre was used.

- A weighted average of 100% to the market, 0% to the replacement cost and 0% to the income approach was applied to arrive at the final opinion of value estimate.

## Value Computation Summary

**Sales Comparison Approach**

| | Acres | $ / Acre | Total |
|---|---|---|---|
| Comp 1 | 15 | 120,000 | 1,800,000 |
| Comp 2 | 10 | 117,570 | 1,127,500 |
| Comp 3 | 15 | 102,224 | 1,531,322 |
| Comp 4 | 12 | 97,081 | 1,126,136 |
| Average | 13 | `109,219 | 1,397,182 |
| Sales Comp. Approach | | $ | 1,052,870 |




### Disclaimer

This IRS Section 170 Bargain Sale Opinion of Value is not an actual appraisal, but simply the author's opinion of what this property may ultimately be appraised at for the purposes of valuing donated property as described in IRS Code Section 170 and IRS Publication 561. This opinion is calculated in good faith based on information available on the internet and key real estate databases. The opinion author has not had the opportunity to actually inspect the property. Therefore, the opinion author has no way to verify or assure that all the information submitted is completely accurate. If the seller is interested in the proposed transaction, the seller must obtain an actual qualified appraisal according to Section 170 of the Internal Revenue Code and IRS Publication 561.

DocuSign Envelope ID: 92A944E5-969F-4407-A559-6E2FF5D4B6CD

# REAL ESTATE PURCHASE AGREEMENT

This Real Estate Purchase Agreement (**"Agreement"**) is dated as of the Effective Date, as defined, between Food Assistance, Inc. (**"Buyer"**) and J & A of Louisiana LLC (**"Sell er"**).

## WITNESSETH:

**WHEREAS,** Seller is the owner of the Property (as more particularly described in Section 1 below), and wishes to sell the Property via bargain sale (as hereinafter defined) to Buyer;

**WHEREAS,** Buyer desires to purchase the Property in a bargain sale from Seller; and

**NOW, THEREFORE,** the parties have agreed and do hereby agree as follows:

1. **PROPERTY.** Subject to the provisions of this Agreement, and for the consideration herein stated, Seller agrees to sell to Buyer and Buyer agrees to buy from Seller all of the following described property located at :1665 Hwy. 171, Stonewall, LA 71078 (collectively, the **"Property"**):

a. That certain tract of land described on **Exhibit A** attached hereto and by this reference made a part hereof (the **"Land"**), which shall be deemed to include all appurtenances, licenses, easements, rights-of-way, tenements and hereditaments incident thereof, if any, and any and all title and interest of Seller in and to all strips and gores, any land lying in or under the bed of any adjoining street, and any streets, roads, pipes, utility lines, and infrastructure improvements in, on or under the Land, if any.

b. The land is situated on 9.64 acres MOL ; provided, however, that if there is a material discrepancy in the acreage of the land as determined by the Appraisal (as hereinafter defined), Buyer shall have the right to terminate this Agreement within five (5) business days after receipt of the Appraisal.

c. All of Seller's right, title and interest in and to all furniture, fixtures, equipment, appliances and other items of personal property located on or with the Land and Improvements which are owned by Seller, but excluding ______________________________ (the **"Excluded Property"**).

d. To the extent Seller has the right to assign the same, all of Seller's right, title and interest in and to the leases, subleases, contracts, licenses and permits described on **Exhibit B** attached hereto and any renewals thereof (collectively, the **"Leases"**).

e. To the extent Seller has the right to assign the same, all of Seller's right, title and interest in and to all third party warranties or guaranties relating to the Property.

2. **PURCHASE PRICE.** In consideration of the conveyance of the Property to Buyer, Buyer shall pay to Seller a purchase price of One Hundred Thousand and 00/100 Dollars ($100,000.00) (the **"Purchase Price"**). The Purchase Price is payable as follows:

a. Within three (3) business days after receipt of the Initial Due Diligence Materials (as defined in Section 8.a. below), Buyer will deliver to Escrow Agent (as defined below) the sum of $5,000 (**"Initial Deposit"**). An additional deposit of $15,000 (**"Additional Deposit"**) shall be deposited upon expiration of the Buyer's due diligence period within three (3) business days.

Seller ______ Buyer ______ DS



EXHIBIT "C"

DocuSign Envelope ID: 92A944E5-969F-4407-A559-6E2FF5D4B6CD

b. Buyer shall have no obligation to deliver the Deposit unless and until the Initial Due Diligence Materials are received by Buyer.

c. The balance of the Purchase Price, subject to credits, adjustments and prorations required by this Agreement, shall be paid by Buyer at Closing (as defined below) in the form of a confirmed wire transfer.

d. The Deposit, at Buyer's written request, shall be placed in an interest bearing account with a federally insured bank of Escrow Agent's selection. Notwithstanding the foregoing, the Escrow Agent shall not be required to place the Deposit in an interest bearing account until such time as Buyer delivers to Escrow Agent a fully completed and executed W-9 reporting form as required by the Internal Revenue Service. Any earned interest shall be paid to or credited to Buyer unless Seller is entitled to retain the Deposit in which event Seller shall also be entitled to the interest earned thereon. If the Deposit is not made in immediately available funds, this Agreement shall be contingent on clearance of funds. At Closing, the Deposit shall be credited for the account of Buyer toward the Purchase Price.

3. **BARGAIN SALE.** Buyer acknowledges that it is Seller's intent to effectuate a "bargain sale" of the Property, i.e., a sale to a charitable organization at a price below fair market value as defined by the Internal Revenue Code of 1986, as amended (the "**IRC**") Section 170 and the Treasury Regulations promulgated thereunder, wherein the difference between the fair market value of the Property and the Purchase Price is considered a charitable contribution under applicable sections of the IRC. Buyer further acknowledges that Seller's motivation is for charitable purposes. The parties acknowledge that this transaction has been facilitated by The Welfont Group, LLC ("**Welfont**") and attached as **Exhibit C** to this Agreement and by this reference made a part hereof, are additional disclosures and disclaimers regarding this transaction.

4. **APPRAISAL.**

a. Promptly after the expiration of the Inspection Period, Seller shall obtain an appraisal for charitable contribution purposes of the Property (the "**Appraisal**") in order to determine the value of the Property for the purpose of disclosing the donation value to the Buyer. Seller has requested, and Buyer has agreed, that The Welfont Group, LLC shall coordinate and facilitate the Appraisal with an independent appraisal management company, or another qualified appraiser that complies with the requirements of Section 170 of the IRC, the Treasury Regulations and rulings and other pronouncements of the Internal Revenue Service (the "**IRS**").

b. Seller shall provide Buyer with a copy of the Appraisal within five (5) days after Seller's receipt of the same.

c. In the event that the appraised value of the Property disclosed by the Appraisal is less than 90% of the anticipated appraised value of $ 1,053,000 (or less than $947,700), Seller may choose to terminate this Agreement by written notice to Buyer and Escrow Agent given within five (5) business days after receipt of the Appraisal, whereupon (i) all rights, obligations and liabilities of the parties hereto shall terminate, except those that expressly survive termination of this Agreement, (ii) upon written request by Seller to Escrow Agent and Buyer, accompanied by a paid invoice, Buyer agrees that Escrow Agent shall remit to Seller, from the Deposit, the cost of the Appraisal, and (iii) any Deposit remaining after any such remittance of the Deposit to Seller for the Appraisal shall be returned to Buyer by Escrow Agent.

Seller ______ Buyer ______ DS

DocuSign Envelope ID: 92A944E5-969F-4407-A559-6E2FF5D4B6CD

5. **ESCROW AGENT.** The Deposit shall be held by Meridian Title Corporation ("**Escrow Agent**"), the escrow and closing agent mutually agreed upon by Buyer and Seller for the purchase and sale of the Property. The Escrow Agent shall hold the Deposit in accordance with this Agreement. In receiving and maintaining the Deposit, Escrow Agent shall be deemed to be acting only as a stakeholder and shall have no liability for any loss or damage or for the improper delivery of such funds, except where such loss or damage is the result of Escrow Agent's willful misconduct or gross negligence. In the event the contract is terminated, the escrow agent shall release the escrow deposit upon written notice of either party in accordance with their rights in this agreement. Escrow Agent shall not be liable to any party or person whomsoever for any action taken or omitted by Escrow Agent unless due to willful misconduct or gross negligence on the part of the Escrow Agent. All of the terms and conditions in connection with Escrow Agent's duties and responsibilities and the rights of Seller, Buyer and any lender or anyone else, are contained in this instrument, and the Escrow Agent is not required to be familiar with the provisions of any other instrument or agreement, and shall not be charged with any responsibility or liability in connection with the observance or non-observance by anyone of the provisions of any other such instrument or agreement. Escrow Agent may rely and shall be protected in acting upon any paper or other document which may be submitted to Escrow Agent in connection with its duties hereunder and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution or validity thereof. Escrow Agent shall not be required to institute or defend any action or legal process involving any matter referred to herein which in any manner affects it or Escrow Agent's duties or liabilities hereunder unless or until required to do so by Buyer or Seller, and then only upon receiving full indemnity in an amount and of such character as Escrow Agent shall require, against any and all claims, liabilities, judgments, attorneys' and paralegals' fees and other expenses of every kind in relation thereto, except in the case of Escrow Agent's own willful misconduct or gross negligence.

6. **REPRESENTATION AND WARRANTIES.**

a. **As to Seller:** Seller represents and warrants that: (1) Seller is a J & A of Louisiana LLC, organized under the laws of the State of Louisiana, and its status is active; (2) Seller has marketable record fee simple title and full right, power and authority to enter into this Agreement, perform its obligations under this Agreement and convey the Property; (3) Seller has no knowledge of and has received no notice of any violation of any law, order, rule or regulation of any kind relating to the Property; (4) this Agreement is a valid and binding obligation of Seller enforceable against Seller in accordance with its term; (5) Seller will not directly or indirectly make an offer or have a financial interest in the future to purchase the Property for a period of three (3) years from the execution of this Agreement; (6) Seller shall maintain hazard and broad form extended coverage insurance on the Property until Closing; (7) Seller shall operate the Property in the same manner and keep the Property in substantially the same condition as on the Effective Date, and shall repair any damage caused by the removal of the Excluded Property; (8) Seller shall not enter into any new lease, or amend or modify any existing lease of the Property, without the prior written consent of Buyer; (9) Seller shall not create any new lien or encumbrance on the Property prior to Closing; (10) Seller shall promptly notify Buyer of any notice of any violation or other matter affecting the Property received by Seller from any governmental authority having jurisdiction over the Property; and (11) Seller shall reasonably cooperate with Buyer, at Buyer's expense, in effectuating the provisions of this Agreement, including without limitation, in making the Property available for any inspections or tests by Buyer during the Inspection Period, and in Buyer's pursuit of any necessary entitlements or approvals for the Property, if applicable.

Seller ___ Buyer ___

DocuSign Envelope ID: 92A944E5-989F-4407-A559-6E2FF5D4B6CD

b. **As to Buyer**: Buyer represents and warrants that: (1) Buyer is a charitable organization within the meaning of IRC Section 501(c)(3), is organized under the laws of the State of North Carolina, and its status is active; (2) Buyer has full right, power and authority to enter into this Agreement and perform its obligations under this Agreement; and (3) this Agreement is a valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

7. **DISCLAIMERS.** Except for the express representations and warranties set forth in this Agreement, Buyer acknowledges that the conveyance of the Property is specifically made "**as-is**," "**where-is**," and with all faults, without any representations or warranties, express or implied, including, without limitation, any representations or warranties with respect to the environmental condition of the Property, any implied warranties of fitness for any particular purpose or merchantability, or any other warranties whatsoever contained in or created by applicable law or otherwise.

8. **INSPECTIONS AND BUYER DUE DILIGENCE**

a. **Due Diligence.** Seller agrees to provide Buyer with all due diligence materials in its possession within ten (10) days of the Effective Date of this Agreement, including but not limited to the due diligence materials requested in the Due Diligence Document List attached as **Exhibit D** to this Agreement (the "**Due Diligence Materials**"). The following Due Diligence Materials shall be called the "**Initial Due Diligence Materials**" herein: (i) copies of tenant roster and all current leases, including any modifications, supplements, and amendments; (ii) a copy of Seller's income and expense statement for the Property for a period of no less than 24 months; (iii) copies of current survey and site plans; and (iv) any existing environmental reports or studies. The Buyer acknowledges that it shall rely on its own due diligence to determine the condition of the Property.

b. **Inspections.** Buyer shall have a period of forty-five (45) days from the Effective Date of this Agreement to conduct such engineering, feasibility, zoning, construction, environmental and any other studies and investigations concerning the Property as Buyer desires (the "**Inspection Period**"). Buyer shall provide written notice to Seller, which may be via electronic email, once Buyer is satisfied that it has received all Due Diligence Materials. During the Inspection Period, Buyer and its representatives shall have reasonable access to the Property for the purpose of soil analysis, core drilling, environmental audit and studies, structural examination and tests, or other studies, tests, examinations and investigations desired by Buyer; provided, however, Buyer and/or Buyer's Representatives shall not carry out any inspection activities below the surface or which involve penetrating the surface of the Property (for example, without limitation, subsurface borings for soils tests) or which would damage in any way the improvements on the Land without Seller's prior written consent, which consent Seller shall have the right to withhold in its sole and absolute discretion. Buyer or its representatives shall give Seller notice of their intent to carry out any inspection activities on the Property at least forty-eight (48) hours prior to commencing each such activity, and Seller shall have the right to have a representative present at all inspections. Any such examinations and investigations shall not damage the Property in any manner. In the event any of the Property is damaged, Buyer shall restore the Property to its pre-existing condition to Seller's reasonable satisfaction. Buyer shall not permit any lien to attach to the property in connection with any such examinations or inspections.

Buyer has the absolute right to terminate this Agreement during the Inspection Period, for any reason or no reason, which right shall be exercised, if at all, by providing written notice to

Seller____ Buyer____

Seller and Escrow Agent pursuant to Section 15 of this Agreement before the expiration of the Inspection Period, whereupon all rights, obligations and liabilities of the parties shall terminate except those that expressly survive termination of this Agreement and Escrow Agent shall return the Deposit (or balance of the Deposit, if Seller has incurred an appraisal fee pursuant to Section 4 of this Agreement) to Buyer within five (5) days after Escrow Agent's receipt of such notice.

At any time during the Inspection Period, Buyer may provide written notice to Seller waiving the remainder of the Inspection Period, and the Inspection Period shall be deemed to have expired on the date of receipt of such written notice by Seller as determined in accordance with Section 15.

9. **TITLE POLICY, SURVEY, AND UCC SEARCH.**

a. **Title Policy.** Within ten (10) days after the delivery to Buyer of this Agreement fully executed between the parties, Seller shall cause delivery to Buyer a title commitment or abstract of title for the Property, whichever is customary in the location of the Property (the "**Commitment**"), together with all copies of the documents which constitute exceptions to the Commitment. Buyer shall have until the end of the Inspection Period to notify Seller in writing of any objection that Buyer has to the Commitment (each, a "**Title Defect**"). All exceptions for which no timely notice was provided to Seller shall be deemed exceptions permitted by Buyer ("**Permitted Exceptions**"); provided, however, that any monetary liens, judgments or other exceptions appearing in the Commitment that can be cured by the payment of money by Seller shall be automatically deemed objected to by Buyer. Seller shall have the right, but not the obligation, for ten (10) days following receipt of Buyer's notice of Title Defects to cure such Title Defects. If Seller is unable or unwilling to cure any of the Title Defects, then Seller shall give Buyer written notice of Seller's failure to cure within such ten (10) day period. In such event, Buyer shall have the option to (i) terminate this Agreement by written notice to Seller and Escrow Agent, whereupon all rights, obligations and liabilities of the parties hereto shall terminate, except those that expressly survive termination of this Agreement, and Escrow Agent shall return the Deposit to Buyer, or (ii) elect to purchase the Property without cure of the applicable Title Defects and without reduction in the Purchase Price, whereupon such Title Defects shall become Permitted Exceptions.

b. **Survey.** Buyer shall have the right to have the Property surveyed during or after the Inspection Period. If the Survey reveals any matters objectionable to Buyer, such matters shall be treated as Title Defects and the provisions of Subsection a. above shall apply so long as Buyer notifies Seller of its survey objection prior to the end of the Inspection Period.

c. **UCC Search.** Within ten (10) days after the delivery of the Appraisal to Buyer, Seller will furnish Buyer a Uniform Commercial Code search of Seller in the jurisdiction in which Seller was formed and is registered as a business entity, as well as the state and county in which the Property is located, all prepared by a reporting service reasonably acceptable to Buyer and dated within thirty (30) days of the date of delivery to Buyer.

10. **CLOSING.**

a. **Closing.** The closing of the transaction contemplated herein (the "**Closing**") shall be held on a date mutually agreed upon by Seller and Buyer, which shall be no sooner than ten (10 days) after Buyer waives the Inpsection Period and the receipt of the Appraisal, and not later than sixty (60) calendar days after the date of the Appraisal, unless extended in writing by

Seller ____ Buyer ____

DocuSign Envelope ID: 92A944E5-989F-4407-A559-6E2FF5D4B6CD

the parties to this Agreement (the "**Closing Date**").

b. **Possession.** Possession of the Property shall be delivered to Buyer at the Closing.

c. **Proration of Taxes and Other Expenses and Profits.** At Closing, the following expenses shall be pro-rated, with the Closing Date attributed to Seller: (i) all rents and income from the Property for the month in which the Closing occurs; (ii) real estate and personal property taxes with respect to the Property for the year in which the Closing occurs; provided, however, that if the Closing occurs before the tax rate or assessed valuation of the Property is fixed for the then current year, then the taxes shall be based on the preceding year's tax bill with full discounts applied. Seller shall deliver to Buyer any tenant security deposits and any prepaid rents at Closing, as described on **Exhibit B.**

d. **Utilities.** Utilities serving the Property shall not be prorated. On the day following Closing, Seller shall have each utility provider render a final bill through said date and Seller shall terminate all such accounts. Buyer shall be solely responsible for establishing new accounts with such utility providers in Buyer's own name.

e. **Insurance.** Seller shall maintain its insurance on the Property until the Closing Date. On the day following Closing, Seller shall have the right to cancel any existing policy of insurance and receive a refund of unearned premiums. Buyer shall solely be responsible for obtaining new insurance coverage for the Property as Buyer deems appropriate.

11. **CLOSING COSTS AND OBLIGATIONS.** The Closing costs shall be allocated as follows:

a. **Seller's Closing Costs.** Seller shall pay (i) the documentary stamp or other transfer taxes attributable to the conveyance of the Property; (ii) the cost of curing any Title Defects that Seller elects to cure; (iii) Seller's attorneys' fees; (iv) the cost of preparing the closing documents; (v) one-half of the costs of the Escrow Agent; (vi) the premium for the owner's policy of title insurance and an ALTA Endorsement 9 (or equivalent endorsement); and (v) certified, confirmed and ratified special assessment liens imposed by a public body as of the Closing Date will be paid by Seller; provided, however, that if a certified, confirmed and ratified special assessment lien is payable in installments, Seller shall pay all installments due and payable on or before the Closing, with any installment for any period extending beyond the Closing Date prorated, and Buyer will be responsible for all assessments of any kind which become due and owing after the Closing Date.

b. **Buyer's Closing Costs.** Buyer shall pay (i) the recording fees to record the deed conveying the Property and any other document associated with the conveyance of the Property; (ii) the cost of Survey; (iii) Buyer's attorney's fees; (iv) the cost of any mortgagee title insurance policy and endorsements; and (v) one-half of the costs of the Escrow Agent.

c. **Seller's Closing Documents.** Seller shall deliver to Escrow Agent the following executed documents: (i) a special warranty deed; (ii) FIRPTA Affidavit; (iii) Owner's Affidavit acceptable to the title company issuing the owner's policy of title insurance (the "**Title Company**") to delete exceptions for mechanics' liens and rights of parties in possession; (iv) a closing statement; (v) an assignment of leases; (vi) an appropriate certificate of incumbency and resolution authorizing Seller's transfer of the Property pursuant to this Agreement; and (vii) a

Seller ______ Buyer ______

DocuSign Envelope ID: 92A944E5-969F-4407-A559-6E2FF5D4B6CD

Seller's acknowledgement in substantially the form attached as **Exhibit E** to this Agreement.

d. **Buyer's Closing Documents.** Buyer shall deliver to Seller the following: (i) the balance of the Purchase Price by confirmed wire transfer; (ii) an appropriate certificate of incumbency and resolution authorizing Buyer's acquisition of the Property, if required by the Title Company; (iii) a signed counterpart of the closing statement; (iv) any other documents necessary in opinion of Seller or Seller's counsel for Closing; and (iv) IRS Form 8283 as set forth in Section 12 below.

12. **IRS FORM 8283.** At Closing, Buyer shall sign and deliver to Seller IRS Form 8283, setting forth the appraised value of the Property. The form will represent that Buyer is a duly established non-profit corporation and qualified as a tax exempt public charity under IRC Section 501(c)(3) and is qualified to receive federal tax deductible contributions pursuant to IRC Section 170.

13. **BROKER'S FEE.** Seller and Buyer represent and warrant to each other that no other real estate brokerage firm, broker, salesperson or finder are involved in any aspects of this Agreement other than Doug Abington, Sealy & Company (**"Seller's Broker"**), which represents the Seller's interest in this transaction and Welfont or its assignee, which represents Buyer's interest in this transaction. Seller further agrees to pay a real estate sales commission (**"Sales Commission"**) equal to six percent (6%) of the cash equivalent. Cash equivalent is the combined total cash payment at Closing and the estimated net tax savings (net tax savings is a calculation of the Appraisal multiplied by the Seller's federal and state income tax bracket) determined by the Appraisal noted in Paragraph 4 of this Agreement at the Closing. Seller acknowledges the Sales Commission shall be shared equally between Seller's Broker and Welfont.

14. **DEFAULTS.** Notwithstanding anything to the contrary set forth herein, no party shall be in default hereunder unless and until the other party has provided written notice of the basis for any such default and the alleged defaulting party has failed to cure such matter within fifteen (15) days of its receipt of such notice.

a. **Breach by Seller.** If (i) Seller defaults with respect to the performance of any or all of its obligations under this Agreement, and (ii) Buyer is not in default with respect to the performance of any or all of its obligations under this Agreement, then after the expiration of the fifteen (15) day notice and cure period set forth above, Buyer may, at its option, elect either (i) to terminate this Agreement by written notice to Seller and Escrow Agent, whereupon the Deposit shall be returned to Buyer as well as reimbursement to Buyer of all hard costs and expenses and all rights, obligations and liabilities hereunder shall terminate, except those that expressly survive termination of this Agreement, or (ii) to seek specific performance of this Agreement, in equity, without reduction in the Purchase Price. These shall be the sole and exclusive remedies of Buyer in the event of any default by Seller under this Agreement.

b. **Breach by Buyer.** If (i) Buyer defaults with respect to the performance of any or all of its obligations under this Agreement, and (ii) Seller is not in default with respect to the performance of any or all of its obligations under this Agreement, then after the expiration of the fifteen (15) day notice and cure period set forth above, Seller shall have the right to terminate this Agreement by written notice to Buyer and Escrow Agent, whereupon the Deposit shall be remitted to Seller as liquidated and agreed damages for the breach (and not as a penalty) and in full satisfaction of all claims against Buyer and all rights, obligations and liabilities hereunder shall terminate, except those parties that expressly survive termination of this Agreement. This shall be the sole and exclusive remedy of Seller in the event of any default by Buyer under this Agreement.

Seller ______ Buyer ______

DocuSign Envelope ID: 92A944E5-969F-4407-A569-6E2FF5D4B6CD

15. **NOTICES.** All notices which are required or permitted to be given by either party to the other under this Agreement shall be in writing and shall be deemed to be have been given, delivered or made, as the case may be (notwithstanding lack of receipt by the addressee): (i) three (3) business days after having been deposited in the United States Mail, certified or registered, postage pre-paid, and addressed to the intended recipient at the address specified herein; or (ii) one (1) business day after having been deposited for overnight delivery with a nationally recognized expedited, overnight delivery service (such as by way of example but not limitation, FedEx or UPS), addressed to the intended recipient at the address specified herein. Email is not an acceptable means of providing notice to the parties under this Agreement except as to the receipt of the Inspection Period Commencement Notice. The addresses of the parties for all notices are as follows (unless changed by similar notice in writing given by the particular person whose address is to be changed):

**IF TO SELLER:** J & A of Louisiana LLC

**WITH COPY TO:**

**IF TO BUYER:** c/o The Welfont Group, LLC
100 S Ashley Drive Suite 1300
Tampa, FL 33602
Telephone: 813-226-2099
Attn: Closing Dept.

16. **MISCELLANEOUS.**

a. **Rules of Assignment.** Buyer may assign this Agreement or designate another entity to take title to the Property at any time before the Closing Date, provided any such designee or assignee is wholly owned by Buyer or is another qualified 501(c)(3) entity. Where appropriate in this Agreement, the term "Buyer" includes any assignee or designee of Buyer.

b. **Interpretation and Governing Law.** The headings in this Agreement are for convenience of reference only, and are not to be used in interpreting this Agreement. This Agreement shall be governed, construed and enforced pursuant to the laws of the State of Florida and the laws of the United States pertaining to transactions in such State.

c. **Professional Advice.** Each party to this Agreement represent to the other party that they have consulted with their own legal and tax counsel and other appropriate professional advisors prior to signing this Agreement and have not and do not rely on any legal or tax advice or opinion that either may have provided to the other during the course of the negotiation of this Agreement.

d. **Effective Date of Agreement.** The **"Effective Date"** of this Agreement is deemed to be the date that the last of Buyer or Seller executed this Agreement as memorialized on the signature page to this Agreement.

Seller _____ Buyer _____

e. **Risk of Loss.** If any part of the Property is damaged by fire or other casualty prior to Closing, Buyer shall have the option to either (i) terminate this Agreement by written notice to Seller and Escrow Agent, whereupon all rights, obligations and liabilities of the parties hereto shall terminate, except those that expressly survive termination of this Agreement, and Escrow Agent shall return the Deposit to Buyer, or (ii) proceed to purchase the Property without reduction in Purchase Price, whereupon Buyer shall receive any insurance proceeds payable for the damage.

f. **Time of Essence.** Time is of the essence.

g. **Entire Agreement; Amendment.** This Agreement constitutes the entire agreement between Buyer and Seller. If any provision of this Agreement is or becomes invalid or unenforceable, all remaining provisions will continue to be fully effective. This Agreement may be amended only by a written instrument executed by Buyer and Seller.

h. **Recording.** Neither this Agreement nor any memorandum hereof may be recorded in the Public Records of the county in which the Land is located.

i. **Anti-Terrorism Representations.** Neither Buyer nor Seller, nor any of their affiliates, is in violation of any Anti-Terrorism Law (as hereinafter defined) or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. "Anti-Terrorism Laws" shall mean any laws relating to terrorism or money laundering, including: Executive Order No. 13224; the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or may hereafter be, renewed, extended, amended or replaced; the applicable laws comprising or implementing the Bank Secrecy Act; and the applicable laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing may from time to time be amended, renewed, extended, or replaced).

j. **Time Computations.** Unless otherwise expressly provided in this Agreement, any reference to time periods shall in the computation include Saturdays, Sundays and all federal legal holidays. Notwithstanding any provision of this Agreement to the contrary, any time period which shall end on a Saturday, Sunday or legal holiday shall automatically extend to 5:00 p.m. of the next full day which is not a Saturday, Sunday or federal legal holiday. Wherever used in this Agreement, the term "business day" shall mean Monday through Friday, excluding all federal legal holidays.

k. **Attorneys' Fees and Costs.** In connection with any litigation or court proceedings arising out of this Agreement, the prevailing party shall be entitled to recover all costs incurred, including reasonable attorneys' and legal assistants' fees incurred for services rendered before suit is brought, prior to trial, at trial, on appeal, or in federal bankruptcy proceedings.

l. **Restrictions and Exceptions:.** The parties shall not, both during the term of this Agreement and for a period of Nine (9) months after the termination or conclusion of this Agreement, contact or solicit any Charity, Broker or Buyer for the purpose of conducting a "bargain sale" transaction as defined in Section 3 of this Agreement related to the subject Property, other than in connection with this Agreement without the prior written consent of the other party to this Agreement.

Seller Buyer

DocuSign Envelope ID: 92A944E5-969F-4407-A559-6E2FF5D4B6CD

m. **Non-Disparagement.** The parties including their brokers, agents and representatives agree they will not make any statement, written or oral, to any person or entity, including in any forum or media, or take any action, in disparagement of each other (each, a "**Company Party**"), including negative references to or about any Company Party's services, policies, practices, documents, methods of doing business, strategies, objectives, shareholders, partners, managers, members, officers, directors, or employees, or take any other action that may disparage any Company Party to the general public and/or any Company Party's officers, directors, employees, clients, suppliers, investors, potential investors, business partners or potential business partners.

n. **Benefit of Agreement.** The provisions of this Agreement are intended solely to benefit the parties hereto, and nothing in this Agreement shall be deemed to create any right in any person not a party hereto; *provided*, however, that Welfont shall be deemed to be a third party beneficiary with respect to all representations, disclaimers and other matters relating to the IRS Section 170 Bargain Sale transaction. Except as expressly provided herein, this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third person.

o. **Counterpart Execution.** This Agreement may be executed by all parties in multiple counterparts, each of which shall be deemed an original, but all of such counterparts taken together shall constitute one and the same Agreement.

p. **Business Entities.** Each person signing this Agreement on behalf of a party that is a business entity represents and warrants to the other party that such signatory has full power and authority to enter into and perform this Agreement in accordance with its terms and each person executing this Agreement and other documents on behalf of such party has been duly authorized to do so.

17. **ACCEPTANCE.** The offer by the first party to execute this Agreement to sell or buy the Property shall terminate unless this Agreement is accepted and executed by the other party within five (5) business days after the offer is made.

18. **STATE LAW PROVISIONS.** The state specific provisions attached hereto as **Exhibit F** are incorporated as if set forth herein.

*[Rest of Page Left Intentionally Blank; Signature Page Follows]*

Seller ________ Buyer ________

DocuSign Envelope ID: 92A944E5-969F-4407-A559-8E2FF5D4B6CD

**Exhibit E**

**Seller's Acknowledgment**

Seller hereby acknowledges that in addition to the Purchase Price of $______________, a portion of the consideration for this Agreement and the sale of the Property is the charitable donation made by Seller to Buyer having an estimated value of $______________________, based on the Appraisal (as defined in the Agreement).

LEONARD OARINGTON + CALVIN JONES
*Name of Seller Above*

By: ______________________
Print Name: ALVIN JONES LEONARD OARINGTON
Title: OWNERS

Date of Signature
09/11/17

[ TO BE COMPLETED AT CLOSING]

Seller ____ Buyer ____

DocuSign Envelope ID: 92A944E5-959F-4407-A559-6E2FF5D4B6CD

Seller ____ Buyer ____

DocuSign Envelope ID: 92A944E5-969F-4407-A559-6E2FF5D4B6CD

**IN WITNESS WHEREOF,** Buyer and Seller have each caused this Real Estate Purchase Agreement, consisting of ________ (___) pages including this signature page and the Escrow Agent's Acceptance, but not including any Exhibits or Schedules hereto, to be executed and delivered by its duly constituted agent as of the day and year first above written.

**ACCEPTED & AGREED BY:**

J & A of Louisiana LLC
By: ____________
Print Name: Leonard O. Abington and Calvin Jones
Title: Owner

09/11/17
Date of Signature

Food Assistance, Inc.
DocuSigned by: Jane Carlson
By: 8C2D81DA49BC4DD...
Print Name: Jane Y. Carlson
Title: Executive Director

9/2/2017
Date of Signature

**Address of Seller:**

P.O. Box 294
Many, LA 71449

Phone Number: 318-471-2268

**Address of Buyer:**

102 Kirk Road
Greensboro, NC 27455

Phone Number: 336-988-8899

Seller ______ Buyer ______

DocuSign Envelope ID: 92A944E5-969F-4407-A559-6E2FF6D4B6CD

**Exhibit C**

**Bargain Sale Disclosures and Disclaimers**

Both Buyer and Seller agree that these disclosures and disclaimers are incorporated by reference as an integral and material term of the Real Estate Purchase Agreement to which they are attached as **Exhibit C**, that both Buyer and Seller have been provided with and have reviewed these disclosures and disclaimers, and that both Buyer and Seller have had an opportunity to consult and retain counsel, accountants, advisors or any other professional to discuss these disclosures and disclaimers.

- Buyer and Seller hereby acknowledge and agree that Welfont is a real estate brokerage organization, as such, Welfont is serving as a facilitator of this Bargain Sale transaction, and therefore Welfont makes no representation, warranty or acknowledgment as to the Seller's tax circumstances, tax or legal opinions or advice, the availability of any tax deduction to the Seller arising from the Bargain Sale contemplated by this Agreement, the amount of any such tax deduction, the fair market value of the Property, or any facts or matters relating to the Property, its ownership, condition, marketability or suitability for any use.

- Seller acknowledges that Seller must have the Property appraised by a "qualified appraiser" for charitable contribution over $5,000, pursuant to the requirements of IRC Section 170 to qualify for a Bargain Sale transaction. If Seller claims a deduction of more than $500,000.00 for a donation portion of the Property, Seller must attach a copy of the appraisal of the Property that is prepared by the "qualified appraiser" to the Seller's tax returns.

- The Seller and Buyer acknowledge that the contribution is to be reported on IRS Form 8283, which is to be filed with Seller's tax return. The Seller, Buyer and the appraiser must sign IRS Form 8283. Notwithstanding its execution of IRS Form 8283, Buyer makes no representation about or acknowledgment of the amount of any income tax deduction declared by Seller as a result of this transaction.

- If Seller occupies, lease backs, or rents the Property from Buyer longer than sixty (60) days, Seller acknowledges that (i) the occupancy may impact its deduction with respect to this Bargain Sale transaction, and (ii) it shall enter into a written lease at the fair market value of such lease hold interest with Buyer.

- The Seller acknowledges that the Fair Market Value ("FMV") is defined by the IRS in Internal Revenue Code Section 170 and IRS Publication 561, which is ultimately determined a qualified appraiser for a specific asset following the IRS guidelines and definition.

- The Buyer makes no representations of what the Buyer will or will not do with the property after the Buyer consummates this proposed transaction. The Seller acknowledges that the Seller is not imposing a restriction on the sale or encumbrance of the property after the date of this proposed transaction. If there is a restriction imposed by Seller on the sale of the Property, then Seller must inform the qualified appraiser of such restriction, and the appraiser must take that restriction into account in determining the value of the Property as of the date of donation. Seller hereby acknowledges that such restriction may impact the charitable contribution of this Bargain Sale transaction. Buyer acknowledges that if the Buyer chooses to sell the property, it is the Buyer's responsibility to follow any additional regulatory compliance related to this

Seller ____ Buyer ____ DS JC

DocuSign Envelope ID: 92A944E5-969F-4407-A569-6E2FF5D4B6CD

## ESCROW AGENT'S ACCEPTANCE

The undersigned agrees to act as Escrow Agent in accordance with the foregoing Agreement and will acknowledge the Deposit upon receipt.

NAME OF ESCROW AGENT: Meridian Title Corporation

By: ____________________
Name: ____________________
Title: ____________________

Seller ______ Buyer ______

DocuSign Envelope ID: 92A944E5-969F-4407-A559-6E2FF5D4B6CD

property or transaction.

**Exhibit D**
**Due Diligence Document List**

1. Underlying Title Documents
2. ALTA/ACSM Survey
3. Rent Roll (if applicable)
4. Tenant Leases (if applicable)
5. Operating Statement (Year to Date for Current Year)
6. Operating Statements (Previous Years)
7. General Ledger Report-Current Year to Date and Prior Year
8. CAM Reconciliation/CAM Budget
9. Service Contracts
10. Warranties
11. Certificate of Insurance and any claims for the past 3 years
12. Utility Bills (Ledger)
13. Property Tax Bills (Current year and previous 2 years)
14. Certificate of Occupancy (shell and all suites)
15. Building Plans (AS-BUILTS to include MEPs)
16. Roof Information (AS-BUILTS)
17. Parking Information (Please refer to the AS-BUILTS drawings)
18. Phase I Environmental Site Assessment Report
19. Phase II Environmental Site Assessment Report if applicable
20. IRS Schedule C related to the Property

Seller_____ Buyer_____ DS

# An Appraisal Report

*Concerning the Market Value of the Fee Simple Interest of the*

**J&A of Louisiana Land**
±9.64 Acre Commercial Developmental Site

*Located At*

**1665 US Highway 171**
Stonewall, Louisiana 71078



*Prepared For*

**Leonard O. Abington & Calvin Jones**
J&A of Louisiana, LLC
P.O. Box 294
Many, Louisiana 71449

*Prepared By*

**Andrew J. Bryant, MAI, ASA**
Bryant Asset Advisors LLC
11715 Fox Road, Suite 400-127
Indianapolis, IN 46236
EIN: 45-3085574

*As Of*

**November 20, 2017, Effective Date of Value**
November 29, 2017, Report Date

EXHIBIT
"D"

BRYANT ASSET ADVISORS
Real Estate Appraisal & Consulting Services

11715 Fox Road, Suite 400-127
Indianapolis, Indiana 46236
Office: (317) 730-2423
Fax: (317) 863-1017
info@bryantassetadvisors.com
www.bryantassetadvisors.com

Leonard O. Abington & Calvin Jones
J&A of Louisiana, LLC
P.O. Box 294
Many, Louisiana 71449

November 29, 2017

Subject: The estimated fair market value of the real property located at:
1665 US Highway 171, Stonewall, Louisiana 71078

To Whom It May Concern:

Pursuant to your request, I have conducted the required investigation, gathered the necessary data, and made certain analyses that have enabled me to form an opinion as to the estimated fair market value of the fee simple interest in the property at the address listed above.

The function of this appraisal is to provide an "as-is" **Fair Market Value** of the subject property in support of a bargain sale to a charitable organization. It is acknowledged that, ultimately, this appraisal will also be utilized to develop a deduction for the seller's (owner's) federal income tax. The appraiser is not responsible for unauthorized use of this report. Based upon the subsequent investigation and analyses undertaken, I have formed the opinion, that as of the effective date of November 20, 2017, the fair market value of the subject property "as-is" is:

**ONE MILLION ONE HUNDRED FIFTY THOUSAND DOLLARS**
**(*$1,150,000)**
*Refer to page 12 for Extraordinary Assumptions & Limiting Conditions.

**Note:** *As of the effective date, the subject was under contract to purchase, with Food Assistance, Inc., a 501(C) organization, listed as buyer (grantee), and the current ownership as seller (grantor). The purchase price was indicated as being $100,000. This price is not reflective of fair market value and is premised on the assumption that the property is conveyed as a donation. The decision to sell the property at this price as a charitable donation reflects the seller's motivation to liquidate the asset in a timely fashion (to avoid carrying costs).*

The analyses, opinions and conclusions herein were developed and this appraisal report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) and the Appraisal Institute's ethical requirements.

It is understood that this is an Appraisal Report and will be used financial decision making purposes relating to a bargain sale to a charitable organization. The Appraisal Report that follows presents only succinct discussions of the data, reasoning, and analyses undertaken to arrive at the valuation conclusion. This report is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report and IRS Publication 561. Documentation supporting the data, reasoning, and analyses is retained in the appraiser's file. This report is specific to the needs of the client. This letter is cogent only when presented conjointly with the appraisal report.

*Continued…*

*Leonard O. Abington & Calvin Jones*
*J&A of Louisiana, LLC*
*Page Two*

J&A of Louisiana, LLC, in addition to affiliates and-or assigns, including the Internal Revenue Service (IRS), may rely upon this report in evaluating the subject property's Fair Market Value for financial decision making purposes relating to a bargain sale of the subject.

**Extraordinary Assumptions**

- See page 12

**Hypothetical Conditions**

- None

Our firm appreciates the opportunity to have performed this appraisal assignment on your behalf. If we may be of further service, please contact us.

Respectfully submitted,
**Bryant Asset Advisors, LLC**

Andrew J. Bryant, MAI, ASA
Indiana Certified General Appraiser
License # CG41100046 (Expires 6/30/2018)
Louisiana Temporary Registration Certification Number: 1878

**Bryant Asset Advisors LLC**
11715 Fox Road, Suite 400-127
Indianapolis, IN 46236
EIN: 45-3085574

# TABLE OF CONTENTS


**TABLE OF CONTENTS** .......... **4**

**APPRAISER'S CERTIFICATION OF VALUE** .......... **5**

**SUMMARY OF SALIENT FACTS & CONCLUSIONS** .......... **6**

**GENERAL ASSUMPTIONS AND LIMITING CONDITIONS** .......... **8**

**EXTRAORDINARY ASSUMPTIONS AND/OR ATYPICAL LIMITING CONDITIONS** .......... **12**

**REPORT FUNDAMENTALS** .......... **13**

- Definition of the Problem .......... 13
- Scope of Appraisal .......... 13
- Intended Use of Appraisal .......... 13
- Client Identification - Intended User of Appraisal .......... 14
- Real Property Interest Appraised .......... 14
- Effective Date of the Appraisal .......... 14
- Competency of Appraiser .......... 14
- "Typical Buyer" Defined .......... 14
- History of the Property .......... 15
- Definition of Market Value .......... 15
- IRS 561 Appraisal Guidlines .......... 15
- Marketing Period & Exposure Time .......... 16
- Appraisal Process Summary .......... 17

**MARKET AREA ANALYSIS** .......... **18**

- National Market Area Analysis .......... 18
- Regional Market Area Analysis .......... 27
- Local Market Analysis .......... 34

**SITE DESCRIPTION** .......... **37**

- Representative Subject Photos .......... 41

**HIGHEST AND BEST USE ANALYSIS** .......... **42**

**VALUATION PROCESS SUMMARY** .......... **45**

**THE COST APPROACH** .......... **46**

**SALES COMPARISON APPROACH** .......... **46**

- Comparable Sales Grid (Quantitative Analysis) .......... 51
- Additional Trade Data (Qualitative Analysis) .......... 53

**INCOME APPROACH** .......... **53**

**RECONCILIATION AND VALUE ESTIMATE** .......... **54**

**ADDENDUM** .......... **55**

- *Subject Exhibits* .......... *56*
- *Qualifications of the Appraiser* .......... *57*

# APPRAISER'S CERTIFICATION

I hereby certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analysis, opinions and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. My analyses, opinions, and conclusions have been developed, and this appraisal report has been prepared in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice; Financial Institutions Reform, Recovery, and Enforcement Act of 1989, IRS Publication 561, and the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

8. No physical inspection of the subject was performed by the appraiser. Their inspection was limited to various data sources, including Google, Bing, local/municipal and state GIS maps, photographs provided by the client, and other site data provided by the client.

9. Andrew J. Bryant, MAI, ASA, is professionally competent to perform this appraisal assignment by virtue of previous experience with similar assignments and/or research and education regarding the specific property type being appraised.

10. I have performed no other services, as an appraiser, or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the acceptance of this assignment.

11. No one provided significant real property appraisal assistance to the person signing this certification.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, I, Andrew J. Bryant, MAI, ASA, have completed the continuing education program of the Appraisal Institute, and American Society of Appraisers.

As of the effective date of this report, being: November 20, 2017.

Andrew J. Bryant, MAI, ASA
Indiana Certified General Real Property Appraiser
License # CG41100046 (Expires 6/30/2018)
Louisiana Temporary Practice Permit # 1878

November 29, 2017
Date

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| **PROPERTY NAME:** | J&A of Louisiana Vacant Land |
| **PROPERTY USE TYPE:** | ±9.64 Acre Commercial Developmental Tract |
| **REAL PROPERTY:** | The subject property consists of a ±9.64 gross acre (±420,114 SF, per survey) tract of commercial developmental land, comprised of a single parcel, with minimal improvement. The improvements existing on-site include two (2) single-family residences of manufactured production, in addition to various auxiliary improvements, such as utility sheds, and fencing. The improvements are in poor to fair condition and do not represent the highest and best use of the site, under existing zoning, and make no significant contribution to value, over the fair market value of the land, "as-though-vacant".<br><br>Note: See also any Extraordinary Assumptions or Atypical Limiting Conditions of this Appraisal Report, page 12. |
| **GENERAL LOCATION:** | The subject property is located along the east side of US Highway 171, approximately ±1,000 feet south of its intersection with William Flavis Road, within the Town of Stonewall, DeSoto Parish, Louisiana. This location is approximately ±1.60 miles south of downtown Stonewall, ±17.0 miles north of Mansfield (DeSoto Parish seat), and ±18.8 miles southwest of the Shreveport central business district (CBD), within the Shreveport-Bossier Metropolitan Statistical Area (MSA), in northwestern Louisiana. |
| **LOCATION:** | |
| Mailing Address: | 1665 US Highway 171 |
| Ward, Parish: | Ward 2, Caddo Parish |
| City, State & Zip Code: | Town of Stonewall, Louisiana 71078 |
| **PARCEL NUMBER:** | 0200252000 |
| **OWNER OF RECORD:** | J & A of Louisiana, L.L.C.<br>1030 San Antonia Avenue<br>Many, Louisiana 71449-0000 |
| **PROPERTY HISTORY:** | The subject property consists of a single parcel, currently under the ownership of J & A of Louisiana, L.L.C. The subject is identified on public records as 1659 Highway 171, Stonewall, Louisiana 71078, but has a common address of 1665 US Highway 171.<br><br>Parrish records indicate that the subject last transferred on May 11, 2016, to the current ownership, from Caroline W. Coker. The purchase price was unlisted. No additional transfers were noted within the three years preceding the effective date of this appraisal. |

As of the effective date, the subject was under contract to purchase, with Food Assistance, Inc., a 501(C) organization, listed as buyer (grantee), and the current ownership as seller (grantor). The purchase price (cash value) was indicated as being $100,000.

**Note:** This price is not reflective of fair market value and is premised on the assumption that the property is conveyed as a donation. The decision to sell the property at this price as a charitable donation reflects the seller's motivation to liquidate the asset in a timely fashion (to avoid carrying costs).

**VALUE INDICATIONS:**

| | |
|---|---|
| Cost Approach: | Not Developed |
| Sales Comparison Approach: | $1,155,000 |
| Income Capitalization Approach: | Not Developed |
| **FAIR MARKET VALUE "AS-IS":** | **$1,150,000 (Rounded to the nearest *$10,000*)** |
| *As of the effective date being:* | November 20, 2017 |
| *As of the date of report being:* | November 29, 2017 |
| **MARKETING & EXPOSURE TIME:** | 24 to 36 months in current market conditions |

## General Assumptions and Limiting Conditions

This appraisal report has been made with the following general assumptions:

1. Any legal description or plats reported herein are assumed to be accurate. Any sketches, surveys, plats, photographs, drawings or other exhibits are included only to assist the intended user to better understand and visualize the subject property, the environs, and the competitive data. We have made no survey of the property and assume no responsibility in connection with such matters.

2. The appraiser has not conducted any engineering or architectural surveys in connection with this appraisal assignment. Information reported pertaining to dimensions, sizes, and areas is either based on measurements taken by the appraiser or the appraiser's staff or was obtained or taken from referenced sources and is considered reliable. No responsibility is assumed for the costs of preparation or for arranging geotechnical engineering, architectural, or other types of studies, surveys, or inspections that require the expertise of a qualified professional.

3. No responsibility is assumed for matters legal in nature. Title is assumed to be good and marketable and in Fee Simple unless otherwise stated in the report. The property is considered to be free and clear of existing liens, easements, restrictions, and encumbrances, except as stated.

4. Unless otherwise stated herein, it is assumed there are no encroachments or violations of any zoning or other regulations affecting the subject property and the utilization of the land and improvements is within the boundaries or property lines of the property described and that there are no trespasses or encroachments.

5. Bryant Asset Advisors, LLC assumes there are no private deed restrictions affecting the property which would limit the use of the subject property in any way.

6. It is assumed the subject property is not adversely affected by the potential of floods; unless otherwise stated herein.

7. It is assumed all water and sewer facilities (existing and proposed) are or will be in good working order and are or will be of sufficient size to adequately serve any proposed buildings.

8. Unless otherwise stated within the report, the depiction of the physical condition of the improvements described herein is based on visual inspection. No liability is assumed for the soundness of structural members since no engineering tests were conducted. No liability is assumed for the condition of mechanical equipment, plumbing, or electrical components, as complete tests were not made. No responsibility is assumed for hidden, unapparent or masked property conditions or characteristics that were not clearly apparent during our inspection.

9. If building improvements are present on the site, no significant evidence of termite damage or infestation was observed during our physical inspection, unless so stated in the report. No termite inspection report was available, unless so stated in the report. No responsibility is assumed for hidden damages or infestation.

10. Any proposed or incomplete improvements included in this report are assumed to be satisfactorily completed in a workmanlike manner or will be thus completed within a reasonable length of time according to plans and specifications submitted.

11. No responsibility is assumed for hidden defects or for conformity to specific governmental requirements, such as fire, building, safety, earthquake, or occupancy codes, except where specific professional or governmental inspections have been completed and reported in the appraisal report.

12. Responsible ownership and competent property management are assumed.

13. The appraisers assume no responsibility for any changes in economic or physical conditions which occur following the effective date of value within this report that would influence or potentially affect the analyses, opinions, or conclusions in the report. Any subsequent changes are beyond the scope of the report.

14. The value estimates reported herein apply to the entire property. Any proration or division of the total into fractional interests will invalidate the value estimates, unless such proration or division of interests is set forth in the report.

15. Any division of the land and improvement values estimated herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application.

16. Unless otherwise stated in the report, only the real property is considered, so no consideration is given to the value of personal property or equipment located on the premises or the costs of moving or relocating such personal property or equipment.

17. Unless otherwise stated, it is assumed that there are no subsurface oil, gas or other mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Nor are the rights associated with extraction or exploration of such elements considered; unless otherwise stated. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

18. Any projections of income and expenses, including the reversion at time of resale, are not predictions of the future. Rather, they are our best estimate of current market thinking of what future trends will be. No warranty or representation is made that these projections will materialize. The real estate market is constantly fluctuating and changing. It is not the task of an appraiser to estimate the conditions of a future real estate market, but rather to reflect what the investment community envisions for the future in terms of expectations of growth in rental rates, expenses, and supply and demand. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

19. Unless subsoil opinions based upon engineering core borings were furnished, it is assumed there are no subsoil defects present, which would impair development of the land to its maximum permitted use or would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

20. Bryant Asset Advisors, LLC representatives are not experts in determining the presence or absence of hazardous substances, defined as all hazardous or toxic materials, wastes, pollutants or contaminants (including, but not limited to, asbestos, PCB, UFFI, or other raw materials or chemicals) used in construction or otherwise present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such substances or for loss as a result of the presence of such substances. Appraisers are not qualified to detect such substances. The client is urged to retain an expert in this field.

21. We are not experts in determining the habitat for protected or endangered species, including, but not limited to, animal or plant life (such as bald eagles, gophers, tortoises, etc.) that may be present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such species or for loss as a result of the presence of such species. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent endangered species impact studies, research, and investigation that may be provided.

22. No environmental impact studies were either requested or made in conjunction with this analysis. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental impact studies, research, and investigation that may be provided.

23. The appraisal is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the report; further, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

24. Neither all nor any part of the contents of this report or copy thereof, shall be conveyed to the public through advertising, public relations, news, sales, or any other media, without the prior written consent and approval of the appraisers. This limitation pertains to any valuation conclusions, the identity of the analyst or the firm and any reference to the professional organization of which the appraiser is affiliated or to the designations thereof.

25. Although the appraiser has made, insofar as is practical, every effort to verify as factual and true all information and data set forth in this report, no responsibility is assumed for the accuracy of any information furnished the appraiser either by the client or others. If for any reason, future investigations should prove any data to be in substantial variance with that presented in this report, the appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or estimates of value.

26. If this report has been prepared in a so-called "public non-disclosure" state, real estate sales prices and other data, such as rents, prices, and financing, are not a matter of public record. If this is such a "non-disclosure" state, although extensive effort has been expended to verify pertinent data with buyers, sellers, brokers, lenders, lessors, lessees, and other sources considered reliable, it has not always been possible to independently verify all significant facts. In these instances, the appraiser may have relied on verification obtained and reported by appraisers outside of our office. Also, as necessary, assumptions and adjustments have been made based on comparisons and analyses using data in the report and on interviews with market participants. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

27. The American Disabilities Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey or analysis of the property to determine whether or not it is in conformity with the various detailed requirements of ADA. It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative impact upon the value of the property. Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

28. This appraisal report has been prepared for the exclusive benefit of the client. It may not be used or relied upon by any other party. Any other party who is not the identified client within this report who uses or relies upon any information in this report does so at their own risk.

29. The dollar amount of any value opinion herein rendered is based upon the purchasing power and price of the United States Dollar as of the effective date of value. This appraisal is based on market conditions existing as of the date of this appraisal.

30. The right is reserved by the appraiser to make adjustments to the analyses, opinions, and conclusions set forth in this report as may be required by consideration of additional or more reliable data that may become available. No change of this report shall be made by anyone other than the appraiser or appraisers. The appraiser(s) shall have no responsibility for any unauthorized change(s) to the report.

31. If the client instructions to the appraiser were to inspect only the exterior of the improvements in the appraisal process, the physical attributes of the property were observed from the street(s) as of the inspection date of the appraisal. Physical characteristics of the property were obtained from tax assessment records, available plans, if any, descriptive information, and interviewing the client and other knowledgeable persons. It is assumed the interior of the subject property is consistent with the exterior conditions as observed and that other information relied upon is accurate.

32. The submission of this report constitutes completion of the services authorized. It is submitted on the condition the client will provide reasonable notice and customary compensation, including expert witness fees, relating to any subsequent required attendance at conferences, depositions, and judicial or administrative proceedings. In the event the appraiser is subpoenaed for either an appearance or a request to produce documents, a best effort will be made to notify the client immediately. The client has the sole responsibility for obtaining a protective order, providing legal instruction not to appear with the appraisal report and related work files and will answer all questions pertaining to the assignment, the preparation of the report, and the reasoning used to formulate the estimate of value. Unless paid in whole or in part by the party issuing the subpoena or by another party of interest in the matter, the client is responsible for all unpaid fees resulting from the appearance or production of documents regardless of who orders the work.

33. Use of this appraisal report constitutes acknowledgement and acceptance of the general assumptions and limiting conditions, special assumptions (if any), extraordinary assumptions (if any), and hypothetical conditions (if any) on which this estimate of market value is based.

34. If provided, the estimated insurable value is included at the request of the client and has not been performed by a qualified insurance agent or risk management underwriter. This cost estimate should not be solely relied upon for insurable value purposes. The appraisers are not familiar with the definition of insurable value from the insurance provider, the local governmental underwriting regulations, or the types of insurance coverage available. These factors can impact cost estimates and are beyond the scope of the intended use of this appraisal. The appraisers are not cost experts in cost estimating for insurance purposes.

## *Extraordinary Assumptions and/or Atypical Limiting Conditions of this Appraisal Report:*

1. The appraiser did not perform a personal inspection of the subject property. The appraiser's analysis was confined to their analysis of the subject through local GIS maps, Google Earth, Google Maps (and street views), Bing aerial maps, interviews with the client and representative of the ownership, as well as additional photos/site analysis data supplied to the appraiser through these sources that included a recent Appraisal Report. The appraiser assumes the physical condition of the subject, as of the effective date of this report, is consistent with the resources utilized in their analysis of the subject and interviews conducted with the client and representative of the ownership. If the condition of the subject is found to have been significantly different than the resources utilized (contractor inspection report, Google Street photos, aerial maps, property record data, client, etc.), the appraiser reserves the right to make a personal inspection of the subject property and alter their value opinion, based upon their additional investigations and analysis after physical inspection.

2. General Assumption: The value conclusions described herein are predicated on several extraordinary assumptions being met or realized, based on IRS Publication 561 guidelines. These include, but are not limited to, the aggressive and creative marketing of the asset be handled by a professional, market dominant, commercial brokerage team specializing in commercial-retail real estate; marketing time of the asset be nearly open ended (24-36+ months) and void of any undue pressure or motivation on the part of the seller; exposure time is assumed to have been (24-36+ months) preceding the effective date of value; necessary capital investment be made to repair all items of deferred maintenance; property being professionally maintained throughout the prescribed marketing period to exhibit pride of ownership; outreach be made to the Town of Stonewall, and DeSoto Parish to explore any public-private partnership opportunities that might benefit the marketing efforts or serve to enhance the appeal of the subject property; historically low interest rates remain stable; national economic conditions remain stable and continue on a positive trend; local market conditions remain stable to upwardly trending; redevelopment trends continue to take root and benefit more properties within the subject's trade area. It is the opinion of the appraiser that any past buyer or marketing resistance experienced by the owner is likely a result of, or partially due to a lack of intensive, specialized marketing efforts. However, given the current upward economic trends seen in the real estate sector, it is the opinion of the appraiser that the subject property will be an attractive investment for any potential owner-user, or investor/group of investors for office use in the near future.

## *Hypothetical Conditions:*

1. None.

# REPORT FUNDAMENTALS

The following sections provide basic information about the subject property and this appraisal report.

## Definition of the Appraisal Problem

This analysis has been ordered by the client to estimate the fair market value of the fee simple interest in the subject property, identified as the developmental land, located at 1665 US Highway 171, Stonewall, Louisiana 71078. It is understood that this is an Appraisal Report, and will be used for financial decision making purposes in support of a bargain sale to a charitable organization, based on IRS Publication 561. It is acknowledged that, ultimately, this appraisal will also be utilized to develop a deduction for the seller's (owner's) federal income tax. This appraisal is undertaken on an "as-is" basis. Refer to page 12 for Extraordinary Assumptions and/or Atypical Limiting Conditions.

## Scope of Appraisal

The scope of this appraisal concerns the valuation of the subject property - as identified within the *Problem* and *Identification of the Subject Property* sections of this report - on an "as-is" basis.

Having performed an investigation of the subject site and local market area, as well as having gained an understanding of various locational and supply and demand forces active within the subject's market, an analysis is performed concerning the subject property's highest and best use. Based upon the conclusions ascertained via the highest and best use analysis, relevant comparable sales information has been sought, collected, and verified. The data included in this report represents information collected from several sources, not limited to, grantors and grantees of properties, real estate brokers, real estate appraisers, developers of real estate, and real estate management companies. Sources are quoted where applicable.

In most appraisals, once all relevant information is collected and analyzed, it is systematically developed into three approaches to value; the Cost Approach, Sales Comparison Approach, and the Income Approach. Finally, these three value estimates are then reconciled into a final market value determination for the subject property. Additional value determinations may be indicated as deemed necessary by the appraisers, or as requested by the client.

Note that all of the data obtained and employed within this analysis is not necessarily presented within this report. Data collected during our office's research-phase of the valuation analysis but not considered relevant is maintained within our office's work-file.

## Intended Use of Appraisal

The intended use of the appraisal analysis undertaken is to determine the highest and best use and estimate the fair market value of the fee simple interest in the subject on an "as-is" basis for financial decision making purposes in support of a bargain sale to a charitable organization. No attempt is made to determine "sentimental," "book," or "investment" value. This report is for the sole and private use of the client. Acceptance and use of this report shall constitute contractual agreement with an implied consent to all of the definitions, functions, purposes, and limiting conditions contained in this report.

## Client Identification - Intended User of Appraisal

J&A of Louisiana, LLC, in addition to their affiliates and-or assigns, including the Internal Revenue Service (IRS), may rely upon this report in evaluating the subject property's market value ("Fair Market Value") for financial decision making purposes in support of a bargain sale to a charitable organization. It is acknowledged that, ultimately, this appraisal will be utilized to develop a deduction for the seller's (owner's) federal income tax. No other user is intended or permitted.

## Real Property Interest Appraised

The real property interest appraised is the fee simple estate interest. It is defined as:

> "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."[1]

Fee simple estate is recognized as the highest state of ownership, an absolute fee, a fee unencumbered by restrictions; a fee without limitations of use or dispositions to any particular class of heirs; subject only to the aforementioned limitations.

## Effective Date of the Appraisal

No physical inspection of the subject was performed by the appraiser. The appraiser's analysis of the subject was limited to various data sources, including documents and information obtained from the client, potential buyer, county offices, Google, Bing, local and state GIS maps, and other property data provided by representatives of the listed buyer and current ownership. The effective date of value is November 20, 2017. The report was prepared in the interim and signed on November 29, 2017, representing the completion of the report.

## Competency of Appraiser

Our office certifies that Andrew J. Bryant, MAI, ASA, is currently a Certified General Appraiser (CG41100046) by the State of Indiana, working under a temporary permit to practice within the State of Louisiana (1878). He is designated as a commercial (MAI) appraiser by the Appraisal Institute, and an Accredited Senior Appraiser (ASA – Real Property) by the American Society of Appraisers. During the previous several years, Andrew J. Bryant, MAI, ASA, has performed and adequately completed appraisal assignments concerning various improved commercial and industrial properties, as well as vacant tracts of land contemplated for development of various types of office-use, retail, commercial, industrial and residential development. He has previously appraised properties similar to the subject of this report.

## "Typical Buyer" Defined

The "typical buyer", as the term is used in this appraisal context, is defined to identify the characteristics of a potential purchaser of this real estate and improvements. Such characteristics are used to develop the mind-set of those individuals or entities most likely to comprise the theoretical market for the subject. The "typical buyer" is considered as an investor, group of investors, or possibly an owner-user whose purpose is achieve a fair return on a reasonably safe real estate investment.

---

[1] Appraisal Institute, The Dictionary of Real Estate Appraisal, Fifth Edition, (Chicago, Appraisal Institute, 2010), p. 57.

## *History of the Property*

The subject property consists of a single parcel, currently under the ownership of J & A of Louisiana, L.L.C. The subject is identified on public records as 1659 Highway 171, Stonewall, Louisiana 71078, but has a common address of 1665 US Highway 171.

Parrish records indicate that the subject last transferred on May 11, 2016, to the current ownership, from Caroline W. Coker. The purchase price was unlisted. No additional transfers were noted within the three years preceding the effective date of this appraisal.

As of the effective date, the subject was under contract to purchase, with Food Assistance, Inc., a 501(C) organization, listed as buyer (grantee), and the current ownership as seller (grantor). The purchase price (cash value) was indicated as being $100,000.

<u>Note: This price is not reflective of fair market value and is premised on the assumption that the property is conveyed as a donation. The decision to sell the property at this price as a charitable donation reflects the seller's motivation to liquidate the asset in a timely fashion (to avoid carrying costs).</u>

## *Definition of Fair Market Value*

Fair market value is specifically identified to differentiate the conclusion of this analysis from other forms of value. According to U.S. treasury Department regulations, Fair market value is defined in this report as:

*"Fair market value (FMV) is the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts. If you put a restriction on the use of property you donate, the FMV must reflect that restriction."*[2]

As stated, this intended use of this appraisal report is to support the due diligence of a bargain sale for charitable donations under IRS Publication 561 guidelines.

## *IRS 561 Appraisal Guidelines*

Regardless of a property's location, condition or adverse environmental hazards, the IRS allows the Seller to obtain an IRS 561 appraisal for the purpose of a Bargain Sale transaction. The appraisal method is not like a typical bank quick-sale appraisal, nor an insurance appraisal. It's specifically for the purposes of estimating the value of donated property.

**<u>Not Under Compulsion to Sell</u>**

In IRS Publication 561 and IRC §170 the regulations state in various forms that the value for charitable contributions and bargain sales are determined with the following components:

*"The fair market value is the price at which the property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, <u>with neither being required to act</u>, and both having reasonable knowledge of the relevant facts."*

In real estate transactions, one of the biggest reasons that a 561 Appraisal may be higher than list price for large and hard to move properties with significant carrying costs is because the list price is often determined by a seller who is "under compulsion" to sell within certain time frames.

[2] IRS Publication 561

The carrying costs and need to dispose of the property outweigh the need to wait and find the right buyer and user. The 561 Appraisal price is determined by using the IRS stipulation of "not under compulsion" to buy or sell regardless of the carrying cost and other factors.

**Weighted Average of Market, Income, and Replacement Cost Approaches**
Another example of how this appraisal method is different is that Publication 561 allows for, and encourages, a weighted average of the market (sales) approach, income approach and replacement cost approach. The Bargain Sale 561 appraisal accounts for all approaches using a weighted average determined by the qualified appraiser. However, it remains the appraiser's discretion which approaches are applied.

**Highest and Best Use**
A final example of how the 561 Bargain Sale Appraisal is often higher than what the seller is willing to sell it for, is because IRS Publication 561 makes it clear that the appraised value must be based on the property's highest and best use. And quite often the Seller is not patient enough to realize the highest and best use of the property, because of things like the high carrying costs of the property, the Seller's own business and investment focus, external factors influencing the seller's motivation and compulsion to sell, and so forth.

These are just a few examples of how often a Bargain Sale Appraisal, based on Publication 561, can be very different than what the Seller is willing to sell it for.

Bargain Sale Analysis and a Bargain Sale Opinion of Value, as defined by Charity Partners Network and the Welfont Group:

*"Our researchers specifically look for properties that fit our investment criteria, are hard to sell within certain time parameters, and would obtain a higher appraised value than what the seller can sell it for under compulsion, duress, or certain time limits. Once potential properties have been selected, we do an internal valuation to determine where a certified appraiser will likely appraise a specific property. If our internal valuation is favorable and we like the property, then we make an offer. If the seller accepts our offer, then go through the actual appraisal process with the seller."*

## Exposure Time & Marketing Period

The exposure period is "the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market".[3]

The marketing period is "the reasonable marketing time is an estimate of the amount of time it might take to sell a property interest in real estate at the estimated market value level during the period immediately after the effective date of an appraisal."[4]

Based on conversations with local brokers, the subject's marketing and exposure periods are estimated to be approximately 24-36 months to an unmotivated seller, wishing to receive fair market value for their property under the definition of market value utilized in this appraisal (see above). Refer to page 12 for Extraordinary Assumptions and/or Atypical Limiting Conditions.

[3] USPAP Standard No. 6 Adopted September 16, 1992.
[4] USPAP Advisory Opinion G-7, 1994, page 89.

## *Appraisal Process Summary*

The following presents the appraisal process performed in this Appraisal Report:

The use of the Cost Approach is predicated on the assumption that a prudent investor is not warranted in paying more for a given property than its cost of production. This appraisal centers on the valuation of a commercial developmental site, with limited improvement; therefore, the Cost Approach has limited utility and was not developed in this appraisal.

The Sales Comparison Approach is developed from a limited statistical sampling of sales of "like-kind" properties. Based on the number and degree of required adjustments and the perceived compatibility of the sales comparables, the resulting estimate of Fair Market Value for the subject property is considered reliable.

The Income Capitalization Approach is chiefly reliable in the appraisal of properties which are capable of generating income. In the case of the subject, as developmental land with no known leases in place encumbering the property, the Income Approach was not considered applicable to this appraisal.

# MARKET AREA ANALYSIS

## *Introduction*

The initial analysis undertaken concerning the valuation of the subject property focuses upon various "external" factors, (i.e., factors beyond the subject property's physical boundaries), that influence market value and potential marketability. In addition to communicating the subject's physical context within Caddo Parish, Louisiana, a national and regional market analysis is performed to ascertain the subject's geopolitical context. Geopolitical forces that affect market value and marketability include the subject's position relative to area demographic shifts and the local market's infrastructure. Consideration is also given to the subject's position relative to area economic trends and growth cycles. Having considered the effects of these various forces, informed conclusions concerning the health of the area and local market can be drawn.

# NATIONAL MARKET ANALYSIS

Initially, this analysis will focus on the macro economy of the nation. A national map showing the subject's regional market is shown below and a summary of the national economy follows.

**National Map**




The following points summarize some of our general observations relating to the national economy.[5]

[5] Data obtained from Kiplinger's Economic Outlooks

**Economy (GDP):**

- Gross domestic product is the broadest indicator of the economy, measuring the value of final goods and services produced in the U.S. in a given time period. It is perhaps the most closely watched indicator as well, serving as a guidepost for Federal Reserve interest rate policy and fir budgeting both government and private industry.
- The U.S. economy is poised to pick up its pace — with the strongest growth of the year to come in the second half — following a paltry gain of 0.5% in the first quarter. For the year as a whole, look for the nation's GDP to expand by about 2%, down from 2.4% in 2015. Despite a somewhat sluggish April, GDP should rebound in the second quarter and rise by at least 2%, before expanding by 3% in the last six months of the year.
- Consumer spending, which accounts for about 70% of spending, will be the main engine of growth. Continuing job and wage gains will fuel gains in disposable income, enticing consumers to open their wallets after months of paying down various debts and hiking their savings rate.
- Consumer spending will, in turn, spark more home sales, buoying the housing market. Leisure and hospitality businesses will also hear their cash registers ringing more. More government spending, a slow pickup in business investment and increased lending by banks will also contribute to economic growth.
- To be sure, the economy still faces headwinds. Though oil prices are up from their lows, the energy sector won't show much new life until next year. And the still relatively strong dollar will continue to dampen the outlook for firms that make and export products for sale abroad.

**Employment:**

- If gross domestic product is the broadest indicator of the economy, employment is the one most personally felt. These are people's jobs we're talking about.
- Two distinct metrics make up the employment forecast. The more important one is the "payroll report," a summation by the Department of Labor of how many jobs the economy has created (or lost) each month. This data is broken out by sector, such as manufacturing, mining and health care. Note that simply to keep up with population growth, the economy needs to add more than 100,000 jobs every month; otherwise the unemployment rate will rise.
- That rate is the other closely watched figure. It's a simple division of the number of people who have looked for work in the prior four weeks but who do not have a job by how many people are currently in the labor force. That simplicity belies some underlying concerns about the unemployment rate. One key one: Potential workers who aren't actively looking for work aren't included in the calculation.
- Look for job growth in the U.S. to expand to a still healthy 195,000 new hires a month, a step down from last year's 229,000 average. Some sectors of the economy, such as retail establishments and restaurants, appear due for a breather after breakneck growth in past months. Also, with the labor market tightening, it is becoming more difficult for tech companies and other firms looking for skilled help to find qualified workers.
- Though April's low job growth of 160,000 was a bit of a disappointment, raising concerns about the tepid growth of the economy, the lower-than-expected number was entirely the result of weak hiring by the U.S. Postal Service, public education institutions and retailers. More broadly, job growth remains anemic — it has been for a while — in mining, energy and export-oriented industries, as well as at the air, rail, truck and shipping companies that serve them.
- On the plus side, employment in health care, food services, and professional and business services continued to register strong gains through April. Job growth is also on a solid track in the warehousing sector, where Amazon and other retail companies are building up regional distribution networks.
- The unemployment rate will likely fall to 4.7% by the end of the year. A broader measure of labor market slack that combines unemployment and underemployment, called U-6, dipped to 9.7% in April because of a decline in the number of part-timers who wanted full-time

work. U-6 is still above its 8.4% level of 10 years ago, but a long way below its peak of 17% in 2010.

- Meanwhile, wage gains are perking up. Average hourly earnings grew 2.5% over the twelve months ending in April. As the labor market tightens further, as we expect, look for wage growth to strengthen to a 3% rate by the end of 2016. Hiring and wage gains also figure to spur consumer confidence and spending.
- The surprisingly low employment number for April will likely cause the Federal Reserve Board to wait until at least July before hiking interest rates again. The data will not be strong enough for it to pull the trigger a month earlier. Also, the June meeting occurs just one week before the United Kingdom votes on whether to stay in the European Union. The Fed most likely will not want to act before the outcome, because a vote to leave the EU would likely rattle international financial markets. Fed Chair Janet Yellen and her colleagues are also concerned about being the only monetary policymakers in the world raising interest rates while others are still cutting them — conflicting moves that would further underpin the strong U.S. dollar and hurt U.S. exports.

**Interest Rates:**

- Interest rates are of tremendous interest to borrowers (for whom they are a cost) and lenders (a category that includes individuals trying to get some return on their bank savings). Almost everyone is in one or both categories. The level of short-term rates, such as those used by banks when loaning each other money overnight, is set by the Federal Reserve through its Open Market Committee, usually at regularly scheduled meetings.
- Market interest rates, including those in money markets and offered on consumer products such as certificates of deposit, follow the Fed's lead but are also subject to other influences — for example, risk, transaction costs and expectations of inflation. Generally, the longer the period of the loan, such as with 10-year Treasury Bonds or mortgages, the more important market factors become compared with the Federal Reserve's actions. We forecast both what we expect the Federal Reserve to do in the near term and to what extent that will affect the direction of long-term interest rates.
- Odds now favor only one interest rate hike this year, in either late July or December, if employment and other economic data show more signs of life, as we expect they will start doing in the second half of 2016. With economic momentum in the U.S. and abroad slow to develop so far, the Federal Reserve likely won't have enough evidence of forward economic momentum to justify a rate hike at its June meeting. Also giving the Fed pause in June: a scheduled June 33 vote in Britain on whether or not to remain in the European Union. A vote to leave would surely roil the global economy and financial markets.
- And since the Fed will bend over backward to stay out of presidential election politics, there's no way it will even consider acting on rates at meetings in September and early November, with campaigning in full swing.
- That leaves just the July or December meetings as the most viable options for raising rates. If the economy starts picking up momentum sooner rather than later, then July would be the month. If not, then December looks more likely. (Possible, though much less likely, are rate increases at both meetings.)
- Until the first rate hike, we expect interest rates to remain at very low levels, with the 10-year Treasury note yielding about 1.8% or so. Any fresh economic upheaval, such as Britain's exit from the EU, could drive rates even lower. The U.S. dollar remains the world's safe haven currency.
- Look for the Fed to also back off its previous vow to stop replacing maturing securities among its $4.5-trillion portfolio following its quarter-point hike in short-term rates this past December. Our bet is that the Fed will wait until 2017 to stop replacing maturing securities. Since 41% of its portfolio is in mortgage-backed securities, delaying the move should be beneficial for mortgage rates this year.
- By the end of 2016, we see the 10-year Treasury bond rate at 2.1% versus 1.7% now, and the 30-year mortgage rate at 3.9%, from 3.6%.

- We expect more frequent interest rate increases in 2017. Eventually, the Fed will realize that it's not getting very far in "normalizing" short-term interest rates back to the 3% level, and it will mull accelerating hikes once it appears safe to do so in light of an improving economy. Moreover, growing tightness in the labor market in the form of a very low unemployment rate and the beginnings of wage pressures will cause inflation expectations to rise, boosting the push for higher rates.

**Inflation:**

- Inflation is the generally rising price of goods and services, or why things cost more. It's measured by the Department of Labor using a sample, dubbed a "market basket," of what people in urban areas in the U.S. actually buy each month. Then each month, data collectors check on the prices of those items. From that research we get the Consumer Price Index (CPI).
- A component of that index, the core inflation rate, which excludes the more volatile prices of food and energy, is also closely watched. At Kiplinger, we forecast changes in both.
- Economists generally believe that moderate inflation of about 2% is best for an economy. Prices that are rising too quickly cause consumers heartburn, of course, but prices that are flat or falling are a problem, too. This condition, known as deflation, makes debts more expensive to pay back and can lead to declining business investment.

**Business Spending:**

- How much businesses are laying out in investment is critical to other businesses in guiding their own spending. In making our forecasts for the direction of business spending in the quarters and years ahead, we follow two indexes from the Census Bureau: Durable Goods Shipments and Orders and Business Inventories reports.
- Look for manufacturers to continue to struggle this year against the combined impact of sluggish demand from abroad, the strong dollar and declining investment in energy projects, which reduces demand for energy-related goods.
- Key overseas economies such as China's are slowing, while others, including Brazil's, have slipped into outright recession, sapping the potential for exports. Moreover, the resilient dollar makes U.S.-produced goods more expensive in foreign markets while it helps draw in imports. And large oil field service and product suppliers, such as Halliburton and Schlumberger, are paring back capital projects.
- Notwithstanding a small decline in the dollar's value against other key currencies this year, the greenback remains well above its relative value at mid-2014 and thus will continue to pose a headwind for exporters.
- Still, despite weaker first-quarter spending by businesses than in the same period a year ago, we expect a 4% gain in new equipment purchases for the full year. That's a modest improvement, coming on the heels of a 3.5% decline in spending last year on long-lasting durable goods, ranging from computers to aircraft and machinery.
- Business spending will pick up somewhat in coming months as the overstock of inventories from last year is finally drawn down, opening the way for some companies to buy new materials and equipment as they ramp up to churn out more products to meet demand. Spending upticks tend to show up first in orders for fabricated metals (used in intermediate-stage goods) and primary metals, which are running more than 10% below year-ago levels so far this year.
- March orders for capital goods regained a little ground from February's slump, but were weak overall. What strength there was in March orders primarily stemmed from increased demand for military aircraft and other defense goods. By contrast, orders for civilian aircraft, new cars and nondefense capital goods all fell from February levels.
- Manufacturing, of course, no longer plays a significant role in driving the economy. The factory sector accounts for about 12% of national economic output, so while reduced activity is a drag on growth, it's not necessarily enough to trigger a broader slowdown. Keep in mind, too, that not all of manufacturing is in a deep funk. Even after March's decline, for

example, assembly lines for civilian aircraft are humming, with Boeing sporting a years-long order backlog.

- And though there's not much reason to anticipate a pickup in investment by hard-hit oil and gas producers anytime soon, most of the big spending cuts in the energy sector are in the rearview mirror. With oil prices starting to edge back up, there shouldn't be many more unpleasant surprises from that quarter.

**Energy:**

- Like it or not, petroleum and natural gas remain incredibly important to the U.S. economy. Knowing where oil prices are headed is critical to businesses of all stripes, from airlines to plumbing companies. Consumers planning their family budgets and vacations care, too. Not only do we monitor Department of Energy reports, but we also talk to commodities traders and petroleum engineers to forecast price trends, changes in production technologies and consumer habits.
- Drivers hitting the road for Memorial Day will see the highest gasoline prices of the year. But they'll still be spending less than what they shelled out this time last year. The national average price of regular unleaded rose six cents this week to hit $2.27 per gallon. And odds are, the national average will reach about $2.35 per gallon by the holiday weekend. By comparison, prices averaged $2.75 during the Memorial Day holiday a year ago. Diesel prices, now averaging $2.26 per gallon, will also creep higher, reaching about $2.40 per gallon by late spring.
- Crude oil rallied this week as traders bet that disruptions to oil output in Canada, Libya, Nigeria and elsewhere would cause the recent supply glut to shrink. U.S. benchmark West Texas Intermediate (WTI) hit $48 per barrel, its highest level so far in 2016. But the rally could prove short-lived. News reports indicate that oil production is restarting in western Canada in the wake of the massive wildfire that forced oil companies to slow or halt work as a precaution. Meanwhile in Africa, tankers recently picked up cargoes of crude from Libya and Nigeria after terrorist attacks and political turmoil had interrupted shipments.
- The market will undoubtedly remain volatile and unpredictable in the short run. But if supplies continue to rebound, crude prices are going to be hard-pressed to hang on to their recent gains. Global stockpiles remain at high levels, so a return of additional barrels to the market could aggravate the oversupply situation. We look for WTI to retreat slightly by July 4, returning to a trading range of $40 to $45 per barrel.
- Natural gas prices remain docile, with the benchmark gas futures contract last trading at $2.04 per million British thermal units. We expect prices to stay near $2 until the weather warms up significantly and power plants start burning more gas to generate electricity. Several long-term weather outlooks are calling for a warmer-than-normal summer, so don't be surprised if natural gas trends higher in a few months.

**Housing:**

- In addition to being the roof over our heads, housing is an important sector in the economy. Three statistics form the core of our coverage: sales of existing homes (and the prices those sales fetch); sales of new homes; and housing starts, which reflect new construction that is counted in GDP. Because housing is a diversified and highly regional industry, our reporting and forecasting are informed by other research as well as conversations with industry experts as well.
- Trends in residential construction remain positive, despite the recent decline in housing starts. Owing to a warmer-than-usual early winter, spring groundbreaking for new-home construction was pushed forward to the first two months of the year, which is largely why total housing starts dropped 8.8% in March from February. Note, though, that starts are still up compared with March 2015, indicating that the pace of construction remains healthy.
- The housing market is gaining momentum as the spring selling season revs up. Sales of existing homes surged 5.1% in March to an annual rate of 5.33 million units. Moreover, sales rose in all regions of the country, jumping as high as 11.1% in the Northeast and 9.8% in the Midwest. Realtors are seeing higher foot traffic from buyers, especially in the West

and the South. Favorable mortgage rates plus job and wage gains will continue to propel home sales this year.

- Home inventories remain relatively tight, even with the 5.9% rise in inventory of existing homes in March. Buyers are moving quickly to snap up homes for sale. In March, houses typically stayed on the market for 47 days — down from 59 days in February. Builders ramping up single-family construction in coming months, combined with a growing number of people listing existing homes for sale, should help ease some of the supply constraints.
- Home prices are appreciating at a moderate pace, on average. Home value appreciation was unchanged in February from the previous month. The S&P/Case-Shiller U.S. National Home Price Index rose 5.3% in February from a year earlier. Cities such as Portland (Oregon), Seattle and San Francisco are seeing home prices rise at a double-digit pace. These metro areas are more likely to start seeing affordability becoming an issue for some folks, particularly those looking for starter homes.

**Retail:**

- Consumers are the engine of our economy, and when their spending flags, business feels it. We examine trends that are influencing their habits, such as falling gas prices, to forecast what they'll be buying in the future and how much they'll be willing to shell out both on everyday items and on big-ticket purchases such as cars and trucks.
- Healthy retail sales growth in April promises to be a foretaste of stronger consumer spending after the slow start to the year. For retailers of all stripes, who saw April sales rise 1.3% from the month before, the prospect of better days ahead comes as welcome relief. Though consumers won't throw caution to the winds, we expect they will open their wallets a bit more, especially in the second half of the year as the sluggish economy shows more life.
- Retail sales, excluding gasoline sales, will expand at a 4.2% clip for the year. That's slower than last year's 4.7% gain, largely because the torrid pace of car sales will cool in a saturated market.
- Look for shoppers to shell out more for apparel and other goods, plus lawn care and a variety of other services in coming months. Spending on furniture and home decor, recreational items, health care products and beauty supplies, in particular, will see stronger growth. An end to cool, rainy and stormy weather in many parts of the country so far this spring is also sure to unleash pent-up demand for sandals, swimsuits and other warm-weather clothing.
- Online sales are climbing at a double-digit pace and show little indication of slowing. Online sales and, to a much smaller extent, mail-order sales account for 10% of all goods sold in April, up from 8.7% in April 2015. That's sure to grow further at the expense of sales in brick-and-mortar establishments. Amazon's recent full-fledged jump into selling fashion online, for example, will have a big impact.
- Department store earnings will likely continue to spiral down, following dismal numbers in the first quarter and despite a 0.3% boost in sales in April, compared with the month before. But sales were down 1.7% when compared with April 2015. Department stores continue to be plagued by a lack of ingenuity. They're also struggling to put all of their inventory online and to better tailor their assortments to the differing needs and tastes of people in different regions of the country. Some also grapple with how to streamline inventory management systems, invest in improving their sales forces and offer more entertainment in stores to engage consumers.
- For department stores, which used to be a mainstay in American consumer culture, with command over the majority of apparel sales, it has come down to survival of the fittest — and the most adaptable. Those able to bend under the pressures of the Digital Age will survive; others will be forced to shutter more, if not all, of their doors.

## CONSUMER PRICE INDEX

**ALL URBAN CONSUMERS (1982-1984=100)**

**Source: U.S. Bureau of Labor Statistics**

To figure the percentage increase between any two months: Subtract the index for the earlier month from that of the later month. Divide that number by the index for the earlier month. Then multiply by 100 by moving the decimal two places to the right.

| Year | Jan. | Feb. | March | April | May | June | July | Aug. | Sep. | Oct. | Nov. | Dec. | Dec.-Dec. Increase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1986 | 109.6 | 109.3 | 108.8 | 108.6 | 108.9 | 109.5 | 109.5 | 109.7 | 110.2 | 110.3 | 110.4 | 110.5 | 1.1% |
| 1987 | 111.2 | 111.6 | 112.1 | 112.7 | 113.1 | 113.5 | 113.8 | 114.4 | 115.0 | 115.3 | 115.4 | 115.4 | 4.4% |
| 1988 | 115.7 | 116.0 | 116.5 | 117.1 | 117.5 | 118.0 | 118.5 | 119.0 | 119.8 | 120.2 | 120.3 | 120.5 | 4.4% |
| 1989 | 121.1 | 121.6 | 122.3 | 123.1 | 123.8 | 124.1 | 124.4 | 124.6 | 125.0 | 125.6 | 125.9 | 126.1 | 4.6% |
| 1990 | 127.4 | 128.0 | 128.7 | 128.9 | 129.2 | 129.9 | 130.4 | 131.6 | 132.7 | 133.5 | 133.8 | 133.8 | 6.1% |
| 1991 | 134.6 | 134.8 | 135.0 | 135.2 | 135.6 | 136.0 | 136.2 | 136.6 | 137.2 | 137.4 | 137.8 | 137.9 | 3.1% |
| 1992 | 138.1 | 138.6 | 139.3 | 139.5 | 139.7 | 140.2 | 140.5 | 140.9 | 141.3 | 141.8 | 142.0 | 141.9 | 2.9% |
| 1993 | 142.6 | 143.1 | 143.6 | 144.0 | 144.2 | 144.4 | 144.4 | 144.8 | 145.1 | 145.7 | 145.8 | 145.8 | 2.7% |
| 1994 | 146.2 | 146.7 | 147.2 | 147.4 | 147.5 | 148.0 | 148.4 | 149.0 | 149.4 | 149.5 | 149.7 | 149.7 | 2.7% |
| 1995 | 150.3 | 150.9 | 151.4 | 151.9 | 152.2 | 152.5 | 152.5 | 152.9 | 153.2 | 153.7 | 153.6 | 153.5 | 2.5% |
| 1996 | 154.4 | 154.9 | 155.7 | 156.3 | 156.6 | 156.7 | 157.0 | 157.3 | 157.8 | 158.3 | 158.6 | 158.6 | 3.3% |
| 1997 | 159.1 | 159.6 | 160.0 | 160.2 | 160.1 | 160.3 | 160.5 | 160.8 | 161.2 | 161.6 | 161.5 | 161.3 | 1.7% |
| 1998 | 161.6 | 161.9 | 162.2 | 162.5 | 162.8 | 163.0 | 163.2 | 163.4 | 163.6 | 164.0 | 164.0 | 163.9 | 1.6% |
| 1999 | 164.3 | 164.5 | 165.0 | 166.2 | 166.2 | 166.2 | 166.7 | 167.1 | 167.9 | 168.2 | 168.3 | 168.3 | 2.7% |
| 2000 | 168.8 | 169.8 | 171.2 | 171.3 | 171.5 | 172.4 | 172.8 | 172.8 | 173.7 | 174.0 | 174.1 | 174.0 | 3.4% |
| 2001 | 175.1 | 175.8 | 176.2 | 176.9 | 177.7 | 178.0 | 177.5 | 177.5 | 178.3 | 177.7 | 177.4 | 176.7 | 1.6% |
| 2002 | 177.1 | 177.8 | 178.8 | 179.8 | 179.8 | 179.9 | 180.1 | 180.7 | 181.0 | 181.3 | 181.3 | 180.9 | 2.4% |
| 2003 | 181.7 | 183.1 | 184.2 | 183.8 | 183.5 | 183.7 | 183.9 | 184.6 | 185.2 | 185.0 | 184.5 | 184.3 | 1.9% |
| 2004 | 185.2 | 186.2 | 187.4 | 188.0 | 189.1 | 189.7 | 189.4 | 189.5 | 189.9 | 190.9 | 191.0 | 190.3 | 3.3% |
| 2005 | 190.7 | 191.8 | 193.3 | 194.6 | 194.4 | 194.5 | 195.4 | 196.4 | 198.8 | 199.2 | 197.6 | 196.8 | 3.4% |
| 2006 | 198.3 | 198.7 | 199.8 | 201.5 | 202.5 | 202.9 | 203.5 | 203.9 | 202.9 | 201.8 | 201.5 | 201.8 | 2.5% |
| 2007 | 202.4 | 203.499 | 205.352 | 206.686 | 207.949 | 208.352 | 208.299 | 207.917 | 208.490 | 208.936 | 210.177 | 210.036 | 4.1% |
| 2008 | 211.080 | 211.693 | 213.528 | 214.823 | 216.632 | 218.815 | 219.964 | 219.086 | 218.783 | 216.573 | 212.425 | 210.228 | 0.1% |
| 2009 | 211.143 | 212.193 | 212.709 | 213.240 | 213.856 | 215.693 | 215.351 | 215.834 | 215.969 | 216.177 | 216.330 | 215.949 | 2.7% |
| 2010 | 216.687 | 216.741 | 217.631 | 218.009 | 218.178 | 217.965 | 218.011 | 218.312 | 218.439 | 218.711 | 218.803 | 219.179 | 1.5% |
| 2011 | 220.223 | 221.309 | 223.467 | 224.906 | 225.964 | 225.722 | 225.922 | 226.545 | 226.889 | 226.421 | 226.230 | 225.672 | 3.0% |
| 2012 | 226.665 | 227.663 | 229.392 | 230.085 | 229.815 | 229.478 | 229.104 | 230.379 | 231.407 | 231.317 | 230.221 | 229.601 | 1.7% |
| 2013 | 230.280 | 232.166 | 232.773 | 232.531 | 232.945 | 233.504 | 233.596 | 233.877 | 234.149 | 233.546 | 233.069 | 233.049 | 1.5% |
| 2014 | 233.916 | 234.781 | 236.293 | 237.072 | 237.900 | 238.343 | 238.250 | 237.852 | 238.031 | 237.433 | 236.151 | 234.812 | 0.8% |
| 2015 | 233.707 | 234.722 | 236.119 | 236.599 | 237.805 | 238.638 | 238.654 | 238.316 | 237.945 | 237.838 | 237.336 | 236.525 | 0.7% |
| 2016 | 236.916 | 237.111 | 238.132 | 239.261 | | | | | | | | | |

## *Conclusion*[6]

Financial markets are unsettled. Since this time last year, credit spreads in the bond market have gapped out, the value of the U.S. dollar has surged, and oil and other commodity prices have tumbled. Most dis- concerting have been the wild swings in the stock market. There is ominous talk that the troubled financial markets are signaling, or may even precipitate, a recession.

Although the turmoil in financial markets will do some damage to the economy—Moody's Analytics has lowered its forecast for real GDP growth this year by 0.5 percentage point to 2.3%—the recession talk is off base. The economy is creating lots of jobs across all pay scales, and the remaining slack in the labor market is being quickly absorbed. The economy remains firmly on track to reach full employment by midyear.

Financial markets have suffered a series of wrenching spasms over the past year and a half. The selloff has been especially hard in the market for below-investment-grade or high-yield corporate bonds. The yield spread between high-yield corporates and 10-year Treasury yields is approaching 800 basis points (see Table 1), more than double the spread that prevailed in summer 2014.

The value of the U.S. dollar also has soared. The real broad trade-weighted dollar is up nearly 20% since summer 2014. The dollar is up against nearly all currencies, notably against the U.S.'s largest trading partners, including Canada, Mexico, Europe and Japan. Oil prices have cratered, free-falling from more than $100 per barrel to near $30 recently. Other energy and commodity prices have also slumped. Copper prices, often a good barometer of global economic conditions, are trading near $2 per pound, down from $3.25 in summer 2014.

---

[6] Obtained from Moody's Analytics: Précis® U.S. Macro, Volume 20, Number 11 / February 2016

Most disconcerting perhaps has been the violent drop in stock prices. As measured by the Standard & Poor's 500 index, stock prices are down more than 10% from their all-time peak reached in May. Some $2 trillion in stock wealth has evaporated.

Investors also anguish over the Federal Reserve's decision to begin raising interest rates. Financial markets tend to struggle when the Fed normalizes interest rates during economic recoveries. Investors are even more on edge this time as the Fed is exiting from emergency policies it implemented in response to the financial crisis. Short-term rates had been effectively set at zero since late 2008. Nevertheless, the Fed has shown great sensitivity to financial market conditions. The decision to begin raising rates was delayed from September to December because of a previous bout of selling in markets. Moody's Analytics now expects the next rate hike to be delayed until June to give markets a chance to find a bot- tom. Investors will learn that the Fed means what it says, namely that it will take several years to normalize rates.

Even if financial markets settle soon, the turmoil has already harmed the economy. The clearest damage is the stronger dollar's impact on U.S. trade. Struggling emerging market economies, hurt by weaker oil and commodity prices, are crimping exports.

Weaker stock prices weigh on consumer spending via the negative wealth effects. Lower stock prices and higher credit spreads increase businesses' cost of capital and thus impede investment and hiring. All this puts a dark pall on consumer and business sentiment and the willingness to spend and invest.

But while lower oil prices devastate the energy industry, they are pretty good for the rest of the economy. The U.S. economy still consumes more oil than it produces. So, if the price of oil goes down, the economy ultimately wins. Mortgage rates have also declined as scared investors have piled into risk-free Treasury and mortgage securities. Simulations of the Moody's Analytics macro model suggest that the financial market turmoil will slice about 0.5 percentage point from 2016 real GDP growth, assuming that oil and stock prices are near a bottom, credit spreads are at an apex, and the pace of U.S. dollar appreciation will slow considerably.

Tighter financial conditions will slow the expansion, but will not lead to a recession. Recall Paul Samuelson's famous quip that "Wall Street indexes predicted nine out of the last five recessions." Indeed, of the 20 market corrections—peak-to-trough declines of 10% or more—in the past half century, only six were followed by recessions (see Table 2). Recessions are always preceded by big declines in stock prices, as investors sniff out weakening sales and profits at big publicly traded companies. But investors are a fickle bunch and will sell for lots of rea- sons that may or may not be linked to what is going on in the broader economy.

None of the other tried-and-true signals of impending recession are even flashing yellow. Unemployment insurance claims remain extraordinarily low, the unemployment rate is falling and not rising as it does prior to recessions, and consumer confidence remains resilient. The shape of the Treasury yield curve also remains firmly positive; recessions have always been preceded by inversions with long-term rates falling below short rates.

The selloff in financial markets should be seen in a broader context. Not more than a year ago there was handwringing that stock, bond and other asset markets were overvalued. Fed Chair Janet Yellen ruminated publicly that many high-flying biotechnology stocks were turning speculative. Thus, the re- cent decline in financial markets is therapeutic, wringing out any froth in these markets.

The Federal Reserve began normalizing interest rates at the mid-December Federal Open Market Committee meeting, raising short-term rates by 0.25 percentage point from the effective zero lower bound that had prevailed since the financial crisis. Rate normalization will be a lengthy process. The Fed has said it will be slow to increase short- term rates, implying the funds rate will not normalize until well after the economy has returned to full employment. If the economy performs consistently with the Moody's Analytics outlook, full employment will be achieved by mid-2016, and short-term interest rates will not normalize until mid-2018.

There is a consensus that the federal funds rate consistent with normalization has fallen since the crisis. Forecasts provided by Fed officials of the funds rate in the long run would suggest an estimated equilibrium rate of approximately 3.5%. This is equal to the sum of the Fed's 2% inflation target, the economy's potential growth rate, and the impact of various economic headwinds.

The federal government's situation continues to improve. Lawmakers recently reached a budget deal that sets tax and spending policy into early 2017. The Treasury debt limit was also increased sufficiently so that it will not be an issue until the second half of 2017. Based on the budget deal and the outlook, the federal budget deficit is expected to come in near $450 billion this fiscal year, equal to 2.5% of GDP. Given the budget deal, fiscal policy will be a small positive for growth in 2016, adding about 0.2 percentage point to real GDP growth.

The value of the U.S. dollar has increased substantially against nearly all other currencies, rising nearly 20% on a real broad trade- weighted basis since summer 2014. The strong dollar reflects stronger U.S. economic growth and prospects for monetary policy normalization, and disappointing growth and further monetary easing in much of the rest of the world. Further dollar appreciation is likely, assuming that the Federal Reserve will normalize U.S. monetary policy by mid-2018, but the European Central Bank will continue with its extraordinary policy actions, including QE and negative interest rates, until near decade's end. While the long-run fair value euro/dollar exchange rate is an estimated $1.25, the euro is expected to fall briefly below parity with the dollar by early 2017.

Though an unexpected spike in interest rates would disrupt the baseline outlook, other factors suggest that long-term interest rates will remain low for an extended period. The divergence between U.S. and international growth rates, exacerbated by the slowdown in China, will drive international investors to U.S. government debt. An aging world population also will lift demand for safe assets and weigh on yields, with the up- tick in demand occurring during a period of diminishing supply. U.S. government spending is not expected to rise for several years, reducing the need to issue debt as deficits shrink. With fewer "risk-free" bonds available for purchase, yields will remain low for an ex- tended period. As a result, nonresidential in- vestment and housing market activity could exceed expectations.

The baseline forecast hinges on a re- bound in homebuilding, but the exact timing is uncertain. Demand remains muted despite a tightening labor market, rising wages, and improving household balance sheets. Household formation has been modest since the Great Recession, with many millennials being forced to live with family members or roommates instead of living on their own. Rising student debt might prevent young adults from forming their own households as quickly as expected. Further, although financing costs are low, mortgage rates will eventually rise, which could put downward pressure on construction and sales.

Even if demand were strong, resource and capacity constraints will limit near-term building activity. Lenders have been hesitant to extend credit, while labor shortages and bottlenecks within material supply chains have strained developers. Shortages of specialty trade contractors and support workers will pose a constraint on homebuilders. Therefore, the pace of new residential construction could underperform.

# REGIONAL ANALYSIS

## *Introduction*

The short- and long-term value of real estate is influenced by a variety of factors and forces that interact within a given region. Regional analysis serves to identify those forces that affect property value, and the role they play within the region. The four primary forces that influence real property value include environmental characteristics, governmental forces, social factors, and economic trends. These forces determine the supply and demand for real property, which, in turn, affect market value.

The subject property is located along the east side of US Highway 171, approximately ±1,000 feet south of its intersection with William Flavis Road, within the Town of Stonewall, DeSoto Parish, Louisiana. This location is approximately ±1.60 miles south of downtown Stonewall, ±17.0 miles north of Mansfield (DeSoto Parish seat), and ±18.8 miles southwest of the Shreveport central business district (CBD), within the Shreveport-Bossier Metropolitan Statistical Area (MSA), in northwestern Louisiana. The subject's location within the regional market can be better visualized by viewing the map below.

**Regional Area Map – Shreveport MSA**




The Shreveport-Bossier City Metropolitan Statistical Area is a metropolitan area in northwestern Louisiana that covers three parishes: Caddo, Bossier, and DeSoto. As of the 2010 census, the MSA had a population of 439,000. When combined with Webster Parish, the four parishes make up the Shreveport- Bossier City-Minden CSA.

## *Geography*

Shreveport sits on a low elevation overlooking the Red River. Pine forests, cotton fields, wetlands, and waterways mark the outskirts of the city. According to the United States Census Bureau, the city has a total area of 120.8 square miles, of which 105.4 square miles is land and 15.4 square miles, or 12.79%, is water.

## *Economy*

Shreveport was once a major player in United States oil business, and at one time could boast Standard Oil of Louisiana as a locally based company. The Louisiana branch was later absorbed by Standard Oil of New Jersey. Beginning in 1930, the nation's busiest pipeline operator and massive integrated oil company, United Gas Corporation, was headquartered in Shreveport, until its hostile takeover by Pennzoil in 1968, and the subsequent forced merger. In the 1980s, the oil and gas industry suffered a large economic downturn, and many companies cut back jobs or went out of business, including a large retail shopping mall, South Park Mall, which closed in the late 1990s and is now Summer Grove Baptist Church. Shreveport suffered severely from this recession, and many residents left the area.

Shreveport has largely transitioned to a service economy. In particular, the area has seen a rapid growth in the gaming industry, hosting various riverboat gambling casinos, and, before Hurricane Katrina in 2005, was second only to New Orleans in Louisiana tourism. Nearby Bossier City is home to one of the three horse racetracks in the state, Harrah's Louisiana Downs. Casinos in Shreveport-Bossier include Sam's Town Casino, Eldorado Casino, Horseshoe Casino, Boomtown Casino, and Diamond Jacks Casino (formerly Isle of Capri). The Shreveport-Bossier Convention and Tourist Bureau is the official tourism information agency for the region. The bureau maintains a comprehensive database of restaurants, accommodations, attractions, and events.

In May 2005, the Louisiana Boardwalk, a 550,000-square-foot shopping and entertainment complex, opened across the Red River in Bossier City, featuring outlet shopping, several restaurants, a 14-screen movie theater, a bowling complex, and a Bass Pro Shops.

A new 350,000-square-foot convention center was recently completed in downtown Shreveport. It includes an 800-space parking garage. An adjoining Hilton Hotel opened in June 2007. The city's direct construction and ownership of the Hilton Hotel has been a controversial issue as to the proper use of public funds. The Shreveport Convention Center is managed by SMG.

Shreveport is a major medical center of the region and state. The Louisiana State University Health Sciences Center Shreveport operates at expanded facilities once used by the former Confederate Memorial Medical Center. Major hospitals include Christus Schumpert, Willis Knighton, and the Shriners Hospital for Children.

In November 2008, excitement centered on the Haynesville Shale, with many new jobs in the natural gas industry expected to be created over the next few years. Residents in the region enjoyed large bonuses for signing mineral rights leases up to $25,000 per acre. However, the recent economic downturn has resulted in a lower market price for natural gas and slower-than-expected drilling activity. The city itself stands to profit by leasing the mineral rights on public lands in the near future as neighboring municipalities have already done.

Shreveport was home to Shreveport Operations, a General Motors plant that closed in August 2012. The plant produced the Chevrolet Colorado, GMC Canyon, and the Isuzu i- Series. In January 2013, the plant was leased from Caddo Parish by Elio Motors.

## *Transportation*

**Highways and Roads**

Shreveport's past reflects the need for mass transit and public roads. As far back as the 1870s, residents used mule-drawn street cars that were converted to electric-motorized cars by 1890. Commuter rail systems in Shreveport flourished for many decades, and rail car lines extended out to rural areas. In 1930 trolleys and rail cars began to be replaced by buses, although motor buses did not finally replace all trolley service until the 1960s. In the 1960s, the Interstate Highway System came to the area with the construction of Interstate 20.

The local public transportation provider, SporTran, provides moderately extensive bus service throughout Shreveport and Bossier City. SporTran operates seven days a week on seventeen bus routes (five night routes) from 6:00 a.m. to 1:00 am, with no night service on Sunday. The highway system has a cross-hair and loop freeway structure similar to that of Texas cities like Houston and Dallas. The loop consists of the Outer Loop Freeway Interstate 220 on the north and the Inner Loop Freeway, Louisiana Highway 3132, on the south, forming approximately an 8-mile-diameter semi-loop around downtown. Another loop is formed by the Bert Kouns Industrial Loop (Louisiana Highway 526) and circles further south bisecting Interstate 49. Interstate 49 now extends north to Interstate 30 in Arkansas.

Shreveport lies along the route of the proposed Interstate 69 North American Free Trade Agreement (NAFTA) superhighway that will link Canada, the U.S. industrial Midwest, Texas, and Mexico.

**Airports**

Shreveport is served by two airports. The larger is Shreveport Regional Airport (SHV), established in 1952, and is served by Allegiant Air (to Las Vegas), American Airlines (to Dallas/Ft. Worth), United Airlines (as United Express) (to Houston and Denver) and Delta Air Lines (to Atlanta and Memphis). The smaller airport, Shreveport Downtown Airport (DTN), was built in 1931 and is located north of the Downtown Business District along the Red River. It is currently a general aviation/reliever airport, but was originally Shreveport's commercial airport.

## *Military Installations*

Barksdale Air Force Base is located in Bossier Parish across the river from Shreveport, which donated the land for its construction in the 1920s. Named for pioneer army aviator Lt. Eugene Hoy Barksdale and originally called Barksdale Army Air Field, it opened in 1933 and became Barksdale Air Force Base in 1947. Headquartered here are the Air Force Global Strike Command, 8th Air Force, 2nd Bomb Wing, and 307th Wing. The primary plane housed here is the Boeing B-52 Stratofortress. In earlier years, the base was the home to other famous planes, including the B-47 Stratojet.

Shreveport is home to the 108th Cavalry Squadron, the reconnaissance element of the 256th Infantry Brigade. Three of the squadron's four cavalry troops are located at 400 East Stoner Avenue in a historic armory known as "Fort Humbug". This was named due to the Confederate Army burning logs to look like cannons and placing them along the Red River. This caused Union ironclad ships sailing north on the Red River to be tricked into turning back south.

## *Moody's Economy.com Metropolitan Summary*

The subject site is located in an area which is included within the Shreveport Metropolitan Statistical Area (MSA). The following pages are taken from Moody's Economy.com March 2016 Metropolitan Summary of the Shreveport MSA.

MOODY'S ANALYTICS

# SHREVEPORT-BOSSIER CITY LA

| ECONOMIC DRIVERS | EMPLOYMENT GROWTH RANK | | RELATIVE COSTS | | VITALITY | |
|---|---|---|---|---|---|---|
| | 2015-2017 | 2015-2020 | LIVING | BUSINESS | RELATIVE | RANK |
| | 318 (5th quintile) | 318 (5th quintile) | 101% | 81% | 95% | 206 |
| | Best=1, Worst=401 | | U.S.=100% | | U.S.=100% | Best=1, Worst=401 |

## BUSINESS CYCLE STATUS

- Expansion
- Recovery
- At Risk
- Moderating Recession
- » IN RECESSION «

## STRENGTHS & WEAKNESSES

### STRENGTHS

- Low business costs, particularly energy and labor.
- Barksdale Air Force Base provides stability.
- High concentration of healthcare jobs helps curb volatility.

### WEAKNESSES

- Long-term growth potential limited by reliance on low-paying, low-skilled gambling industry.
- Worsening migration patterns.
- Dearth of skilled labor.

## FORECAST RISKS

SHORT TERM ↓ | LONG TERM ↑

RISK EXPOSURE 2016-2021: 204 — 3rd quintile (Highest=1, Lowest=401)

### UPSIDE

- Port activity rebounds more quickly than expected, leading to more job opportunities.
- Increase in natural gas prices enables faster development of Haynesville natural gas field.

### DOWNSIDE

- Texas legalizes casino gambling, eliminating SHR's biggest market.
- House price declines resume, weighing on consumer spending.

## MOODY'S RATING

**Aa1** — CITY, AS OF DEC 16, 2015

## ANALYSIS

**Recent Performance.** Shreveport-Bossier City's economy is still in recession because of weakness in the key energy industry. While benchmark revisions to employment reveal that fewer jobs have been lost compared with previous estimates, SHR's labor market has still contracted steadily for the past year and conditions are worse than in the rest of the state. The unemployment rate is down to a cycle low of 6.3%, which is still much higher than its prerecession rate and the state and national figures. Also, while it has risen the past couple of months, the labor force has shrunk by 20,000 since hitting an all-time high in 2008.

Job losses are widespread but are the greatest in high-wage industries. Average weekly earnings subsequently have fallen close to 2% over the past year. Fewer jobs and weak income trends, along with persistent out-migration, are hurting consumer industries and housing. Residential permits are at a seven-year low and construction employment is extending its yearlong decline.

**Energy.** SHR's energy industry is contracting amid low energy prices and there is very little chance of meaningful job gains in mining in the coming year. Natural gas prices hit a 17-year low in March, rendering extraction unprofitable for Louisiana Oil & Gas, which estimates that nearly 50% of the revenue from a year ago is lost. Operators have been forced to pull rigs from service; there are now 14 active gas drilling rigs in the Haynesville Shale, nearly half the active count a year ago and a far cry from the 160 in 2011. Drastically lower profits have also resulted in industry-wide layoffs, particularly among support services. Mining payrolls have fallen by more than 50% from their peak in 2011, costing the metro area more than 4,000 jobs. While the outlook assumes that most of the cutbacks in the mining industry have occurred, job growth will be slow to return and layoffs that have occurred will take time to ripple through the economy.

**Population declines.** The lackluster energy industry has spurred out-migration and three consecutive years of population decline, a negative for consumption and employment in consumer-oriented industries. The population decline of 0.2% in 2015 was the steepest drop in the state and places SHR in the bottom quintile of metro areas nationally. The loss of population has also meant fewer households, reducing demand for housing and stalling the metro area's housing recovery. As long as energy prices stay low, demographics and the housing market will remain weak.

**Health and education.** Job growth in health and educational services will be limited as poor state finances hamper investment and hiring. While SHR's main hospital, the LSU Health Sciences Center, avoided midyear state funding cuts because of its standing as a teaching hospital, it is unlikely to be as fortunate in the second half of the year: Louisiana's state legislature plans to slash a remaining $750 million shortfall with harsher cuts to education and hospitals, something that SHR's medical campus chancellor has stated would force faculty layoffs. This puts downward pressure on both educational and health services, which account for 10% of personal income, and the industries will be at best average performers over the next two years.

**Shreveport-Bossier City's economy will remain weak as long as commodity prices are low. However, job growth will resume as the energy industry stabilizes and private services strengthen later in 2016. Longer term, however, weak demographics, including low educational attainment and poor population growth, will constrain SHR's growth prospects and the metro area will be a below-average performer.**

*Paul Matarac* 1-866-275-3266
*March 2016* helpeconomy.com

| 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | INDICATORS | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21.2 | 21.1 | 20.2 | 19.1 | 19.2 | 19.6 | Gross metro product (C09$ bil) | 20.5 | 21.1 | 21.5 | 21.8 | 21.9 | 22.2 |
| 5.7 | -0.4 | -4.6 | [illegible] | 0.7 | 2.8 | % change | 4.8 | 2.9 | 2.6 | 1.6 | 0.9 | 1.2 |
| 188.7 | 190.5 | 188.4 | 184.0 | 184.5 | 183.9 | Total employment (ths) | 185.2 | 188.2 | 190.5 | 192.0 | 192.5 | 192.7 |
| [illegible] | 1.0 | [illegible] | -2.3 | [illegible] | [illegible] | % change | 0.7 | 1.6 | 1.2 | 0.8 | 0.2 | [illegible] |
| 7.8 | 7.4 | 7.3 | 7.2 | 7.0 | 7.0 | Unemployment rate (%) | 6.9 | 7.3 | 7.5 | 7.7 | 7.9 | 8.1 |
| [illegible] | 7.3 | [illegible] | [illegible] | [illegible] | [illegible] | Personal income growth (%) | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 41.2 | 41.9 | 42.6 | 42.1 | 42.2 | 43.1 | Median household income ($ ths) | 43.9 | 45.0 | 46.2 | 47.2 | 48.1 | 48.9 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Population (ths) | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 1.2 | 0.9 | 0.7 | -0.4 | -0.4 | 0.2 | % change | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 |
| [illegible] | [illegible] | [illegible] | -3.4 | [illegible] | [illegible] | Net migration (ths) | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 1,165 | 1,158 | 1,214 | 1,249 | 1,284 | 894 | Single-family permits (#) | 977 | 1,155 | 1,157 | 1,115 | 1,151 | 1,196 |
| [illegible] | 264 | [illegible] | [illegible] | 479 | [illegible] | Multifamily permits (#) | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 178.8 | 178.4 | 183.0 | 182.5 | 183.4 | 188.7 | FHFA house price (1995Q1=100) | 192.0 | 195.2 | 197.1 | 200.2 | 204.8 | 210.5 |

3-MO MA

| | Sep 15 | Oct 15 | Nov 15 | Dec 15 | Jan 16 | Feb 16 |
|---|---|---|---|---|---|---|
| Employment, change, ths | [illegible] | -0.3 | -0.1 | -0.1 | -0.1 | -0.1 |
| Unemployment rate, % | 6.2 | 5.7 | 6.7 | 6.7 | [illegible] | [illegible] |
| Labor force participation rate, % | 58.4 | 57.9 | 57.5 | 57.2 | 57.0 | 57.0 |
| Employment-to-population ratio, % | 54.5 | 54.1 | 53.7 | 53.3 | 53.3 | [illegible] |
| Average weekly hours, # | 35.1 | 35.1 | 35.0 | 35.0 | 34.9 | 34.6 |
| Industrial production, 2007=100 | 103.1 | 103.0 | 102.7 | 102.4 | 102.1 | 101.9 |
| Residential permits, single-family, # | 766 | [illegible] | 772 | [illegible] | [illegible] | [illegible] |
| Residential permits, multifamily, # | [illegible] | [illegible] | [illegible] | [illegible] | 586 | 555 |

Unchanged from prior 3-mo MA | Worse than prior 3-mo MA

Sources: BLS, Census Bureau, Moody's Analytics

JAN 2002=100




Source: Moody's Analytics

% CHANGE YR AGO




Sources: BLS, Moody's Analytics

% CHANGE YR AGO, 3-MO MA

| | Jan 15 | Oct 15 | Feb 16 |
|---|---|---|---|
| Total | -0.0 | -0.7 | -1.3 |
| Construction | -1.1 | -0.3 | -4.6 |
| Manufacturing | 0.6 | -2.4 | -1.2 |
| Trade | 0.3 | -0.6 | -0.2 |
| Trans/Utilities | 6.1 | 0.5 | -2.9 |
| Information | -4.5 | -4.4 | -5.9 |
| Financial Activities | -2.2 | -2.2 | -3.1 |
| Prof & Business Svcs. | -3.1 | -1.1 | -1.8 |
| Edu & Health Svcs. | 3.4 | 2.9 | 2.2 |
| Leisure & Hospitality | 0.1 | 0.4 | 0.6 |
| Other Services | -1.0 | -1.0 | -1.0 |
| Government | -1.5 | -1.6 | -2.0 |

Sources: BLS, Moody's Analytics

1998Q1=100, NSA




Sources: FHFA, Moody's Analytics

JAN 2006=100




Sources: BLS, Moody's Analytics

HOMEOWNER, % HOUSES FOR SALE




Sources: Census Bureau, ACS, Moody's Analytics, 2014

U.S.=100




Source: Moody's Analytics

% OF ADULTS 25 AND OLDER




Sources: Census Bureau, Moody's Analytics, 2014




Sources: Census Bureau, Moody's Analytics, 2014

## EMPLOYMENT & INDUSTRY

### TOP EMPLOYERS

| | |
|---|---|
| Barksdale Air Force Base | 7,450 |
| LSU Health Sciences Board | 6,200 |
| Willis Knighton Health System | 6,145 |
| Wal-Mart Stores Inc. | 2,946 |
| Christus Schumpert Health System | 1,800 |
| Harrah's HorseShoe Casino & Hotel | 1,800 |
| Overton Brooks VA Medical Center | 1,590 |
| US Support Co. | 1,585 |
| Eldorado Hotel & Casino | 1,300 |
| Gamble Guest Care Group | 1,260 |
| Brookshire's/Super 1 Food Stores | 1,223 |
| Sam's Town Hotel & Casino | 1,194 |
| Gorman Group/Tango Transport | 1,100 |
| Red River Services Inc | 975 |
| Libbey Glass Inc. | 950 |
| Greggs Enterprises Inc.-McDonalds | 932 |
| The Arc of Caddo-Bossier | 857 |
| Diamond Jack's Casino Resort | 837 |
| AEP Southwestern Electric Power Co. | 732 |
| Sonic Restaurants | 680 |

*Sources: Guide to Military Installations, 2015, North Louisiana Economic Partnership, 2012*

### PUBLIC

| | |
|---|---|
| Federal | 4,858 |
| State | 5,845 |
| Local | 20,575 |

2015

### INDUSTRIAL DIVERSITY




### EMPLOYMENT VOLATILITY




## MIGRATION FLOWS

### INTO SHREVEPORT LA

| | Number of Migrants |
|---|---|
| Dallas TX | 568 |
| Houston TX | 464 |
| Monroe LA | 433 |
| Baton Rouge LA | 313 |
| Fort Worth TX | 284 |
| Lafayette LA | 228 |
| New Orleans LA | 225 |
| Alexandria LA | 193 |
| San Antonio TX | 180 |
| Colorado Springs CO | 171 |
| *Total in-migration* | *15,540* |

### FROM SHREVEPORT LA

| | |
|---|---|
| Dallas TX | 887 |
| Houston TX | 437 |
| Fort Worth TX | 361 |
| Monroe LA | 314 |
| New Orleans LA | 306 |
| San Antonio TX | 251 |
| Baton Rouge LA | 242 |
| Alexandria LA | 143 |
| Longview TX | 120 |
| Atlanta GA | 111 |
| *Total out-migration* | *14,095* |
| Net migration | 1,445 |

### NET MIGRATION, #




| | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Domestic | 319 | -3,841 | -4,338 | -3,372 |
| Foreign | 647 | 468 | 493 | 522 |
| Total | 966 | -3,373 | -3,845 | -2,850 |

*Sources: IRS (top), 2011, Census Bureau, Moody's Analytics*

### COMPARATIVE EMPLOYMENT AND INCOME

| Sector | % of Total Employment | | | Average Annual Earnings | | |
|---|---|---|---|---|---|---|
| | SHR | LA | U.S. | SHR | LA | U.S. |
| Mining | 2.6% | 2.3% | 0.5% | $76,623 | $102,262 | $108,705 |
| Construction | 4.8% | 7.1% | 4.5% | nd | $64,755 | $61,655 |
| Manufacturing | 5.9% | 7.2% | 8.7% | nd | $87,051 | $78,447 |
| *Durable* | *59.1%* | *50.9%* | *63.0%* | *nd* | *$72,573* | *$80,476* |
| *Nondurable* | *40.9%* | *49.1%* | *37.0%* | *nd* | *$103,189* | *$75,052* |
| Transportation/Utilities | 3.8% | 4.4% | 3.8% | $67,323 | $76,538 | $65,427 |
| Wholesale Trade | 4.4% | 3.7% | 4.1% | $68,266 | $74,865 | $83,751 |
| Retail Trade | 12.6% | 11.7% | 11.0% | $34,218 | $31,732 | $33,494 |
| Information | 1.1% | 1.3% | 1.9% | $53,063 | $57,399 | $108,937 |
| Financial Activities | 4.1% | 4.6% | 5.7% | $35,435 | $43,667 | $54,020 |
| Prof. and Bus. Services | 9.2% | 10.7% | 13.9% | $38,080 | $51,600 | $65,204 |
| Educ. and Health Services | 17.9% | 15.3% | 15.5% | $51,710 | $48,084 | $52,501 |
| Leisure and Hosp. Services | 13.1% | 11.5% | 10.7% | $23,443 | $24,234 | $26,128 |
| Other Services | 3.5% | 3.7% | 4.0% | $32,727 | $33,056 | $35,611 |
| Government | 17.0% | 16.4% | 15.5% | $67,659 | $61,843 | $73,862 |

*Sources: Percent of total employment — BLS, Moody's Analytics, 2015, Average annual earnings — BEA, Moody's Analytics, 2014*

## PER CAPITA INCOME




*Sources: BEA, Moody's Analytics*

### HIGH-TECH EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| SHR | 3.2 | 1.7 |
| U.S. | 6,767.6 | 4.8 |

### HOUSING-RELATED EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| SHR | 16.0 | 8.7 |
| U.S. | 12,751.2 | 9.3 |

*Source: Moody's Analytics, 2015*

## LEADING INDUSTRIES BY WAGE TIER

| | NAICS | Industry | Location Quotient | Employees (ths) |
|---|---|---|---|---|
| HIGH | GVF | Federal Government | 1.3 | 4.9 |
| | 2131 | Support activities for mining | 5.2 | 3.1 |
| | 6211 | Offices of physicians | 0.8 | 2.7 |
| | 5242 | Agencies, brokerages & other insur. rel. acts. | 0.8 | [illegible] |
| MID | GVL | Local Government | 1.1 | 20.6 |
| | 6221 | General medical and surgical hospitals | 1.7 | 10.4 |
| | GVS | State Government | 0.9 | 6.4 |
| | 2382 | Building equipment contractors | 1.2 | 2.9 |
| LOW | 7225 | Restaurants and other eating places | 1.1 | 14.6 |
| | MIL | Total Military Personnel | 2.7 | 7.2 |
| | 7132 | Gambling industries | 22.0 | 2.9 |
| | 4529 | Other general merchandise stores | 1.4 | 3.8 |

*Source: Moody's Analytics, 2015*

## *Government*

Founded in 1836 and incorporated in 1839, Shreveport is the parish seat of Caddo Parish. It is part of the First Judicial District, housing the parish courthouse. It also houses the Louisiana Second Circuit Court of Appeal, which consists of nine elected judges representing twenty parishes in northwest Louisiana. A portion of east Shreveport extends into Bossier Parish due to the changing course of the Red River.

The city of Shreveport has a mayor-council government. The elected municipal officials include the mayor, Ollie Tyler, and seven members of the city council. Cedric Glover, now a member of the Louisiana House of Representatives, was the first African American to hold the mayoral position. Under the mayor- council government, the mayor serves as the executive officer of the city. As the city's chief administrator and official representative, the mayor is responsible for the general management of the city and for seeing that all laws and ordinances are enforced.

## *Education*

Caddo Public Schools is a school district based in Shreveport. The district serves all of Caddo Parish. Its founding superintendent was Clifton Ellis Byrd, a Virginia native, who assumed the chief administrative position in 1907 and continued until his death in 1926. C. E. Byrd High School, which was established in 1925 on Line Avenue at the intersection with East Kings Highway, bears his name.

Shreveport has several colleges, including the Methodist-affiliated Centenary College (founded at Jackson, Louisiana, in 1825; relocated to Shreveport in 1908) and Louisiana State University in Shreveport, which opened as a two-year institution in 1967. It became four-year in 1976. Louisiana State University Health Sciences Center Shreveport, the only medical school in northern Louisiana, opened in 1969. Shreveport also has one of the largest nursing schools in northern Louisiana, the Northwestern State University College of Nursing. Louisiana Tech University at Shreveport-Bossier City was launched in 2012 offering their Executive MBA and main campus undergraduate and graduate degree programs at the university's Shreveport Center.

## *Conclusion*

Shreveport-Bossier City's economy is still in recession because of weakness in the key energy industry. While benchmark revisions to employment reveal that fewer jobs have been lost compared with previous estimates, SHR's labor market has still contracted steadily for the past year and conditions are worse than in the rest of the state. The unemployment rate is down to a cycle low of 6.3%, which is still much higher than its prerecession rate and the state and national figures. Also, while it has risen the past couple of months, the labor force has shrunk by 20,000 since hitting an all-time high in 2008.

Job losses are widespread but are the greatest in high-wage industries. Average weekly earnings subsequently have fallen close to 2% over the past year. Fewer jobs and weak income trends, along with persistent out-migration, are hurting consumer industries and housing. Residential permits are at a seven- year low and construction employment is extending its yearlong decline.

Shreveport-Bossier City's economy will remain weak as long as commodity prices are low. However, job growth will resume as the energy industry stabilizes and private services strengthen later in 2016. Longer term, however, weak demographics, including low educational attainment and poor population growth, will constrain SHR's growth prospects and the metro area will be a below-average performer.

# LOCAL MARKET AREA ANALYSIS

## *Introduction*

A market area is considered a "...geographic or locational delineation of the market for a specific category of real estate."[7] An analysis of the subject's market area is pertinent when attempting to estimate the market value of real property. The reason for this analysis is to identify and forecast trends in the market area that will influence demand. The market area profile is provided to outline the primary area of influence on the subject property. The Market Analysis section, which follows, provides additional information concerning the subject's market.

## *Primary Market Area*

The subject property is located along the east side of US Highway 171, approximately ±1,000 feet south of its intersection with William Flavis Road, within the Town of Stonewall, DeSoto Parish, Louisiana. This location is approximately ±1.60 miles south of downtown Stonewall, ±17.0 miles north of Mansfield (DeSoto Parish seat), and ±18.8 miles southwest of the Shreveport central business district (CBD), within the Shreveport-Bossier Metropolitan Statistical Area (MSA), in northwestern Louisiana. The subject's location within this defined market can be better visualized by viewing the Local Market Area Map below.

**Local Market Area Map**




7 The Appraisal of Real Estate, Thirteenth Edition, Appraisal Institute, 2008, Page 55.

The previous map shows the primary market area. The primary market area, as defined, includes diverse land use, including an abundance of commercial uses, industrial, residential, special uses, and other uses typical of such suburban communities.

## Secondary & Tertiary Market Areas

The secondary market area includes competing commercial pockets within the Stonewall and Shreveport southwest submarket and along the periphery of this market, or specifically those primary and secondary thoroughfares similar to the subjects with mixed development. Tertiary market areas include other markets within DeSoto Parish, or surrounding markets with similar access to major transportation routes that offer comparable economic characteristics and share similar linkage with employment centers.

## Change & Transition

As a part of the market area analysis, change and transition in the defined area are reviewed. There is only modest land use change occurring in the primary market area. The Stonewall area is a well-established small market and vacant land exists in abundance in the immediate area surrounding the town. There has been some activity in the form of changing land use and some minor development/redevelopment activity. Overall, however, the primary market area is stable with no significant change or transition expected.

## Life Cycle of Market Area

An area of harmonious land use generally progresses through four stages. These stages do not have to be sequential in nature. "At any point in the cycle, a major change can interrupt the order of the stages."[8] The stages include growth, stability, decline and revitalization. The growth stage is a period during which the market area receives public acceptance and favor. During the stability stage, there is a period of equilibrium with neither gain nor loss in value of properties. In the decline period there is evidence of diminishing demand. There can be a period of revitalization with renewal, modernization and increasing demand after decline.

The best characterization of the primary market area would be stability. The primary market area pushed through the major growth stage of the life cycle years ago and now the market is limited to occasional fill-in development and some redevelopment along the major intersections within the market. There is limited land available for expansion, though some sporadic vacant developmental sites exist in this portion of the Shreveport MSA. However, significant demand for vacant sites is not expected in the next five to seven years. Thus, the primary market area as defined previously is stable with no significant expansion expected.

## Market Area Access

Access to the local interstate system is provided via US Highway 171 itself, taken north ±1.60 miles into the heart of Stonewall, to its intersection with Stonewall-Frierson Road (LA-3276), then east ±4.35 miles to Interstate 49 (I-49) at interchange #191, approximately ±4.65 miles northeast of the subject's location. Addition north-south access is provided via US Highway 171 itself, which turns into Mansfield Road in the southwestern Shreveport submarket, in addition to numerous primary and secondary thoroughfares that blanket the local market.

---

8 The Appraisal of Real Estate, Thirteenth Edition, Appraisal Institute, 2008, Page 167.

## *Land Use in Primary Market Area*

Land use in proximity to the subject are detailed as follows:

| Neighboring Property Use | |
|---|---|
| **North:** | Residential and worship use is located adjacent south of the subject site. |
| **South:** | Residential use is located adjacent south of the subject site. |
| **East:** | Mixed residential and agricultural use is located east of the subject site. |
| **West:** | Mixed commercial (U-Haul) and light-industrial use is located west of the subject, across US Highway 171. |

An aerial location map of the local market and a summary of the Local Market Analysis follow.

### Local Market Area Aerial Map



## *Conclusion*

The local market area is generally considered to be suburban, lying just to the south and west of the Shreveport CBD. The market area is well located with easy access to major employment centers and support facilities and benefits from the accessibility offered by Interstate 49. The forecast for the local area is one of continued population decline, which will affect the demand for all forms of real estate. In the long run, the area appears to remain on a trajectory that will lag behind most other markets throughout the country.

# SITE DESCRIPTION SUMMARY

| | |
|---|---|
| **SITE DESCRIPTION:** | The vacant subject site consists of ±9.64 gross acres (±420,114 gross square feet, per survey), under a single parcel. |
| **PARCEL NUMBER:** | 0200252000 |
| **LEGAL DESCRIPTION:** | See attached addendum |
| **CONFIGURATION:** | Irregular |
| **SITE ACCESS:** | US Highway 171. Access and visibility to the subject tract is considered to be average. |
| **VISIBILITY:** | Average |
| **TOPOGRAPHY:** | √ Generally Level ☐ Rolling ☐ Sloping |
| **STREET GRADE:** | √ Above Grade ☐ Below Grade ☐At Grade |
| **DRAINAGE:** | ☐ Storm Sewers ☐ Retention Area √ Site |
| **SOIL CONDITIONS:** | Adequate for building improvements |
| **CURRENT ZONING:** | SC Commercial District |
| **UTILITIES:** | Municipal |
| **ENVIRONMENTAL ISSUES:** | It is expressly assumed that there are no hidden or non-apparent conditions of the property or subsoil that would render the subject property more or less valuable than an otherwise comparable property. |
| **ASSESSMENT:** | Assessed Land Value $26,500<br>Total Assessed Value $33,360 |
| **REAL PROPERTY TAXES:** | $3,690.97 (2016) – Taxes are current, as of the effective date of this report. |
| **EASEMENTS/ENCROACHMENTS:** | Review of public records does not indicate any easements or encroachments that would have an adverse impact on the use, marketability, or value of the site. |
| **FLOOD HAZARD STATUS:** | Zone X |
| **FLOOD HAZARD COMMENTS:** | The subject site does not appear to be located within a designated flood hazard area, as established by the Department of Housing and Urban Development, Federal Emergency Management Agency (FEMA), Federal Insurance Administration, per Panel 22031C0015C, dated 12/16/2003. |
| **IMPROVEMENTS:** | The improvements existing on-site include two (2) single-family residences of manufactured production, in addition to various auxiliary improvements, such as utility sheds, and fencing. The improvements are in poor to fair condition and do not make no significant contribution to value, over the fair market value of the land, "as-though-vacant". |

## Street Location Map




## Site Aerial Plat



## Zoning Map (Stonewall)




## Flood Map



## Subject Survey



## REPRESENTATIVE SUBJECT PHOTOS (GOOGLE, INC.)



US Highway 171 – Looking North



US Highway 171 – Looking South



Subject Site – Northeast View



Subject Site – East View



Subject Site – Southeast View



Development West of Subject

# HIGHEST AND BEST USE ANALYSIS

## *Introduction:*

The highest and best use analysis of the subject is discussed on the following pages. This analysis incorporates the information presented in the Market Analysis section, as well as any unique characteristics of the subject described previously. The highest and best use of a property is defined as: "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property—specific with respect to the user and timing of the use—that is adequately supported and results in the highest present value."[9] There are four stages of analysis used when estimating highest and best use:

1. **Legally Permissible:** Those uses permitted by zoning and deed restrictions.
2. **Physically Possible:** Uses to which it is physically possible to improve the site.
3. **Financially Feasible:** Possible and permissible uses that produce a net return.
4. **Maximally Productive:** Among the feasible uses, that use which produces the highest net return.

The highest and best use analysis is provided to form a conclusion of the most profitable and productive use of a site. Such optimum use may be based upon highest and most profitable continuous use to which the property is adapted or is likely to be in demand in the near future. However, a probable use that depends upon; future events, or; a combination of likely uses which depend upon future events, or; "likely happenings," are not to be included within the analysis. In short, any use that is shown to be dependent on an uncertain act of another person, or body of persons, is not to be considered in the analysis.

In the first part of this two-part analysis, the highest and best use of the land is analyzed. This section discusses the site as if it were not improved with any structures. The conclusion is then used as the basis of the land valuation, which concludes the value of the land at its highest and best use – that use which provides the largest return to the owner.

The concept of highest and best use recognizes the maximum generation of wealth to the property owner. As was previously defined, highest and best use must be considered in two situations:

1. The highest and best use of a site as though it were vacant, and
2. The highest and best use of the property as improved.

The first situation considers that a parcel of land is either vacant or that it can be made vacant through demolition of existing improvements. The key issue in this situation is the determination of what type of building or other improvements, if any, that should be built upon the land if it were vacant. The concept underlying this analysis is that the prevailing use on the site may not be the highest and best use. The second situation is considering the highest and best use of a property as improved. This relates to the use that should be made of the property as it exists, or the ideal form of improvement.

Ultimately, the use that maximizes the property's net operating income on a long-term basis is its highest and best use. The four criteria presented previously must be considered serially in an attempt to determine the highest and best use. This includes first, an investigation of uses that are legally permissible. After permissible legal uses are reviewed, an analysis of uses that are physically possible is conducted. From the uses that are both physically possible and legally permissible, the financially feasible alternatives are reviewed, and finally, the most productive use concluded.

---

[9] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 5th ed. (Chicago: Appraisal Institute, 2010).

## *Highest and Best Use of the Land As Though Vacant:*

The highest and best use of the land is defined as: "Among all reasonable, alternative uses, the use that yields the highest present land value, after payments are made for labor, capital, and coordination. The use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements."[10]

The highest and best use of the land (site) "as though vacant" and available for use, may be different than the highest and best use of a subject property as improved. This is true in cases where an existing improvement may not be an appropriate use yet it makes a contribution to the overall property value greater than that of the land value as vacant. Use of the site is dependent upon such physical characteristics as size, configuration, topography, and soil composition. Additional physical influences potentially affecting use include the possibility of the site being exposed to environmental hazards, as well as the potential risk of the subject site's potential improvements being affected by natural disasters such as floods and earthquakes.

The following analysis considers each of the four highest and best use criterions, in turn, for the subject site, as though vacant and available for development.

**Legally Permissible:**

The legally permissible use of a property relates primarily to legal restraints imposed by zoning regulations, building codes, environmental constraints, and other applicable laws and regulations that govern land use. The subject site is currently zoned SC Commercial District, with secondary zoning of SR-A Residential Agriculture District (eastern portion of site). This zoning allows for a variety of commercial uses, such as retail, office, service, restaurant, hospitality, etc.

**Physically Possible:**

The physical characteristics of a site can affect the uses. These characteristics include: (1) size; (2) shape; (3) terrain or topography; (4) soil condition; (5) utilities; (6) access characteristics; and (7) surrounding land uses. Each of these site characteristics were described and discussed in the Site Analysis section of this report. A number of uses are physically possible on the subject site. The ±9.64 gross acre site (as surveyed) is generally level. Soil and subsoil conditions appear adequate for development as evidenced by area development. Surrounding land uses include a mix of commercial, and residential uses. From a development standpoint, the location and visibility of the site is considered good to above average, fronting US Highway 171.

**Financially Feasible:**

Any use that results in a positive residual land value to the owner is considered to be financially feasible. Based on surrounding land use, and local demand, it appears the most financially feasible use of the subject site, as vacant, would be development for some form of retail use, consistent with current zoning regulations.

**Maximally Productive:**

Among financially feasible uses, the use that provides the highest rate of return or value (given a constant rate of return) is the highest and best use. Given the legally permissible and physically possible discussions set forth above, holding the site for future commercial development is to be the only financially feasible use at this time. Therefore, it is the opinion of the appraiser that the maximally productive use of the site is for commercial development.

**Conclusion:**

In this analysis, the appraiser considered legal restrictions relating to the subject site, as well as physical characteristics and limitations to determine the most logical and financially feasible use that was ultimately, the maximally productive use of the site.

---

[10] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 5th ed. (Chicago: Appraisal Institute, 2010).

Finally, given all legally permissible, physically possible, financially feasible, and maximally productive uses, as well as the subject's location, surrounding land use, and estimated traffic counts, commercial use is determined to be the highest and best use of the subject as vacant. Such use would take the form of retail, office, mixed commercial use, or other consistent uses, conforming to the existing municipal regulations.

## *Highest and Best Use of the Property as Improved:*

*The Dictionary of Real Estate Appraisal* defines highest and best use of the property as improved as: "The use that should be made of a property as it exists. An existing improvement should be renovated or retained as is so long as it continues to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one."[11]

The same criterion is utilized in the determination of highest and best use, as improved, as those utilized in the as though vacant analysis; however, with reference to this analysis any existing improvements would be considered in the final determination. Because the subject property is developmental land with minimal improvement, the highest and best of the subject, as improved, would be the same highest and best use as though vacant.

---

[11] Ibid.

# VALUATION PROCESS SUMMARY

The valuation process is the orderly program in which the data used to estimate the value of the subject property are acquired, classified, analyzed, and presented. The first step in the process is to define the appraisal problem - i.e., identify the real estate, the effective date of the value estimate, the property rights being appraised, and the type of value sought. Once this has been accomplished, the appraiser collects and analyzes the factors that affect the market value of the subject property. These factors are addressed in the regional and local market analysis, the site and improvement analysis, and the highest and best use analysis, and in the application of the three approaches to value. The three traditional approaches to valuing improved properties are:

1. Sales Comparison Approach – a comparison of the property appraised with reasonably similar, recently conveyed properties for which the price, terms and conditions of sale are known.

2. Income Approach – the processing of a projected net income into a valuation estimate via one or more capitalization techniques.

3. Cost Approach – an estimate of the replacement cost of all structural improvements as if new, less loss in value attributable to depreciation from all causes plus the value of the land as if vacant.

The Sales Comparison Approach is founded upon the principle of substitution that holds that the cost to acquire an equally desirable substitute property without undue delay ordinarily sets the upper limit of value. At any given time, prices paid for comparable properties are construed by many to reflect the value of the property appraised. The validity of a value indication derived by this approach is heavily dependent upon the availability of data on recent sales of properties similar in location, size, and utility to the appraised property.

The Income Capitalization Approach is based on the principle of anticipation that recognizes the present value of the future income benefits to be derived from ownership in a particular property. The Income Approach is most applicable to properties that are bought and sold for investment purposes, and is considered very reliable when adequate income and expense data are available. Since income producing real estate is most often purchased by investors, this approach is valid and is generally considered the most applicable when the property being appraised was designed for, or is easily capable of producing a rental income.

The Cost Approach is based on the premise that the value of a property can be indicated by the current cost to construct a reproduction or replacement for the improvements minus the amount of depreciation evident in the structures from all causes plus the value of the land and entrepreneurial profit. This approach to value is particularly useful for appraising new or nearly new improvements.

The Appraisal Process is concluded by a review and re-examination of each of the approaches to value that was employed. Consideration is given to the type and reliability of data used, the applicability of each approach to the type of property being appraised and the value being sought.

# THE COST APPROACH

Because the subject tract is vacant land with minimal improvement of any deemed contributory value, the cost approach is inapplicable to this appraisal analysis.

# SALES COMPARISON APPROACH

The *objective* of the Sales Comparison Approach analysis is to estimate the most probable selling price of the subject property. The underlying rationale of the approach is the principle of substitution; that a prudent purchaser will not pay more for a given property than he or she would be required to pay for a comparable alternative property. Alternately, it is recognized that a prudent seller will not take less than he or she can obtain elsewhere in the market.

The *method* of the Sales Comparison Approach is an empirical investigation where the subject property's estimated market value is ascertained by way of historical sales of comparable properties. In an ideal market situation for applying the Sales Comparison Approach, the following conditions prevail:

- A large number of sales have occurred between buyers and sellers who are knowledgeable and familiar with the local market.
- The sold property is closely comparable to the subject property.
- The terms of sale are identical.
- The sales are all very recent.
- The sales are "normally distributed" in a statistical sense.

Typically, the method involves five steps:

- Research the market to identify similar properties for which pertinent sales, listings, offerings, and/or rental data is available.
- Qualify the prices as to terms, motivating forces, and bona fide nature.
- Compare each of the comparable properties important attributes to the corresponding ones of the property being appraised, under the general categories of time, location, physical characteristics, and conditions of sale.
- Consider all dissimilarities and their probable effect on the price of each sale property to derive individual market value indications for the property being appraised.
- From the pattern developed, formulate an opinion of market value for the property being appraised.

The weakness of the Sales Comparison Approach is the fact that it is based on historical data rather than future expectations and/or the fact that the conditions of comparability may not closely conform to the subject property. The strength lies in the fact that the approach reflects actual behavior of typical purchasers under current (at the time of the data occurrence) market conditions. In short, the reliability depends upon the comparability of the comparable properties, verification of the sales data, the conditions under which the property is sold, the date of sale and the judgment with which adjustments to the data are made.

The unit comparison price of dollar per acre is utilized in this analysis, for this unit of measure is that which comparable property sales prices are quoted by buyers and sellers in the market place. This conclusion is drawn from observation of communications within the real estate industry and is supported by the fact that land of similar size and uses are assessed on a per acre basis. When appropriate, the comparable sales have been adjusted for: conditions of sale, financing, the date of sale, location, topography, utilities and size of site. Sales adjustments have also been made for geometric configuration, street frontage, (i.e. visibility) and ease of access when appropriate. The various adjustments are derived from the market by way analyzing paired-data sets.

The following information presented constitutes a summary of relevant sales data. An adjustment grid was created using sales of similarly zoned commercial land.

## *Comparable Land Sales Map*






Photo from Google, Inc.

## *Land Comparable #1*

| | |
|---|---|
| **Location:** | 52610 Stevens Road, Shreveport, LA 71106 |
| **Proximity:** | Shreveport South Submarket |
| **Date of Sale:** | 2/5/2016 |
| **Financing Terms:** | Cash Equivalent |
| **Conditions of Sale:** | Arm's Length |
| **Parcel/Tax ID:** | 161412-000-0191-00 |
| **Grantor (Seller):** | Stevens Village Properties LLC |
| **Grantee (Buyer):** | Stevens Road Prop Group LLC |
| **Deed (Book/Page/Date):** | 004877000518 (Recorded) |
| **Mortgage Terms:** | Unavailable |
| **Assessed Value:** | Unavailable |
| **Tax Rate:** | $129.59 (per $1,000 of Assessed Value) |
| **Assessor's FMV:** | Unavailable |
| **Site Size:** | ±5.96 Acres |
| **Market Appeal:** | Similar to subject |
| **Exposure:** | Primary / Superior to subject |
| **Other Features:** | None Noted / Similar to subject |
| **Sales Price:** | $1,671,000 |
| **Price per Acre:** | $280,369 |
| **Price per SF:** | $6.44 |
| **Comments:** | This sale is deemed overall superior to the subject. |




*Photo from Google, Inc.*

### *Land Comparable #2*

| | |
|---|---|
| **Location:** | 12497 Brookwood Church Way, Shreveport, LA 71106 |
| **Proximity:** | Shreveport South Submarket |
| **Date of Sale:** | 11/23/2015 |
| **Financing Terms:** | Cash Equivalent |
| **Conditions of Sale:** | Arm's Length |
| **Parcel/Tax ID:** | 161401-032-0002-00 |
| **Grantor (Seller):** | Alt-Shreve LLC |
| **Grantee (Buyer):** | Confidential |
| **Deed (Book/Page/Date):** | 2559070 (Recorded) |
| **Mortgage Terms:** | Unavailable |
| **Assessed Value:** | Unavailable |
| **Tax Rate:** | $129.59 (per $1,000 of Assessed Value) |
| **Assessor's FMV:** | Unavailable |
| **Site Size:** | ±4.00 Acres |
| **Market Appeal:** | Similar to subject |
| **Exposure:** | Primary / Superior to subject |
| **Other Features:** | None Noted / Similar to subject |
| **Sales Price:** | $1,060,440 |
| **Price per Acre:** | $265,110 |
| **Price per SF:** | $6.09 |
| **Comments:** | This sale is deemed overall superior to the subject. |




*Photo from Google, Inc.*

## *Land Comparable #3*

| | |
|---|---|
| **Location:** | ±283 E Flournoy Lucas Rd, Shreveport, LA 71106 |
| **Proximity:** | Shreveport Southeast Submarket |
| **Date of Sale:** | 7/5/2017 |
| **Financing Terms:** | Cash Equivalent |
| **Conditions of Sale:** | Arm's Length |
| **Parcel/Tax ID:** | 161308-000-0043-00 |
| **Grantor (Seller):** | E Alton Sartor Properties LLC |
| **Grantee (Buyer):** | Gamvest Limited Partnership |
| **Deed (Book/Page/Date):** | Unavailable |
| **Mortgage Terms:** | Unavailable |
| **Assessed Value:** | $20,921 |
| **Tax Rate:** | $129.59 (per $1,000 of Assessed Value) |
| **Assessor's FMV:** | $20,921 |
| **Site Size:** | ±14.98 Acres |
| **Market Appeal:** | Similar to subject |
| **Exposure:** | Primary / Inferior to subject |
| **Other Features:** | None Noted / Similar to subject |
| **Sales Price:** | $1,531,322 |
| **Price per Acre:** | $102,224 |
| **Price per SF:** | $2.35 |
| **Comments:** | This sale is deemed overall inferior to the subject. |

## *Comparable Land Sales Grid*

**Sales Adjustment Grid**

| Comparable Number | Subject $ | % | Comparable 1 $ | % | Comparable 2 $ | % | Comparable 3 $ | % |
|---|---|---|---|---|---|---|---|---|
| Location | ±1665 US Highway 171 | | 52610 Stevens Rd | | 12497 Brookwood Church Way | | ±0 Flournoy Lucas Rd | |
| City, State | Stonewall, LA | | Shreveport, LA | | Shreveport, LA | | Shreveport, LA | |
| Proximity | N/A | | Shreveport South | | Shreveport South | | Shreveport SE | |
| Sale Price | | | $ 1,671,000 | | $ 1,060,440 | | $ 1,531,322 | |
| Plus Buyer Expenditure | | | $ - | | $ - | | $ - | |
| Total Buyer Cost | | | $ 1,671,000 | | $ 1,060,440 | | $ 1,531,322 | |
| Main Building Area | N/A | | N/A | | N/A | | N/A | |
| Lot Size (Acres) | 9.640 | | 5.960 | | 4.000 | | 14.980 | |
| Price/AC of Land | | | $ 280,369 | | $ 265,110 | | $ 102,224 | |
| **Property Rights** | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | |
| Adjustment | $0.00 | | - | 0.0% | - | 0.0% | - | 0.0% |
| **Financing Terms** | Cash Equivalent | | Cash Equivalent | | Cash Equivalent | | Cash Equivalent | |
| Adjustment | $0.00 | | - | 0.0% | - | 0.0% | - | 0.0% |
| **Conditions of Sale** | Arm's Length | | Arm's Length | | Arm's Length | | Arm's Length | |
| Adjustment | $0.00 | | - | 0.0% | - | 0.0% | - | 0.0% |
| **Date of Sale** | N/A | | Feb-16 | | Nov-15 | | Jul-17 | |
| Mkt Conditons Adjustment | $0.00 | | - | 0.0% | - | 0.0% | - | 0.0% |
| Adjusted Price | | | $ 1,671,000 | | $ 1,060,440 | | $ 1,531,322 | |
| Adj. Price per Acre | | | 280,369 | | 265,110 | | 102,224 | |
| **Location** | Stonewall | | Shreveport South | | Shreveport South | | Shreveport SE | |
| Adjustment | | | (56,074) | -20% | (53,022) | -20% | (20,445) | -20% |
| **Site Size (Acres)** | 9.640 | | 5.960 | | 4.000 | | 14.980 | |
| Adjustment | | | (42,055) | -15% | (53,022) | -20% | 5,111 | 5% |
| **Zoning** | SC Commercial | | Similar | | Similar | | Residential / Inferior | |
| Adjustment | | | 0 | 0% | 0 | 0% | 10,222 | 10% |
| **Utilities** | Municipal | | Similar | | Similar | | Similar | |
| Adjustment | | | 0 | 0% | 0 | 0% | 0 | 0% |
| **Topography** | Generally Level | | Similar | | Inferior | | Inferior | |
| Adjustment | | | 0 | 0% | 13,256 | 5% | 5,111 | 5% |
| **Flood Zone** | None / Zone X | | Zones X and AE | | Zone X | | Zone X | |
| Adjustment | | | 0 | 0% | 0 | 0% | 0 | 0% |
| **Appeal** | Average | | Similar | | Similar | | Similar | |
| Adjustment | | | 0 | 0% | 0 | 0% | 0 | 0% |
| **Access/Exposure** | Primary | | Primary / Superior | | Primary / Superior | | Primary / Inferior | |
| Adjustment | | | (56,074) | -20% | (53,022) | -20% | 10,222 | 10% |
| **Improvements** | As-Vacant | | None | | None | | None | |
| Adjustment | | | 0 | 0% | 0 | 0% | 0 | 0% |
| **Proposed Use (H&BU)** | Retail | | Similar | | Similar | | Similar | |
| Adjustment | | | 0 | 0% | 0 | 0% | 0 | 0% |
| **Additional Features** | None Noted | | None Noted | | None Noted | | None Noted | |
| Adjustment | | | 0 | 0% | 0 | 0% | 0 | 0% |
| **Adjusted Price per Acre** | | | $ 126,166 | | $ 119,300 | | $ 112,447 | |
| Absolute Adjustment | | | $ 154,203 | 55% | $ 172,322 | 65% | $ 51,112 | 50% |
| Net Adjustment | | | $ (154,203) | 55% | $ (145,811) | 55% | $ - | 0% |

| | |
|---|---|
| Indicated Value Range (Rounded) | $112,400 to $126,200 |
| **Reconciled Value per Acre** | $120,000 |
| Value Indication | $1,156,800 |
| **Value Indication Rounded** | **$1,155,000** |

## Adjustment Process

What follows is an explanation of the adjustments applied in the grid analysis on the previous page. Only those attributes requiring adjustment are detailed:

**Location:** Comparables #1-3 are located within the superior Shreveport south and southeast submarkets and were each adjusted downward by 5% in recognition of this.

**Site Size:** Differences in site size must be accounted for. In this market, smaller sites of similar utility and appeal typically command a higher price per acre than larger sites. To that end, the comparables were adjusted up/down for respective site size when compared to the subject on a percentage basis.

**Zoning:** The subject is zoned SC Commercial District, with secondary zoning of SR-A, or Residential Agriculture District, allowing for a variety of commercial uses, such as retail, office, or mixed use. Comparable #3 had an inferior zoning classification and was adjusted positively by 10% in reflection of this.

**Topography:** Comparables #2 and #3 are wooded developmental sites with an inferior topography when compared to the subject and were each adjusted positively by 5% to account for this.

**Access/Exposure:** The subject is located along a primary thoroughfare in its market (US Highway 171) and enjoys relatively good exposure because of this. The comparables utilized were adjusted up, or down for their access/exposure when compared to the subject on a percentage basis, as warranted.

Additional comparable data and final reconciliation of value for the Sales Comparison Approach follows.

## Additional Land Trade Data

In addition to the sales data utilized in the quantitative analysis grid presented previously, the appraiser has located additional land trade data within the local market. A summary of these sales is located in the table on the following page.

It should be noted that those comparables selected for use in the quantitative analysis on the previous page are highlighted in **bold** text (i.e., comparables #2, #6, and #7).

***COMPARABLE LAND SALES – LOCAL MARKET***

| # | Address | City | Land Type | Closed Date | Site (AC) | Site (SF) | Price | $/AC |
|---|---|---|---|---|---|---|---|---|
| 1 | Paxton Rd & I-49 | Shreveport | Industrial | 12/23/2014 | 4.360 | 189,922 | $238,950 | $54,805 |
| 2 | **283 E Flournoy Lucas Rd** | **Shreveport** | **Commercial** | **7/5/2017** | **14.980** | **652,529** | **$1,531,322** | **$102,224** |
| 3 | "0" Viking Dr | Bossier City | Commercial | 7/1/2014 | 3.600 | 156,816 | $485,000 | $134,722 |
| 4 | ±1102 E Bert Kouns Ind Loop | Shreveport | Commercial | 11/17/2014 | 5.140 | 223,898 | $783,644 | $152,460 |
| 5 | ±8500 Business Park Dr | Shreveport | Office | 2/6/2015 | 2.080 | 90,605 | $500,000 | $240,385 |
| 6 | **12497 Brookwood Church Way** | **Shreveport** | **Commercial** | **11/23/2015** | **4.000** | **174,240** | **$1,060,440** | **$265,110** |
| 7 | **52610 Stevens Rd** | **Shreveport** | **Commercial** | **2/5/2016** | **5.960** | **259,618** | **$1,671,000** | **$280,369** |
| 8 | Brookhollow Dr & Bert Koons Dr | Shreveport | Retail | 7/17/2017 | 3.270 | 142,441 | $1,045,425 | $319,702 |
| 9 | I-20 & US 79 | Greenwood | Commercial | 8/14/2015 | 5.000 | 217,800 | $2,000,000 | $400,000 |
| 10 | ±9471 Ellerbe Rd | Shreveport | Office | 10/27/2014 | 2.840 | 123,710 | $1,244,000 | $438,028 |
| 11 | 10470 Norris Ferry Rd | Shreveport | Commercial | 2/22/2016 | 2.780 | 121,097 | $2,080,000 | $748,201 |
| 12 | 2722 Lakeshore Dr | Shreveport | Commercial | 8/1/2014 | 1.810 | 78,844 | $1,636,964 | $904,400 |
| | | | | | | | Minimum: | $54,805 |
| | | | | | | | Maximum: | $904,400 |
| | | | | | | | Mean (Avg): | $336,701 |
| | | | | | | | Median: | $272,740 |

The twelve (12) comparable sales presented in the table above represent prices ranging between $54,805 and $904,400 per acre, with an average price of $336,701, and a median price of $272,740, per acre. Sale #1 sets the low end of the value range, but is an inferior industrial site not comparable to the subject. Conversely, comparables #6 through #12 set the high end of the range, but represent developmental sites with superior locations, configurations, or other attributes not comparable to the subject site. **The subject's value would be significantly lower than indicated by these sales and listings.**

Given the data, the best range of value is represented by comparables #2-5, or between $102,224 and $240,385 per acre, with an average (mean) price of $157,448, per acre. In consideration of this, the reconciled value per acre of $115,000 presented in the previous quantitative analysis is considered supported by this secondary qualitative analysis, and consistent with the additional sales data researched.

## *Reconciliation of the Sales Comparison Approach*

Finally, according to the previous analysis and calculations, the subject property's estimated Fair Market Value, "As-Is", **by way of the Sales Comparison Approach, as of the effective date of this** appraisal is $1,156,800, rounded to:

**ONE MILLION ONE HUNDRED FIFTY-FIVE THOUSAND DOLLARS**
**($1,155,000)**

*(which equates to approximately $120,000 per gross acre, or $2.75 per gross square foot of site)*

# INCOME APPROACH

The Income Approach is chiefly reliable in the appraisal of properties which are capable of generating income. In the case of the subject, as developmental land with no known leases in place, the Income Approach was deemed inapplicable and was not developed in this report.

## RECONCILIATION AND VALUE ESTIMATE

The reconciliation section ties together the information provided throughout this report to reconcile a final opinion of value for the subject property. Final reconciliation is defined as: "The last phase in the development of a value opinion in which two or more value indications derived from market data are resolved into a final value opinion, which may be either a final range of value or a single point estimate."[12]

Only the Sales Comparison Approach has been developed to provide a fair market value estimate for the subject property located at: 1665 US Highway 171, Stonewall, Louisiana 71078. The following summarizes the indicated value estimates previously determined:

| Approach to Value | Indicated Value | Rounded Value |
|---|---|---|
| Cost Approach | N/A | N/A |
| **Sales Comparison Approach** | **$1,156,800** | **$1,155,000** |
| Income Capitalization Approach | N/A | N/A |

Each approach utilized has inherent strengths and weaknesses that the final reconciliation process takes into account. These values will be reconciled to produce a point value estimate, based on the criteria of appropriateness, accuracy, and quantity of evidence.

### *Reconciled Value Estimate(s)*

The table below reconciles the appraiser's final estimate of fair market value for the subject. It should be noted that, as indicated on page 12, the Highest and Best Use of the subject, "as-vacant" is for retail development consistent with current zoning (SC Commercial District) regulations. As indicated, as developmental land, without any known leases encumbering the subject, only the Sales Comparison Approach was developed. The final fair market value conclusion is summarized in the table below:

| Final Value Conclusion | | | |
|---|---|---|---|
| **Approach** | **Value** | **Allocation (%)** | **Allocation ($)** |
| Cost Approach | N/A | N/A | N/A |
| **Sales Comparison Approach** | **$1,155,000** | **100%** | **$1,155,000** |
| Income Capitalization Approach | N/A | N/A | N/A |
| | | Value Conclusion: | $1,155,000 |
| | | **Adjustments (if any):** | **$0** |
| | | Adjusted Value Conclusion: | $1,155,000 |
| | | **Final Reconciled Value Estimate (Rounded):** | **$1,150,000** |

Finally, based upon the preceding analyses, the Fair Market Value of the fee simple interest of the subject property, "As-Is", all subject to the general underlying assumptions and limiting conditions contained herein, as of the effective date being November 20, 2017, is reconciled to:

**ONE MILLION ONE HUNDRED FIFTY THOUSAND DOLLARS**
**($1,150,000)**
*Refer to page 12 for any Extraordinary Assumptions & Limiting Conditions.

[12] Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Chicago: Appraisal Institute, 2010).

# ADDENDUM

# SUBJECT LEGAL DESCRIPTION

**PROPERTY DESCRIPTION:**

A certain tract of land containing 9.64 acres, or 420,114 square feet, more or less, located in Section 29, Township 15 North, Range 14 West, Desoto Parish, Louisiana and being more particularly described as follows:

Commencing at a found 1/2" iron rod at the southeast corner of Lot 2, Baldwin Acres Subdivision, as recorded in Conveyance Book 231, Page 337 of the records of Desoto Parish, Louisiana for the POINT OF BEGINNING of the tract herein described; thence proceed along the south line of said Lot 2 North 89° 02' 23" West a distance of 701.44 feet to a found 1/2" iron rod on the east right of way of US Highway 171; thence proceed along said right of way North 02° 25' 39" East a distance of 255.49 feet to a found 1" iron rod; thence leaving said right of way proceed South 89° 02' 23" East along the south line of a tract of land as described in Conveyance Book 1224, Page 634 of the records of Desoto Parish, Louisiana a distance of 442.26 feet to a set 1/2" iron pipe at the southeast corner of a 0.229 acre tract of land as described in said Conveyance Book 1224, Page 634; thence proceed North 02° 11' 46" East a distance of 89.53 feet to a set 1/2" iron pipe at the northeast corner of said 0.229 acre tract; thence leaving said tract proceed South 89° 02' 23" East a distance of 258.14 feet to a set 1/2" iron pipe on the East line of Lot 1 of said Baldwin Acres Subdivision, being 120.00 feet south of the northeast corner of said Lot 1; thence proceed along the east line of said Lot 1 North 02° 11' 46" East a distance of 120.00 feet to a set 1/2" iron pipe at the northeast corner of said Lot 1; thence leaving said subdivision proceed South 89° 31' 50" East a distance of 469.00 feet to a found 1/2" iron pipe; thence proceed South 02° 11' 46" West a distance of 465.00 feet to a set 1/2" iron pipe; thence proceed North 89° 31' 50" West a distance of 469.00 feet to the POINT OF BEGINNING, all as further shown hereon, and being subject to the servitudes, easements and/or rights-of-way shown hereon and any and all others of record or of use.

# QUALIFICATIONS OF THE APPRAISER

**ANDREW J. BRYANT, MAI, ASA**
11715 Fox Road, Suite 400-127, Indianapolis, Indiana 46236
Phone: (317) 730-2423 I Email: andrew@bryantassetadvisors.com

## PROFESSIONAL EXPERIENCE

**President** — **September 2011 - Present**
Bryant Asset Advisors, LLC
San Diego California / Indianapolis, Indiana

- *Principal and senior appraiser involved in the valuation of both real and personal property, analysis of various real estate sectors and economies, expanding new and existing client base, as well as the supervision, management, and training of appraisal staff.*

**Senior Staff Appraiser & Independent Contractor** — **October 2004 – May 2014**
Access Valuation
Indianapolis, Indiana

- *Senior commercial appraiser on staff, and independent contractor, as of 2014. Responsibilities include the valuation of commercial and residential properties, analysis of various real estate sectors and economies, expanding new and existing client base, as well as the supervision and training of junior appraisal staff.*

**Residential Real Estate Appraiser** — **June 2003 – October 2004**
RPE-Cobb & Associates
Greenwood, Indiana

- *Responsibilities included the valuation of residential properties, analysis of real estate markets, and expanding new and existing client base.*

## PROFESSIONAL LICENSES/CERTIFICATIONS

- **California Certified General Appraiser,** License # 3002848 (Granted: 12/24/2014/Expires: 12/23/2016)
- **Indiana Certified General Appraiser,** License # CG41100046 (Granted: 6/10/14 / Expires: 6/30/18)
- **Kentucky Certified General Appraiser,** License # 004852 (Granted: 3/19/14 / Expires: 6/30/18)
- **Michigan Certified General Appraiser,** License # 1201074293 (Granted: 2/8/12 / Expires: 7/31/18)
- **Ohio Certified General Appraiser,** License # 2012000299 (Granted: 3/19/14 / Expires: 3/6/17)
- **Pennsylvania Certified General Appraiser,** License # GA003996 (Granted: 5/7/13 / Expires: 6/30/17)
- **Texas Certified General Appraiser,** License # 1380353 (Granted: 8/22/2014 / Expires: 8/31/2018)

## PROFESSIONAL/ASSOCIATION MEMBERSHIPS & DESIGNATIONS

- **MAI Designated Member,** Appraisal Institute
- **ASA Designated Member (Real Property),** American Society of Appraisers

## FORMAL EDUCATION

- **School of Construction Technology –** Indiana University/Purdue University - Indianapolis (IUPUI)

## PROFESSIONAL EDUCATION

- Foundations of Real Estate Appraisal, Indiana University, 2003
- Appraising the Single Family Residence, Indiana University, 2003
- Standards of Professional Appraisal Practice, Indiana University, 2003
- Appraising 2-4 Family Residential Properties, Indiana University, 2003
- Introduction to Income Capitalization, Education Resource, 2004
- Basic Income Capitalization, Education Resource, 2005
- Analytics with the Site-To-Do-Business, Appraisal Institute, 2007
- 7-Hour USPAP Course, Access Education, 2007
- Indiana Appraisal laws & Regulations, Access Education, 2007
- Residential Lot Valuation, Education Resource, 2008
- Surveying & Legal Descriptions, Education Resource, 2008
- Assessment Procedures, Education Resource, 2008
- Psychology of Sales Comparison Analysis & Market Consistency, Ed. Resource, 2008
- Sales Comparison Design, Analysis & Adjustment, Education Resource, 2008
- 2010-2011 National USPAP Course, McKissock Education, 2010
- Indiana Appraisal laws & Regulations, McKissock Education, 2010
- Ad Valorem Tax Consultation, McKissock Education, 2010
- Continued Issues in Appraising, McKissock Education, 2010
- Private Appraisal Assignments, McKissock Education, 2010
- Statistics, Modeling and Finance, McKissock Education, 2011
- General Appraiser Site Analysis and Cost Approach, McKissock Education, 2011
- General Appraiser Sales Comparison Approach, McKissock Education, 2011
- General Appraiser Report Writing and Case Studies, McKissock Education, 2011
- General Appraiser Market Analysis and Highest & Best Use, McKissock Education, 2011
- General Appraiser Income Approach II, Appraisal Institute, 2011
- Personal Property Appraiser Certification, National Auctioneers Association, 2011
- 2012-2013 National USPAP Course, McKissock Education, 2011
- Business Practices and Ethics, Appraisal Institute, 2012
- Advanced Income Capitalization, Appraisal Institute, 2012
- Advanced Concepts & Case Studies, Appraisal Institute, 2012
- Uniform Appraisal Standards for Federal Land Acquisition, Appraisal Institute, 2012
- General Appraiser Report Writing and Case Studies, Appraisal Institute, 2013
- Advanced Market Analysis and Highest & Best Use, Appraisal Institute, 2013
- Quantitative Analysis, Appraisal Institute, 2013
- 2014-2015 National USPAP Course, McKissock Education, 2014
- Appraisal of Land Subject to Ground Leases, Mckissock Education, 2015
- 2016-2017 National USPAP Course, McKissock Education, 2016
- Appraisal of Assisted Living Facilities, McKissock Education, 2016
- Basic Hotel Appraising, McKissock Education, 2016
- Managing Appraiser Liability, McKissock Education, 2016
- Michigan License Law, McKissock Education, 2016

## APPRAISAL EXPERIENCE

- Single-Family Residential, Multi-Family Residential, Condominiums, Residential Small Income Producing Properties, Residential Lots, Agricultural Land, Vacant Commercial/Industrial Land, Single and Multi-Tenant Office, Single and Multi-Tenant Retail, Single and Multi-Tenant Industrial, Hotels, Mobile Home Parks, Automobile and RV Dealerships, Self-Storage Facilities, Churches/Worship Facilities, Schools, Funeral Homes, Cemeteries, and Crematories, Residential and Commercial Subdivisions, Farms, Conservation Easements, Special Use Properties (Landfills, Intermodal Facilities), and other real property types.

# APPRAISER'S LICENSES

**Indiana Professional Licensing Agency**
**Real Estate Appraiser Board**
402 West Washington St., Room W072, Indianapolis, IN 46204 (317) 234-3009

## Certified General Appraiser License

| License Number | Expiration Date | License Status |
|---|---|---|
| CG41100046 | 06/30/2018 | Active |

**Andrew Jeffery Bryant**
7328 River Birch Ln
Indianapolis IN 46236

*Michael R. Pence*
Michael R. Pence
Governor
State of Indiana

*Deborah J. Frye*
Deborah J. Frye
Executive Director
Indiana Professional Licensing Agency

## Louisiana Real Estate Appraisers Board

TEMPORARY REGISTRATION CERTIFICATION

Having complied with R.S. 1950, Title 37, Chapter 51, Subsection 3401.C. of the Louisiana Real Estate Appraisers Law, temporary registration to operate as a non-resident real estate appraiser in the state of Louisiana is hereby granted to:

**ANDREW J. BRYANT**

This registration for the appraisal assignment on the following real property shall remain in effect for a period not to exceed six months from issue date:

**2500 Highway 14, New Iberia, LA 70560,**
**1659 Highway 171, Stonewall, LA 71078, and**
**3041 Ryan Street, Lake Charles, LA 70605**

Temporary Certificate Number: 1878

Date Issued: November 17, 2017

Clayton Lipscomb, Chairman

# ENGAGEMENT LETTER – PAGE 1

BRYANT ASSET ADVISORS
Real Estate Appraisal & Consulting Services

11715 Fox Road, Suite 400-127
Indianapolis, IN 46236
Office: (317) 730-2423
Fax: (317) 663-1017
info@bryantassetadvisors.com
www.bryantassetadvisors.com

November 1, 2017

Lynda Scull, Owner
Tax Appraisal Group (TAG)
701 S. Howard Avenue
Suite 106260
Tampa, FL 33606

Leonard O. Abington
Calvin Jones
J&A of Louisiana, LLC
P.O. Box 294
Many, LA 71449

Re: **1665 Highway 171, Stonewall, LA**

Dear Ms. Sculi,

This letter serves as a formal proposal to determine the Bargain Sale Opinion of Value, based on IRS Publication 561, of the real property referenced above. Once signed by TAG, Appraisal Management Company, this letter will serve as a formal agreement to perform the assignment as outlined below.

The scope of this appraisal assignment will include: (1) inspection of the property, (2) collection of data concerning the subject property and available market date, (3) determination of the property's highest and best use, and (4) application of the three traditional approaches to value, per IRS Publication 561.

No attempt will be made to determine "sentimental," "book," "historic," or "investment" value. The report will be for the sole and private use of the client. Further, the appraisal may not be used for any other use, except as noted above. The assignment will be subject to the limiting conditions extraordinary assumptions and applicable hypothetical conditions all of which will be included within the final report. It is assumed, the property is in compliance with all applicable laws and regulations in regards to environmental concerns. A more detailed Scope of Work is available upon request.

We understand that in the performance of our work, we might have the opportunity to be privy to certain materials and communications and/or witness certain events in reference to this project and, hereby, agree to keep such information confidential. We will not communicate, publish nor otherwise utilize the findings without your explicit authorization.

# ENGAGEMENT LETTER – PAGE 2

*Leonard O. Abington*
*Calvin Jones*
*J&A of Louisiana, LLC*
*Page 2*

The fee for this service will be $5,000.00, inclusive of all expenses. We would anticipate report delivery no later than November 20, 2017, barring any unforeseen circumstances.

The fee shall apply to all work undertaken to derive a value estimate and prepare an Appraisal Report. For this fee, you will receive an electronic version of the appraisal (in PDF format), as well as one color original report.

The assignment will be prepared and conveyed in compliance with the Uniform Standards of Professional Appraisal Practice and performed by Andrew J. Bryant, MAI, ASA, MRICS, an Indiana Certified General Appraiser and Christopher D. Bryant, CCIM, ASA, MRICS, a California Certified General Appraiser, working with a temporary permit to practice in the State of Louisiana.

If this letter properly outlines the assignment and you agree to the terms and conditions, please sign below. Your signature and returning a copy of this letter to our office (by email, fax, or mail) is required to formally engage our services for this assignment.

If you have any questions or require further information, please do not hesitate to phone our office at (858) 243-8724, or you may fax us at (317) 863-1017.

**BRYANT ASSET ADVISORS**

Andrew J. Bryant, MAI, ASA, MRICS
Indiana Certified General Appraiser
Certification No: CG41100046

Christopher D. Bryant, CCIM, ASA, MRICS
California Certified General Appraiser
Certification No: AG044995

APPRAISAL MANAGEMENT APPROVAL (Per Purchase Agreement Section 4a):

Signature: ____________________ Date: November 1, 2017

Name: Lynda Scull Title: Owner

## ADDENDUM TO REAL ESTATE PURCHASE AGREEMENT

The undersigned parties to a Real Estate Purchase Agreement dated September 11, 2017 by and between Food Assistance, Inc., a 501(c)(3) organization incorporated under the laws of North Carolina, 102 Kirk Road, Greensboro, NC 27455 (Buyer) and J & A of Louisiana, LLC having its principal place of business at P.O. Box 294, Many, LA 71449 (Seller and/or Owner), for the purchase and sale of 1665 Hwy 171, Stonewall, LA 71078 (Property), hereby mutually agree to amend said agreement as follows:

- Buyer and Seller agree to amend the Purchase Price pursuant to Section 2 of the Real Estate Purchase Agreement from $100,000 00 to $28,182.00.
- Buyer and Seller agree to amend the expiration of the Inspection Period pursuant to Section 8)b of the Real Estate Purchase Agreement from October 26, 2017 to November 23, 2017, extending the Inspection Period by a period of twenty eight (28) calendar days.
- Buyer and Seller agree to amend the Broker's Free pursuant to Section 13 of the Real Estate Purchase Agreement to 4 5% of the Cash Equivalent with 1.5% to Welfont and 3% to Doug Abington.
- All other terms and conditions of the Real Estate Purchase Agreement are to remain the same.

**ACCEPTED & AGREED BY:**

| | |
|---|---|
| J & A of Louisiana LLC<br>By [signature]<br>By [signature] | [signature] |
| Authorized Signature of Seller | Authorized Signature of Buyer |
| Leonard G Abington<br>Calvin Jones | Jane Carlson |
| Printed Name of Signatory | Printed Name of Signatory |
| Members | Executive Director |
| Title | Title |
| 10-23-2017 | October 18, 2017 |
| Date | Date |
| J & A of Louisiana LLC | Food Assistance, Inc. |
| Legal Name of Seller (Owner) | Legal Name of Buyer |
| P.O. Box 294 | 102 Kirk Road |
| Many LA 71449 | Greensboro, NC 27455 |
| Address of Seller (Owner) | Address of Buyer |
| 318-256-4340 (Cell 318-471-2268) | 336-988-8899 |
| Phone Number of Seller | Phone Number of Buyer |

EXHIBIT "E"

# DeSoto Parish Recording Page

**Jeremy Evans**
**Clerk 42nd Jud. Dist.**
Post Office Box 1206
Mansfield, LA 71052-1206
(318) 872-3110

**First VENDOR**

J & A OF LOUISIANA LLC

**First VENDEE**

FOOD ASSISTANCE INC

**Index Type :** CONVEYANCES

**File Number :** 748690

**Type of Document :** CASH SALE DEED

**Book :** **Page :**

**Recording Pages :** 5

## Recorded Information

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for DeSoto Parish, Louisiana

Clerk of Court

On (Recorded Date) : 12/08/2017

At (Recorded Time) : 3:20:59PM

Doc ID - 004654530005

Do not Detach this Recording Page from Original Document

EXHIBIT "F"

tabbies

STATE OF LOUISIANA
PARISH OF DE SOTO

## CASH SALE DEED

BEFORE me, the undersigned authority, personally came and appeared:

J & A of Louisiana, LLC, a Louisiana limited liability company (XX-XXX 7967, represented herein by the undersigned duly authorized Member(s), with a mailing address of 1030 San Antonio Avenue, Many, Louisiana 71449 ("Vendor"),

who declared that Vendor does by these presents, GRANT, BARGAIN, SELL, CONVEY AND DELIVER, with full guarantee of title, and with complete transfer and subrogation of all rights and actions of warranty against all former proprietors of the property herein conveyed, together with all rights of prescription, whether acquisitive or liberative, to which Vendor may be entitled, unto:

Food Assistance, Inc., a North Carolina corporation (XX-XXX 3969), represented herein by the undersigned duly authorized officer, with a mailing address of 100 S Ashley Drive, Suite 1300, Tampa FL 33602 ("Vendee"),

the following described property, to-wit:

A certain tract of land containing 9.64 acres, or 420,114 square feet, more or less, located in Section 29, Township 15 North, Range 14 West of the Louisiana Prime Meridian, Northwestern Land District, Town of Stonewall, Desoto Parish, Louisiana and being more particularly described as follows:

Commencing at a found ½" iron rod at the southeast corner of Lot 2, Baldwin Acres Subdivision, as recorded in Conveyance Book 231, Page 337 of the records of Desoto Parish, Louisiana for the POINT OF BEGINNING of the tract herein described; thence proceed along the south line of said Lot 2 North 89° 02' 23" West a distance of 701.44 feet to a found ½" iron rod on the east right of way of US Highway 171; thence proceed along said right of way North 02° 25' 39" East a distance of 255.49 feet to a found 1" iron rod; thence leaving said right of way proceed South 89° 02' 23" East along the south line of a tract of land as described in Conveyance Book 1224, Page 634 of the records of Desoto Parish, Louisiana a distance of 442.26 feet to a found ½" iron pipe at the southeast corner of a 0.229 acre tract of land as described in said Conveyance Book 1224, Page 634; thence proceed North 02° 11' 46" East a distance of 89.53 feet to a found ½" iron pipe at the northeast corner of said 0.229 acre tract; thence leaving said tract proceed South 89° 02' 23" East a distance of 258.14 feet to a found ½" iron pipe on the East line of Lot 1 of said Baldwin Acres Subdivision, being 120.00 feet south of the northeast corner of said Lot 1; thence proceed along the east line of said Lot 1 North 02° 11' 46" East a distance of 120.00 feet to a found ½" iron pipe at the northeast corner of said Lot 1; thence leaving said subdivision proceed South 89° 31' 50" East a distance of 469.00 feet to a found ½" iron pipe; thence proceed South 02° 11' 46" West a distance of 465.00 feet to a found ½" iron pipe; thence proceed North 89° 31' 50" West a distance of 469.00 feet to the POINT OF BEGINNING, all as further shown on survey prepared by Kenneth D. Kent of Coyle Engineering Co. Inc., dated November 3, 2017 under job no. 217176., and being subject to the servitudes, easements and/or rights-of-way shown on said survey and any and all others of record or of use.

(the "Property")

SALE AAS IS@ WITHOUT WARRANTIES: Vendee acknowledges that the conveyance of the Property is specifically made "as-is", "where-is", and with all faults, without any representations or warranties, express or implied, including without limitation, any representations or warranties with

respect to the environmental condition of the Property, any implied warranties of fitness for any particular purpose or merchantability, or any other warranties whatsoever contained in or created by applicable law or otherwise.

**Vendee's Initials**

x ______ ____ ____

If Vendor owns any mineral rights, all rights and interests are conveyed without warranty. Neither United Title of Louisiana, Inc. nor the undersigned Notary Public warrant that a mineral examination has been performed upon the property.

**Vendor's Initials:** ____ ____ ____ ____

**Vendee's Initials:** x ______ ____ ____

Subject to any restrictions, easements or servitudes of record and any mineral grants, leases or reservations of record.

TO HAVE AND TO HOLD unto Vendee and Vendee's heirs, successors and assigns forever.

This sale is made for the consideration of the sum of ~~One Hundred Thousand and 00/100 Dollars ($100,000.00)~~ Twenty Eight Thousand One hundred Eighty two Dollars ($28,182.00) cash in hand paid, the receipt and sufficiency of which are hereby acknowledged.

The parties waive production of tax certificates and the Vendee agrees to pay the current year's taxes.

DONE AND PASSED in the presence of the undersigned competent witnesses and me, Notary, on this 4th day of **December 2017.**

WITNESSES:

J & A of Louisiana, LLC

______________________
By
Title

______________________
Printed Name Deana Daniels

x ______________________
Printed Name Judith A. Padson

Food Assistance, Inc.

x ______________________
By Jane Carlson
Title Executive Director

KIMBERLY R. DONNELLY NOTARY My Commission Expires 6/21/2021 PUBLIC GUILFORD COUNTY, NC

______________________
Notary Public, ID#__________
My Commission Expires With Life.

respect to the environmental condition of the Property, any implied warranties of fitness for any particular purpose or merchantability, or any other warranties whatsoever contained in or created by applicable law or otherwise.

**Vendee's Initials**

___ ___ ___ ___

If Vendor owns any mineral rights, all rights and interests are conveyed without warranty. Neither United Title of Louisiana, Inc. nor the undersigned Notary Public warrant that a mineral examination has been performed upon the property.

**Vendor's Initials:** JR CAJ ___ ___ **Vendee's Initials:** ___ ___ ___ ___

Subject to any restrictions, easements or servitudes of record and any mineral grants, leases or reservations of record.

TO HAVE AND TO HOLD unto Vendee and Vendee's heirs, successors and assigns forever.

This sale is made for the consideration of the sum of **Twenty Eight Thousand, One Hundred and Eighty Two Dollars** ($28,182.00) cash in hand paid, the receipt and sufficiency of which are hereby acknowledged.

The parties waive production of tax certificates and the Vendee agrees to pay the current year's taxes.

DONE AND PASSED in the presence of the undersigned competent witnesses and me, Notary, on this 4th day of **December 2017.**

WITNESSES:

Katie Clarke (signature)

Printed Name Katie Clarke

Erika Ross (signature)

Printed Name Erika Ross

J & A of Louisiana, LLC

(signature)

By Calvin Jones
Title ~~Owner~~ Member

J & A of Louisiana, LLC

(signature)

By Leonard Q. Abington
Title ~~Owner~~ Member

Food Assistance, Inc.

______________________

By
Title

Edith Duncan Williams (signature)
58189

File Number: 748690 Seq: 4

Notary Public, ID# 58189

My Commission Expires With Life.

American Land Title Association

ALTA Settlement Statement - Combined
Adopted 05-01-2015

File No./Escrow No.: 17-33916
Officer/Escrow Officer: Jessica Shoblom

Meridian Title Corporation
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
(312) 788-2653

Property Address: 1665 HWY 171
STONEWALL, LA 71078 (DE SOTO)

Borrower: FOOD ASSISTANCE, INC.

Seller: J & A OF LOUISIANA LLC

Settlement Date: 12/5/2017

| Seller Debit | Seller Credit | Description | Borrower Debit | Borrower Credit |
|---|---|---|---|---|
| | | **Deposits, Credits, Debits** | | |
| | $28,182.00 | Contract sales price | $28,182.00 | |
| | | Deposit or Earnest Money | | |
| | | Earnest money retained by The Welfont Group, LLC | | $5,000.00 |
| | | Disbursed as proceeds ($5,000.00) | | |
| | | **Prorations** | | |
| | $251.91 | 2017 Tax proration 12/5/2017 to 12/31/2018 | $251.91 | |
| | | **Payoffs** | | |
| $139,713.30 | | Payoff of first mortgage loan to Community Bank of Louisiana | | |
| | | **New Loans** | | |
| | | Principal amount of new loan | | $83,000.00 |
| | | **Title Charges** | | |
| $150.00 | | Owners ALTA 9 Endorsement(s) to Meridian Title Corporation | | |
| $1,000.00 | | Underwriting/Escrow Closing Fee to Meridian Title Corporation | $1,000.00 | |
| $191.80 | | Owner's title insurance to Meridian Title Corporation | | |
| | | Lender's title insurance to Meridian Title Corporation $307.00 | $307.00 | |
| $900.00 | | Search/Exam Commitment to Meridian Title Corporation $0.00 | | |
| | | Final Update to Meridian Title Corporation $50.00 | $50.00 | |
| | | **Government Recording and Transfer Charges** | | |
| | | Recording fees: Deed $150.00 | $150.00 | |
| | | Recording fees: Mortgage $250.00 | $250.00 | |
| | | Recording of Assignment to Meridian Title Corporation $150.00 | $150.00 | |
| | | E-Recording Fee to Meridian Title Corporation $100.00 | $100.00 | |
| | | **Additional Settlement Charges** | | |
| | | QCD prep to Meridian Title Corporation | $100.00 | |
| $3,677.94 | | 2017 Parish Taxes to Desoto Parish | | |
| $100.00 | | Transfer Deed prep to Meridian Title Corporation | | |
| $8,096.00 | | Commission to The Welfont Group, LLC | | |
| | | Survey to (NA) Coyle Engineering Co. Inc | $4,000.00 | |
| | | Phase I to BECC | $2,900.00 | |
| | | BECC Review to BECC | $340.00 | |
| $5,000.00 | | Appraisal to Bryant Asset Advisors, LLC | | |
| $1,000.00 | | TAG to Tax Appraisal Group | | |
| | | Commitment and Survey review to (NA) Randy A. Kirsch | $100.00 | |
| | | Lender cnsl legal fees to Trenam Law | $2,500.00 | |
| $16,191.93 | | Commission based on cash to Seller $593,731 x 0.03 to (NA) Sealy Real Estate Services, LLC | | |
| **Seller Debit** | **Seller Credit** | | **Borrower Debit** | **Borrower Credit** |
| $176,020.97 | $28,433.91 | Subtotals | $40,380.91 | $88,000.00 |
| | | Due To Borrower | $47,619.09 | |
| | $147,587.06 | Due From Seller | | |
| $176,020.97 | $176,020.97 | Totals | $88,000.00 | $88,000.00 |





EXHIBIT "G"

tabbies

**Acknowledgement**

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize Meridian Title Corporation to cause the funds to be disbursed in accordance with this statement.

| BORROWER(S) | SELLER(S) |
| --- | --- |
| FOOD ASSISTANCE, INC. | Leonard C. Abington, Owner 12-4-17 |
| | Calvin Jones, Owner 12-4-17 |

**Acknowledgement**

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize Meridian Title Corporation to cause the funds to be disbursed in accordance with this statement.

BORROWER(S)

FOOD ASSISTANCE, INC.

SELLER(S)

J & A OF LOUISIANA LLC

**Sandra Hardwick**

| | |
|---|---|
| **From:** | Andrew Bryant <bryantassetappraisals@yahoo.com> |
| **Sent:** | Tuesday, June 16, 2020 11:51 AM |
| **To:** | info@bryantassetadvisors.com; mike.mehaffey@welfont.com; Sandra Hardwick |
| **Cc:** | Doug Abington; Jerry Harper; Tom Simms |
| **Subject:** | Re: IRS phone conference |

Sandra,

Thank you for contacting me.

Have you reached out to Welfont on this? They have vastly more experience dealing with these matters than we do and would certainly need to be involved. It is my understanding that Welfont has been audited by the IRS. This has caused many or all of their dealings to come under scrutiny. The manner in which they structured these deals is in question as well as many of the non-profits.

I have been involved with several of these audits recently and the IRS reviewers and agents always contact me outside of the donor. This never happened in this case, but I would have been available to speak with them directly about the report.

Sincerely,

Andrew Bryant, MAI, ASA, IFAS
Bryant Asset Advisors, LLC
11715 Fox Road, Suite 400-127
Indianapolis, IN 46236
Phone: 317-730-2423
Fax: 317-863-1017
andrew@bryantassetadvisors.com
www.bryantassetadvisors.com

On Tuesday, June 16, 2020, 10:35:36 AM EDT, Sandra Hardwick <shardwick@cricpa.com> wrote:

Mr. Bryant, we have attempted several times by email and by certified letter to contact you about the appraisal you performed for J & A of Louisiana LLC on November 29, 2017.

The Internal Revenue Service has rejected your appraisal based on several issues. I sent you a copy of the position the IRS was taken by email on April 18, 2020, per your request to counter propose the issues. I have not heard from you.

I then emailed you on May 7, 2020, informing you that the IRS agent, Kay Peng, wanted to discuss your appraisal in a telephone conference. You have not responded to this request either.



tabbies EXHIBIT "H"

Please send any counter proposals that you have to the IRS' position on your appraisal **IMMEDIATELY**. We have today to either or argue the position that the IRS agent has taken. I have attached a copy of the IRS agent's position regarding your appraisal to this email.

Sandra Hardwick, CPA

Attachments available for 1 year and unlimited views / downloads.

Expires June 16, 2021

IRS position of denial of appraisal for charit...ion.pdf 412.4 KB

Download Attachments

**It Figures: The CRI Podcast is officially here! Subscribe on your favorite platform to listen to these free, 10 to 20-minute episodes hosted by CRI partners who work at the forefront of the accounting industry.**

**Sandra Hardwick,CPA**
Manager
Carr, Riggs & Ingram, LLC
1000 East Preston Avenue
Suite 200
Shreveport, LA 71105
Voice: 318-226-7124
Fax: 318-401-9290

CRIcpa.com

**************************************************************************************************
The information contained in this message may be privileged and confidential and protected from disclosure. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you. Carr, Riggs & Ingram, LLC